

DEPOSITION EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| KATHERINE THOMAS, individually, and as the administrator of the estate of CHRISTOPHER JEROME THOMAS; §§§§§§ Plaintiff, §§ v. §§§ DARREN MOODY, in his individual capacity; And CITY OF DOTHAN, ALABAMA; §§§§§ Defendants. §§ | CAFN: 1:13-cv-00920-WHA-SRW |

### RULE 26(a) REPORT – [Showing Typographical Corrections]

This report is written and furnished in accordance with the requirements specified in Federal Rules of Civil Procedure, Depositions and Discovery, Rule 26(a).

1.  **EXPERT.** My name is Steven D. Ashley.

2.  **QUALIFICATIONS.** This report is being provided based upon my personal and professional experience and knowledge of the law enforcement, corrections, and criminal justice fields, over the past 40 years and more. I am a retired, full-time law enforcement officer, formerly employed as a police officer, deputy sheriff, and law enforcement supervisor and trainer. As such, I have supervised and instructed law enforcement and corrections officers in the performance of their duties, to include arrest, restraints, use of force, motor vehicle operations, and the training of other criminal justice and municipal professionals.

    I have completed many law enforcement instructor certification courses, including firearms, defensive tactics, officer safety and survival, aerosol weapons, impact weapons, handcuffing, weapon retention and disarming techniques, conducted electrical weapons (i.e. TASER™), driving, and others. I teach law enforcement, corrections, and criminal justice courses at colleges, universities, civic organizations, and law enforcement agencies throughout the United States, and have been an invited presenter on a broad range of law enforcement and corrections topics at numerous state, national, and international conferences. Among the many topics I have taught are law enforcement and jail operations, policies and procedures, civil rights, arrest tactics, use of force and deadly force, use of force management, training management, law enforcement driving, conducted electrical weapons, law enforcement liability, and jail liability.

More specifically, I worked for 15 years as a professional law enforcement officer and trainer (across both the county and local levels), with approximately one-half of that time as a supervisor, field supervisor, and manager. Subsequently, I worked for 12 years as a full-time, professional risk manager, counseling municipalities and other government entities on managing the risks of employee injuries and litigation, particularly regarding law enforcement and jail operations.

As a risk manager, I have personally conducted more than 400 on-site risk management reviews of law enforcement agencies and detention facilities in more than seven states, critically examining many varied aspects of law enforcement and corrections operations and practices. Additionally, I have completed in-depth critical reviews of more than 500 law enforcement policy and procedure manuals from police agencies and jails in more than seven states, as well as numerous policy and manual reviews from other agencies across the United States. I have served on – as well as formulated, mentored, and managed – subject matter expert panels, the objective of which was the development of model policies and sample procedural guidelines for critical law enforcement and corrections operations.

I have attended more than 6,000 hours of law enforcement-related training, and have completed numerous use-of-force and police driving-related courses and instructor certification schools, as well as significant training in law enforcement management, policy development, training management, and risk management. I have been actively training police and corrections officers and trainers in firearms, use of force, driving, and other subjects since 1976, and have authored many articles on various law enforcement and criminal justice topics in numerous publications. During my service as a law enforcement trainer, I have personally delivered over 14,500 hours of training to more than 16,000 officers. Prior to my retirement, I was the Use of Force Coordinator, Chief Firearms - Use of Force Instructor, and Chief Driving Instructor for a college-based police academy, where one of my primary tasks was to train and certify use-of-force, firearms, and driving instructors. I am very familiar with and regularly train law enforcement and corrections officers in the use of force, the use of deadly force and non-lethal force implements, and agency policies and practices regarding such use.

I am a certified TASER™ Senior Master Instructor, and hold a Master Use of Force Instructor™ certification from the Police Policy Studies Council®, as well as a Master Force and Control Instructor™ certification from the Smith & Wesson Academy®. I am a Certified Force Science Analyst™, trained by the Force Science Institute®.

At this time, I am an independent law enforcement advisor, risk manager, and trainer. As such, I conduct risk assessments of law enforcement and jail operations for agencies throughout the United States. These assessments often include evaluations of existing policies and procedures, training, staffing, and physical conditions of facilities. In this capacity, I also provide recommendations and assistance where opportunities for improvement are indicated, and conduct staff training for peace officers and corrections personnel, as well as public sector managers.

My detailed Curriculum Vitae, including publications and prior cases, are provided as Exhibits I and II to this report.

3. **ANALYSIS PROTOCOL.** In preparation of this review and development of associated preliminary opinions, I have conducted an analysis of much of the documentation and data currently available, and analysis continues. A listing of documents and data received, reviewed, or considered, thus far, is provided in the attached Documents Received / Reviewed List as Exhibit III. These documents and other materials are of the type typically relied upon by consultants and experts when conducting analyses of law enforcement, corrections, and criminal justice issues, and have provided me with enough relevant data to develop my initial opinions to a reasonable degree of professional certainty.

In addition to my evaluation of documents and other materials, I rely upon my many years of experience, training, study, and teaching, in the law enforcement and corrections fields; consultation with peers; review of professional literature, and independent research; as well as my understanding of this case.

*Terminology.* Any opinions or statements that I make in this report that relate to legal terminology or standards are drawn from my training and experience as a criminal justice practitioner, manager, and trainer, as well as my experience and training as a researcher, governmental risk manager, and advisor. Use of specific legal terminology in this report is not intended to subvert the function of the Court, or to inappropriately influence the role of the Jury or other trier of fact. I use such terms in training that I present to police and corrections personnel, as they are commonly understood by criminal justice practitioners, and are typically used in daily operations by law enforcement and corrections professionals.

*Truth, Veracity, and Bias.* The following analysis is not intended to presume that any one version of the claims made in this case is more truthful than any other. Information drawn from various documents and other sources may be reported and contrasted for the purpose of relating events as they were perceived by those involved.

Where practical I rely upon undisputed facts, and attempt to indicate those that are disputed when appropriate. Where facts and evidence directly contradict statements and assertions of any party to this action, I attempt to point out the contradictions, and place them into context. Any assumption of truth or assignment of veracity by me is undertaken solely for the purpose of analysis and the rendering of opinion, and is not intended to usurp the role of the Jury or other trier of fact.

*Nature and Status of Opinions.* Some of the opinions that I have expressed in this report may list specific references to some of the case specific documents reviewed or considered. These listings are not intended to be all-inclusive, and I specifically reserve the right to supplement the support for each of the opinions in this report.

The opinions expressed in this report are not necessarily fully developed. Each opinion may be further developed and supported through research, investigation, or other means, during deposition or trial testimony.

In this report, I state my opinions based upon my understanding of the incident in question. That understanding is drawn from the documents and other information that is available to me as of this writing. Other documents and materials may yet be

discovered, disclosed, or provided.  As my review of documents continues, further discovery occurs, and/or other information becomes available, I reserve the right to modify, revise, extend, and/or affirm my opinions.

Within the scope of the information thus far received, and unless otherwise indicated, each of my opinions is held to a reasonable degree of professional certainty.

4. **OPINIONS AND ANALYSIS REQUESTED.** I was contacted regarding the provision of analysis and opinions in this case, by counsel for defendants Darren Moody and the City of Dothan.  Counsel provided me with documents and materials, and asked that I review and analyze them, for the purpose of developing opinions regarding the incident involving Christopher Jerome Thomas and officers of the Dothan Police Department on the date in question.

5. **BACKGROUND.** This action arises out of allegations regarding events that occurred in the City of Dothan, Alabama, on June 28, 2012, when Christopher Jerome Thomas was involved in an incident with officers of the Dothan Police Department.

6. **FACTS OR DATA CONSIDERED.** The following reflects my understanding of the incident that occurred on the date in question.  It is an amalgam of the various accounts, information, and perceptions, and is not intended to be an exhaustive recitation of events.

*The Attempted Traffic Stop and Pursuit.* On Thursday, June 28, 2012, Dothan Police Officers Darren Moody and Mitchell Murkerson were on patrol in the City of Dothan.[1]  Moody and Murkerson were in the vicinity of Blackshear Street and Powell Street[2] when Officer Moody observed a white Ford Explorer operated by an individual he recognized[3] and believed to be Johnny Jerome Hill. Because Moody knew there was an active Domestic Violence warrant outstanding for Hill,[4] Moody determined to follow and stop the vehicle, in order to ascertain that the driver was, in fact, Johnny Jerome Hill, as he believed.[5]

Officers Moody and Murkerson followed and caught up to the vehicle, activating their emergency lights in order to effectuate a traffic stop.[6][7]  The driver of the Explorer *"did not stop but instead accelerated the vehicle and turned north on Linden*

---

[1] Officer Moody was assigned as a Field Training Officer, or FTO. Officer Murkerson was a relatively new, probationary, employee, and was thus in the Field Training Program. Moody was assigned as his "FTO" on June 28, 2012.

[2] Dothan Police Department Offense Report, Case Number 1-12-013062, date occurred 06/28/2012, report dated 09/26/2014, page 12.

[3] Deposition Transcript of Darren Moody, dated 08/14/2014, page 61.

[4] Deposition Transcript of Darren Moody, dated 08/14/2014, pages 59-61.

[5] Dothan Police Department Offense Report, Case Number 1-12-013062, date occurred 06/28/2012, report dated 09/26/2014, page 12.

[6] Dothan Police Department Offense Report, Case Number 1-12-013062, date occurred 06/28/2012, report dated 09/26/2014, page 12.

[7] The "Lights Activated" indicator shown in Moody's DashCam video comes on approximately 17 seconds after Moody turns his car around and begins following the Hill vehicle, as Moody's patrol unit is turning from eastbound Chickasaw Street onto northbound Bell Street.

*St. "*[8] [9] Moody followed, with his emergency lights on, eventually utilizing his siren as well. A pursuit of Hill's vehicle continued, lasting an additional 109 seconds – or one minute and forty-nine seconds (1:49) – and ending in the parking lot of a shopping center colloquially known as "Suit City", with the shooting of the Explorer's driver, Christopher Thomas,[10] by Officer Moody.

Following the shooting, the Ford Explorer accelerated across the parking lot, striking a sign, then across Montgomery Highway, and through the wall of a business.[11]

*The Incident as Captured by Officer Moody's DashCam.*  The following sequence of events, and attendant timestamps, are drawn from Moody's DashCam video.[12] From the time that Officer Moody turned the patrol car around,[13] the path of both vehicles was north on Blackshear Street, then east (right) on Chickasaw ~~street~~Street,[14] where the *Lights Activated* indicator shows that the patrol car's emergency lights were turned on,[15] just prior to both vehicles turning north (left) on Bell ~~street~~Street. As the vehicles are turning west (left) onto Whiddon Street, the vehicle's siren is activated for a moment in the intersection.[16] Both vehicles turn north onto Linden Street, as officers are calling in that the vehicle is failing to yield, the vehicle's description, Hill's name, and warrant information.[17] Both vehicles turn west (left) onto Houston Street, and the patrol unit's siren activates immediately after the turn,[18] although the *Siren Activated* indicator is not working. At the first west bound intersection – Montana Street – the Explorer disregards the four-way stop, and passes immediately in front of a maroon vehicle coming from the right, southbound on Montana Street.[19] The maroon vehicle stops, and the patrol car passes across in front of it, as well.[20] Both vehicles turn north (right) onto Greentree Avenue,[21] and then – two blocks later – turn left into a shopping parking lot.[22]

Once in the lot, both vehicles drive along in front of the shops, in a westerly direction.[23] Vehicles and people can be seen in the area, and although the lot does not appear to be crowded, it also does not appear to be nearly empty.[24] Reaching the end

---

[8] Dothan Police Department Offense Report, Case Number 1-12-013062, date occurred 06/28/2012, report dated 09/26/2014, page 12.

[9] The video shows the intersection where this occurred as Chickasaw and Bell Streets.

[10] The actual driver of the fleeing Ford Explorer, whom Officer Moody had believed was Johnny Jerome Hill.

[11] Video File labeled *att in car video of responding officer.asf*, file date stamped 02/20/2014.

[12] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014.

[13] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:56:07.

[14] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:56:19.

[15] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:56:24.

[16] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:56:32.

[17] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:56:42.

[18] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:57:04.

[19] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:57:08.

[20] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:57:11.

[21] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:57:20

[22] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:57:37.

[23] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:57:42.

[24] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:57:43.

of the lot – where the shopping center forms an "L" to the north, the Explorer curves to the right, and – as a grey unmarked car operated by Investigator Ronald Hall pulls into his path[25] – the Explorer continues his right turn, missing the grey vehicle to its rear. The Explorer appears to swerve as it approaches, then passes, the grey vehicle.[26] The Explorer continues on what is essentially an "S" shaped route, continuing to curve to the right with tires smoking, back toward the shops, then reversing its curve,[27] and beginning to curve to the left, away from the shops, then back toward the street in front of the shopping center.[28] The Explorer continues its curved path to the left, winding its way through parked vehicles, until it encounters a parked vehicle in its path, whereupon the Explorer stops.[29] Less than two seconds later, Officers Moody and Murkerson stop their vehicle on the left, or driver's, side of the Explorer.[30] Although difficult to see exactly, it is clear that the vehicles are close together, and appear to be at a slight angle to each other, with the front fenders closer than the rear fenders.[31] The Explorer can be seen to reverse away from the vehicle in front of it, with tires squealing.[32]

The remaining activity occurs off camera, although the audio is recorded. There is a great deal of loud noise on the video recording at this point – including the patrol car's siren, set on the yelp tone – and through the noise Officer Moody can be heard yelling for the driver to *"Get out of the car, now"* and *"Stop the car...Stop the car."*[33] Then, five sounds that appear to be Moody's gunfire can be heard, with all five shots occurring within a second,[34] and without an appreciable break in the shot string.[35]

In the aftermath of the pursuit and shooting, officers learned that the driver of the vehicle was not Johnny Jerome Hill, but Christopher Jerome Thomas, who was deceased.

*The Perspective of Officer Moody.*   From the perspective of Officer Moody as reflected in his testimony, he believed that he had observed an individual known to him as Johnny Jerome Hill driving the Ford Explorer.[36] Knowing that there was an active Domestic Violence warrant out for Hill,[37] Officer Moody decided to stop the vehicle, so as to investigate and – if appropriate – arrest Hill. When he began

---

[25] The Hall vehicle is not seen on the video until Moody's patrol car makes the curve at the "L"; it is evident that Hall has just arrived, and can be seen beginning to open his car door. Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:57:47.

[26] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:57:49.

[27] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:57:54.

[28] Montgomery Highway.

[29] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:58:02.

[30] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:58:04.

[31] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014.

[32] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:58:06.

[33] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:58:09.

[34] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, first shot timestamp 3:58:12, fifth shot timestamp 3:58:13.

[35] To describe the cadence of the shot string, the first and second shots occur, then the next three shots occur more quickly, as if in a three shot burst.

[36] Deposition Transcript of Darren Moody, dated 08/14/2014, page 59.

[37] Deposition Transcript of Darren Moody, dated 08/14/2014, pages 60-61.

following the vehicle, Hill sped away, and failed to yield to the patrol car's emergency lights. After following the vehicle for approximately six blocks – with his emergency lights activated – Moody activated his siren, but Hill continued to flee. During this time, Moody and Murkerson called in a vehicle description, provided the name of the fleeing suspect (Johnny Jerome Hill), and notified dispatch that there was a warrant out for Hill. When asked, Moody testified that he did so in order to confirm that the warrant was still active.[38] They also phonetically called in the license plate number of the Ford Explorer,[39] which was *5A64N54*.[40]

During his flight, Officers Moody and Murkerson observed numerous traffic violations, including excessive speed, and Hill's failure to stop at numerous controlled intersections,[41] including a four-way stop at Houston and Montana Streets, where a southbound vehicle had to stop suddenly to avoid hitting the Hill vehicle. When asked if, at that point, the suspect's conduct made it [the pursuit] unreasonably hazardous to the safety of the public, Moody testified that *"at the point the pursuit started, it wasn't unreasonably hazardous. As the pursuit went on ... yes, the pursuit was escalating, and yes, he's driving more aggressively."*[42] Moody also testified that *"To me it wasn't to the hazardous point where, okay, we need to terminate this pursuit."*[43]

Moody observed Hill's vehicle speed recklessly through the shopping center parking lot, even though there were vehicles and pedestrians in the area. When asked, Moody testified that the point at which [his or] Christopher Thomas' conduct [became] unreasonably hazardous to the public, was *"When we got to the parking lot of suit city [sic]."*[44] Officer Moody also believed that Hill swerved near an unmarked police vehicle in an attempt to hit the vehicle, as he called in on the radio during the pursuit in the parking lot.[45]

Once the vehicle came to a stop, as Officer Moody was exiting his vehicle, he saw Hill's vehicle suddenly reverse and strike a parked vehicle. Moody heard Hill's engine racing, but – due to the seriousness of the impact with the parked vehicle, Moody believed that the vehicle was immobilized, and that the chase was over.[46]

Moody testified that he moved around to the rear of his patrol car, and after the fleeing driver reversed into the parked car, he moved toward the front of the crashed vehicle.[47] In his statement that is included in the Dothan Police report of the incident, Moody stated that:

---

[38] Deposition Transcript of Darren Moody, dated 08/14/2014, page 78.
[39] Deposition Transcript of Darren Moody, dated 08/14/2014, page 79.
[40] Deposition Transcript of Darren Moody, dated 08/14/2014, page 79.
[41] Deposition Transcript of Darren Moody, dated 08/14/2014, page 98.
[42] Deposition Transcript of Darren Moody, dated 08/14/2014, page 99.
[43] Deposition Transcript of Darren Moody, dated 08/14/2014, page 100.
[44] Deposition Transcript of Darren Moody, dated 08/14/2014, page 100.
[45] Video File labeled *att in car video pursuit.asf*, file date stamped 10/02/2014, timestamp 3:57:52.
[46] Deposition Transcript of Darren Moody, dated 08/14/2014, pages 118-119.
[47] Deposition Transcript of Darren Moody, dated 08/14/2014, pages 116-117.

>  *"As I continued to approach the drivers [sic] side front of the vehicle Thomas*
>  *was driving the vehicle suddenly and rapidly accelerated towards me.*
>  *Because I was standing in front of the vehicle and the vehicle was coming at*
>  *my quickly I became in fear for my life and safety and the safety of Inv. Hall*
>  *and PPO Murkerson, who I knew were standing somewhere behind me. As I*
>  *stepped to the right to avoid being struck by the vehicle I fired my weapon at*
>  *Thomas to stop his attempt to strike me with his vehicle."*[48]

Officer Moody testified that he was prepared for a foot chase when he stepped toward the front of the Explorer[.] *"And then in that split second, the car was coming right at me ... I stepped slightly to my right and I fired."*[49]

7. **INCIDENT INFORMATION FOCUS.** Of all the information reviewed regarding this incident, I particularly focus the reviewers of this report on the following items, not as a finite listing, but rather as a guide to further understanding some of what happened during the incident, and why I hold the opinions that I do. These individual points speak to the pursuit, the shooting, or both.

- This incident occurred during daylight hours, at approximately 4 pm, on a day free of inclement weather. As seen on the video, visibility appears good.

- Traffic is light during the pursuit; four vehicles are encountered, other than the vehicle at Montana and Houston Streets.[50] There are no evident collisions as a result of the pursuit, and no reported injuries.

- The fleeing vehicle does fail to stop at several controlled intersections, and is apparently speeding through residential streets, generally moving at between 30 and 50 miles per hour.

- No pedestrians are in evidence until the pursuit enters the Suit City parking lot.

- Throughout the pursuit, Moody believes that he is chasing Johnny Jerome Hill, and that there is a warrant for Hill.

- The exact point at which Officer Moody realized that the Ford Explorer was not being operated by Hill, but by someone else, is not clear.[51] However, because Moody knew that the warrant for Hill was for a misdemeanor, at the point he fired shots at the driver of the Explorer, the mistaken identity – and the warrant – was arguably not a factor in Moody's decision-making regarding the use of force. It does not appear that Moody shot Christopher

---

[48] Dothan Police Department Offense Report, Case Number 1-12-013062, date occurred 06/28/2012, report dated 09/26/2014, page 13.

[49] Deposition Transcript of Darren Moody, dated 08/14/2014, page 124.

[50] One oncoming vehicle pulls over to the right before the pursuit reaches him, one oncoming vehicle passes the pursuit normally, one vehicle is stopped at an intersection as the pursuit turns onto Greentree, and one vehicle – moving in the same direction as the pursuit – is passed on the left.

[51] For this reason, this report refers to ~~the cooperater~~ the operator of the Ford Explorer as Johnny Jerome Hill (or Hill) throughout the pursuit, since – from Moody's perspective – that is who was driving the Explorer, and that undoubtedly colored his perception of events as they unfolded.

Thomas because he had – or Moody thought he had – a misdemeanor warrant out for him. All of Moody's statements regarding his rationale for shooting Thomas are related to the risk posed to himself, other officers, and third parties, if the operator of the fleeing Ford Explorer is was not stopped, and prevented from continuing his increasingly reckless flight to evade arrest.

- Hill's driving appears to be increasingly aggressive, and – in Moody's mind – is escalating. However, in viewing the video, the behavior exhibited by the fleeing vehicle appears generally consistent, turning corners rapidly, without heeding traffic control devices; accelerating toward the next turn, then braking for the corner, before the pattern repeats. This apparent consistency illustrates the potential danger of the pursuit, thus the need to stop the fleeing vehicle from continuing, while underscoring Moody's point that – although reckless and dangerous – the pursuit had not risen to the level or of unreasonable, unacceptable, risk to the public. Consider the following:

    - A review of the Dothan Police Department's policy on police pursuits[52] reveals that written departmental procedural guidelines do not authorize traffic pursuits for fleeing misdemeanant suspects.

    - However, although Moody testified that the pursuit was not yet unreasonably hazardous to uninvolved individuals, he did perceive that the driving of Hill was increasingly aggressive, which increased his felt desire to continue the pursuit, so as to arrest the fleeing driver, and stop him from further dangerous driving.

- Officer Moody testified that, while in the parking lot, he heard Jamie Henderson broadcast that the warrant for Hill was a felony warrant. Further, Moody testified that he did not know the warrant was for a felony, but that if Henderson had secured a felony warrant, he considered that sound information.[53]

- Regarding the issue of whether Moody knew – or believed – that there was a felony warrant out for Hill, I note that the transcript of Primary Radio Traffic that appears in the Dothan Police report of the incident, contains the lines:

    - MM:  Coming up on Montgomery Highway. Turning in the parking lot of suit city.

    - MM:  Continuing through the parking lot.

    - SL:  Advise the reason for 10-99.

    - JH:  I believe it's a three fox trot. Signal 15.

---

[52] Dothan Police Department, General Order 200-40H, *Vehicle Operations*, labeled Plaintiff's Exhibit 14, date is redacted.
[53] Deposition Transcript of Darren Moody, dated 08/14/2014, page 120.

    &ndash;  DM: 857. Shots fired. Shots fired. 857. Shots fired. Subject's trapped in (unintelligible) sign designs.[54]

These lines seem to indicate that information was conveyed over the radio that the warrant (10-99) was for a felony (fox trot).

However, the lines broadcast from SL (Scott Long) and JH (Jamie Henderson) regarding a felony warrant are not heard on the video recording of the pursuit. And several passages of radio traffic that are heard on the video recording do not appear in the radio transcript.

- There is some dispute regarding the exact placement of vehicles, and Moody's positioning to them – particularly where it was physically possible for ~~moody~~ Moody to move to the front of the Explorer after it reversed and crashed into the vehicle behind it. Some of the discrepancy can be traced to the nature of the event, including the fact that the principal vehicle and suspect left the actual scene before being photographed in place. Some discrepancy can be attributed to the way the scene was processed. But much of the apparent discrepancy results from the use of guesses, estimates, and other vague statements regarding time and distance that were placed on the record by Officer Moody, during depositions and statements. Some of the specific details in the record do not match even a cursory viewing of the pursuit video (e.g., Moody testified that he fired two groups of two shots with a pause in the middle.[55] When pressed, he testified that the pause was "less than half a second"[56] In reality, listening to the video recording, one ~~tell~~ can hear five shot<u>s</u>, with no discernible <u>pause.)</u>. There are other<u>s</u> estimates and guesses that are then picked up by others, and used to calculate distances and speeds, using a perfectly legitimate formula for doing so.[57] However, because the data is flawed, the results are flawed.

- There are numerous witness statements in the record regarding the end of the pursuit, and the shooting of Christopher Thomas by Officer Moody. Without an exhaustive recitation of these statements, I note the following:

    &ndash;  There are statements from two officers that are of note; Moody's partner and field trainee, Mitchell Murkerson, and Investigator Ronald Hall.

        &#9642;  Both officers saw the Explorer stop, with Moody and Murkerson's patrol car on the driver's side of the Explorer.

---

[54] Dothan Police Department Offense Report, Case Number 1-12-013062, date occurred 06/28/2012, report dated 09/26/2014, pages 26-27.

[55] Deposition Transcript of Darren Moody, dated 08/14/2014, page 126.

[56] Deposition Transcript of Darren Moody, dated 08/14/2014, page 127.

[57] Vehicle velocity in feet per second is calculated by multiplying the speed in miles per hour by 1.47 (1.47 equals 5,280/3,600, or the number of feet in a mile divided by the number of seconds in an hour). *Traffic Accident Investigation Manual*, J. Stannard Baker, The Traffic Institute, 1976.

- Both officers saw the Explorer reverse quickly and crash into the vehicle behind it.

- Both officers saw Officer Moody at the side of the Explorer, just before he fired at the driver.

- Neither officer saw Officer Moody in front of – or near the front of – the Explorer.

  - Hall was looking down, trying to remove his TASER from his unmounted holster. By the time he looked ~~upo~~up, Moody was at the driver's window area.

  - Murkerson was somewhere in the process of "immediately" getting out of the patrol car, after the Explorer reversed, thereby clearing his door, so that he could open it. By the time he did so, Moody was already alongside the Explorer.

- Investigator Hall had been at right-angles to the Explorer before it reversed, and Officer Murkerson had been pinned in his patrol car by the close proximity of the Explorer. In both cases, once the Explorer reversed, Hall and Murkerson were in front of the Explorer, and therefore in jeopardy if and when the Explorer surged forward.

– Most of the statements from non-police personnel, i.e. third party observers, were proffered by observers that were at, near, or inside, one of the shops in the shopping center. Most seem to have been in the near vicinity of a barber shop. This placed the observers some unknown distance away from the actual shooting scene, across part of the parking lot. All of these witnesses were farther from the scene than the officers, and all of the officers were farther from the scene than Officer Moody. Regarding these statements, I note the following;

- Some of the statements support aspects of Officer Moody's account of events, in greater or lesser part.

- Many of the statements contradict aspects of Officer Moody's account of events, in greater or lesser part.

- Many of the statements indicate, with certainty, that Moody fired four shots.

- Many of the witness statements – especially those that contradict Officer Moody's version of events – are proffered by witnesses that are either related to Christopher Thomas in some way, or long-time friends of Thomas or his family. At least one witness stated that he had grown up with Thomas.

8. **ANALYSIS.** The following analysis of the use of force by Dothan Police Officer Darren Moody in the incident described *supra* is undertaken through application of commonly applied training criteria as they are presented throughout the law

enforcement and criminal justice community. Utilization of specific terminology – including legal terminology – is intended to clarify the relationship between this analysis and a broader criminal justice training and policy context, and is not intended to subvert the function of the Court, or to inappropriately influence the role of the jury or other trier of fact.

The following analysis is not intended to presume that any one version of the claims made in this case is more truthful than any other.  Any assumption of truth or assignment of veracity by me is undertaken solely for the purpose of analysis and the rendering of opinion, and is not intended to usurp the role of the Jury or other trier of fact.

The following discussion of case law reflects what I, as well as most other law enforcement use of force trainers, have been researching, analyzing, and teaching for many years. As the material is taught to officers, it is framed from an informed lay-person's perspective, with the goal of having officers understand the practical application of the criteria that courts will generally hold them to, based on existing case law. This approach – by me, as well as many (if not most) other use of force trainers – is geared to inculcate into officers a deep appreciation and understanding of the rationale applied when use of force incidents are reviewed for justification.

Regarding the use of force by Officer Darren Moody during this incident, law enforcement officers are trained, and know, that their use of force is evaluated from the perspective of the Fourth Amendment to the United States Constitution.  They are also trained, and know, that the standard of conduct they must meet is one of objective reasonableness.[58]

Reasonable law enforcement officers are trained, and know, that whether or not a particular use of force application was objectively reasonable under the Fourth Amendment is based upon an analysis of that use of force in light of three factors, among others:[59]

- *The degree to which a subject poses an immediate threat to the safety of the officers or others;*

- *Whether the subject is actively resisting arrest or attempting to evade arrest by flight;*

- *The severity of the crime at issue.*[60]

Officers are trained, and know, that in applying these criteria, the U. S. Supreme Court reiterated its earlier statement in *Bell v. Wolfish*,[61] that *"the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."*[62]  Officers are trained, and know, that this analysis is

---

[58] *Graham v. Connor*, 490 U.S. 386 (1989).

[59] These factors are cited here, not as originally listed in the *Graham* case, but as they have been reordered in importance by Graham's progeny, most notably *Chew v. Gates*, 27 F.3d 1432 (9CA, 1994).

[60] *Graham*, 490 U.S. at 396.

[61] *Bell v. Wolfish*, 441 U.S. 520 (1979).

[62] *Graham*, 490 U.S. at 396, citing *Bell v. Wolfish*, 441 U.S. at 559.

properly conducted *"from the perspective of a reasonable officer on the scene, rather than with the 20-20 vision of hindsight"*[63] and is properly analyzed in light of the *"totality of the circumstances"* facing the officer.[64] Officers are further trained, and know, that – beyond the above factors – courts will consider the degree to which a given situation is *"tense, uncertain, and rapidly evolving"*[65] when determining the reasonableness of a particular use of force.

In this particular incident, Officer Darren Moody used deadly force in response to what he perceived – in the moment – as an on-going, lethal threat to himself, Officer Murkerson, Investigator Hall, and other people in the immediate vicinity. In this case, the decision to utilize deadly force as a control option was based on information that Darren Moody had perceived in real-time. In the context of *Graham*, Moody was the reasonable officer on the scene, and his perspective was colored by on-going and dynamic events that were occurring around him. To a great extent, the incident was tense, uncertain, and rapidly evolving.

With respect to the individual *Graham* factors, and without reiterating all of the previous incident information:

- The severity of the crime at issue was high, as Moody perceived that the operator of the Ford Explorer was undertaking an aggressive assault upon himself and other officers, and was demonstrating that he ~~continued~~ intended to continue his assaultive behavior by:

    o Ignoring Moody's commands to stop;

    o Ramming the parked vehicle behind him;

    o Revving his engine to high RPM as he began to move forward, or, at least, to shift his transmission from Reverse to Drive.

- In this incident, the driver of the Explorer was actively resisting arrest by refusing the orders of Officer Moody, and attempted to continue to evade arrest by flight.

- In this incident, the operator of the Ford Explorer posed an immediate threat to the safety of Officer Moody and others.

- Finally, in considering the degree to which this incident was tense, uncertain, and rapidly evolving, it's difficult to conceive of an incident that is more so. A pursuit involving speeding through neighborhoods, ignoring controlled intersections, and driving wildly through a parking lot wherein there are people and vehicles, during the business day. Ignoring a police officer's commands to stop, and to exit the vehicle, while being held at gunpoint by said officer. Instead of complying, choosing to ram a vehicle, and then to rev an engine in an apparent attempt to drive forward – possibly to continue the pursuit – and seemingly intending to do so in a direction that would expose

---

[63] *Graham*, 490 U.S. at 396.

[64] *Graham*, 490 U.S. at 396, citing *Tennessee v. Garner*, 471 U.S. at 8-9.

[65] *Graham*, 490 U.S. at 396-397.

several police officers to death or serious injury as a result of one's continued attempt to escape.

9. **OBSERVATIONS & OPINIONS.** Based on the items outlined above, as well as my general understanding of the case, I hold the following opinions:

- *Opinion Statements Regarding the Vehicular Pursuit.* It is my opinion, to a reasonable degree of professional certainty, that the driving behavior of Officer Darren Moody during the pursuit was not atypical for police in chases, and did not appear to be that different from typical officer behavior under similar circumstances. It is also my opinion that Officer Moody's driving manifested many of the elements that I, and many other, police driving trainers have long taught, such as the maintenance of a proper and safe interval from the suspect vehicle, broadcasting a stream of information regarding the pursuit, maintaining control of the patrol vehicle during a time of significant stress, remaining calm while driving the patrol vehicle, and use of proper emergency warning equipment during the pursuit.

  Further, it is my opinion, to a reasonable degree of professional certainty, that other reasonable police officers, similarly trained, and faced with the same or similar circumstances, would have believed that the conduct and actions of Officer Darren Moody were lawful, and could have taken the same or substantially similar actions as those taken by Officer Darren Moody.

  Finally, it is my opinion, to a reasonable degree of professional certainty, that whether or not the actions of Officer Darren Moody in conducting the vehicular pursuit of the Ford Explorer were contrary to the written procedural guidelines of the Dothan Police Department is a matter that is open to interpretation, based on an evaluation of the exigencies of the particular incident. It is also my opinion that such an interpretation – absent egregious conduct on the part of the officer, or a proximate, causal, relationship between the purported procedural abnormality and harm or injury resulting from the procedural abnormality – is the province of the Chief of Police or his designee. Such analyses, interpretations, and – if necessary – corrective actions, are most frequently managed as an internal matter, for the purpose of employee performance improvement, or sometimes as a training or disciplinary measure.

- *Opinion Statements Regarding the Use of Force by Officer Darren Moody.* It is my opinion, to a reasonable degree of professional certainty, that the use of force by Officer Darren Moody in shooting Christopher Thomas, was based on Officer Moody's perception that:

  o He – Moody – was at risk of death or serious bodily harm from the Ford Explorer, due to his close proximity to the vehicle as he perceived that it was revving and beginning to move forward.

  o The distances between the vehicles, the exact point at which Moody was standing – or how he was moving – were such that, in Moody's

mind, the movement of the Explorer put him at great risk, as he testified.

o   Other officers – as Moody stated, Hall and Murkerson – were <u>put</u> at risk by the vehicle's movements also, as Moody knew they were behind him somewhere, but he did not know precisely where.

o   During the pursuit through the parking lot, the Explorer had placed pedestrians and onlookers at risk due to the recklessness with which it was operated.

o   The Explorer had attempted – in Moody's perception – to *"ram an unmarked"* as he broadcast during the pursuit.

It is also my opinion, to a reasonable degree of professional certainty, that a trained and experienced officer such as Darren Moody could reasonably conclude that the actions of Christopher Thomas posed a significant risk of death or serious injury to himself and the other police officers in the immediate vicinity of the Ford Explorer, as well as any other individuals that might cross the vehicle's path, should it surge forward and continue its reckless operation.

Further, it is my opinion, to a reasonable degree of professional certainty, that police officers such as Darren Moody, who do so conclude, would likely determine to act to stop, or at least to mitigate, such a threat to themselves and others, and that it would be reasonable for them to do so, considering their training, their experience, and their oath of office. Given the paucity of practical alternatives available within an extremely short time frame, I believe it is logical and reasonable to conclude that many of those officers, faced with the same or a substantially similar situation as that faced by Officer Darren Moody, would likely act in the same, or a similar way as Officer Darren Moody did. This incident seems to be a textbook example of a situation that is tense, uncertain, and rapidly evolving.

Finally, it is my opinion, to a reasonable degree of professional certainty, that other reasonable police officers, similarly trained, and faced with the same or similar circumstances, would have believed that the conduct and actions of Officer Darren Moody in using force against Christopher Thomas were lawful, and could have taken the same or substantially similar actions as those taken by Officer Darren Moody.

10.  <u>COMMENTS REGARDING OFFICER DARREN MOODY'S PROFESSIONAL HISTORY AND BACKGROUND.</u>

There are numerous allegations and accusations threaded throughout this case regarding Officer Moody's personal and professional history, and the effect that ~~is~~-<u>it</u> should have had on the decision by the City of Dothan to hire him as a police officer.

Many of these allegations date from the mid-1990s, or roughly 15 years prior to the instant case. Much of the material pertaining to these allegations and accusations ~~are~~ <u>is</u> of a personal nature, while ~~others~~-<u>other events</u> are alleged to have occurred in some way that is related to Officer Moody's professional life at a different police agency, in

a different state. Whether the allegations are true or not is not something I was asked to opine on.

I choose to not review these allegations and accusations here, as they seem irrelevant to an analysis of Officer Moody's specific actions in this specific case, other than in a pejorative, sensational, and titillating way.

However, I do note – for the record – the following:

- Many of the allegations are unsubstantiated, but seem to have been added to the file for the purpose of piling on, to build a case of moral turpitude.

- In some of the accusations, the accusers opted to not move forward with their accusations, for whatever reason.

- Officer Moody was, at one point, criminally charged. However, he was acquitted.

- Moody was not – and has not – been convicted of a crime.

- Vague accusations of impropriety based on differently perceived and forgotten answers to questions on forms filled out over 20 years prior to the instant case, seem particularly irrelevant.

- Officer Moody resigned his position at his previous department, following disclosure that the Chief there had recommended Moody's termination. This has been cast as "he quit, because he was going to be fired". However, along with his voluntary separation, the department paid him for several benefits – to the tune of several thousand dollars – which he probably would not have gotten if they just outright fired him. This seems an illogical step for a department and city to take if they are confident in their ability to terminate someone.

- After all of this, the Florida Department of Law Enforcement (FDLE) chose to not de-certify Officer Moody,

- Moody tried – unsuccessfully – to gain other police employment in the State of Florida, but was unable to do so. He worked productively at other jobs during the five years he was out of police work.

- In 2008, after an a review of his professional and personal history – conducted as part of his pre-employment background investigation – Moody was hired by the Dothan Police Department. At DPD, he was eventually so successful as an officer, that the department selected him as a Field Training Officer, or FTO. This is a rare honor, as all officers know. Selection and appointment as an FTO is seen as the fast track to promotion for a department's best officers. FTOs are the senior officers that train the brand new officers. As a former FTO Supervisor and Manager, as well as a trainer of new FTOs, I personally know how challenging being an FTO can be. That Dothan chose Moody as an FTO speaks volumes.

Finally, I also note that Officer Darren Moody's pursuit, and subsequent shooting, of Christopher Thomas, was investigated by both the Dothan Police Department, and the

Alabama Bureau of Investigation. The case was submitted to a Grand Jury by the Prosecuting Attorney. After their investigation, the Grand Jury returned a No Bill, and Officer Darren Moody was not criminally charged in the shooting of Christopher Thomas.

11. QUALIFICATIONS OF EXPERT.

   a. See Section 2 above and attached Exhibit I (Curriculum Vitae) which contains a list of publications that I have authored or coauthored.

   b. Exhibit II is a listing of cases in which I have offered testimony at deposition, hearing, or trial.

   c. Compensation for Study and Analysis. I am compensated at a rate of $150.00 per hour for study, review, and analysis, and $200.00 per hour for testimony. My Fee Schedule is attached, as Exhibit IV.

_____   10/28/2014
STEVEN D. ASHLEY                DATE

Attachments:

Exhibit I – Curriculum Vitae of Steven D. Ashley
Exhibit II – Prior Testimony
Exhibit III – Documents Received / Reviewed List
Exhibit IV – Fee Schedule