

**RONALD R. SCOTT, M.A., M.S.**
Forensic Firearms & Ballistics
37881 N. 10th Street
Phoenix, Arizona  85086

**623.764.6371**

*www.azballistics.com*
*www.forensic-ballistics.com*
*ronaldscott@azballistics.com*

---

*Firearms ▪ Ballistics ▪ Police Shootings ▪ Shooting Reconstruction & Investigations*
*Toolmarks & Comparison Microscopy ▪ Dynamics of Shooting Incidents ▪ Crime Scenes ▪ Gunshot*
*Distance ▪ Daubert Consultation ▪ Gunshot Wounds ▪ Hunting & Firearms Safety ▪ Trajectory Analysis*

August 27, 2014

Mario Williams, Esq.
Williams Oinonen, LLC.                    Re:     Fatal shooting of Christopher Thomas
Grant Building                                        (Thomas v Moody)
44 Broad Street Suite 200
Atlanta, GA 30303

The following constitutes my report in the above case.

### 1.    Purpose

The purpose of my involvement in this case is to conduct an independent and objective review of evidence and circumstances related to the fatal shooting of Christopher Jerome Thomas by Officer Darren Moody of the Dothan Police Department, Dothan, AL., which occurred on June 28, 2012 at approximately 1600 hours (4:00 PM).

The scope of my investigation is related to firearms, ballistics, shooting reconstruction, shooting incident dynamics and any related factors.

### 2.    Credibility of Facts and/or Witnesses.

It is to be understood that the credibility of facts or witnesses alleged as true in any case is determined by the finder of fact.

### 3.    Qualifications.

I am a 25-year plus retired Commissioned Officer of the Massachusetts State Police with over half my career in the MSP Ballistics Section and was the Commanding Officer of the main and sub-labs with 7 forensic examiners; I conducted, supervised, and trained personnel in forensic investigations,

1

shooting reconstruction, and the dynamics involved in shooting incidences. I have also conducted criminal investigations related to shooting incidences and other crimes. The lab provided crime scene investigation and forensic examination services to 350 cities and towns, all State agencies, all Federal agencies except the FBI, and the military services in Massachusetts.

I was appointed a member of the MSP Firearms Review Board which evaluated departmental officer involved shooting incidences. As a member of the Staff Inspections Unit, I conducted agency shooting investigations, claims of excessive force and/or police misconduct, and violations of Policy & Procedure and Rules & Regulations.

I have investigated over 325 police involved shootings including incidents of friendly fire and involuntary accidental discharge.

I have been the lead investigator, supervisor, or assisted at over 700 fatal and non-fatal shooting incident scenes, hundreds of non-injury incidents and been directly involved in approximately 2000 forensic examinations.

I have testified as an expert witness approximately 280 times in the areas of firearms, ballistics, shooting reconstruction, and their dynamics at all levels of the court system including Federal Court and Military Hearings. Testimony has been given before the Massachusetts Legislature and consultation provided to Massachusetts Congressmen to assist with legislative issues.

U.S. Army active duty career was within the Ordnance Corps and included extensive training and assignment in the testing, evaluation, repair and research of small arms and training in Explosive Ordnance Reconnaissance. I attended both the 8-week U.S. Army Ordnance School at Ft. Dix and the 6-week Small Arms Repair Course, at Aberdeen Proving Ground, MD.

In 2002 I started my current practice in independent forensic consulting and provide professional services both nationally and internationally.

My forensic training, education, and experience are over 34 years, and my overall experience with firearms, ballistics, etc., is over 50 years.

I am a member of several professional organizations.

4.      **Source Materials.**

   A. Alabama Public Safety Report 20140220-140707_8C-0485-96-2012. (140 pages)

   B. VTS_01_1_002-Officer Murkerson Video Interview.

   C. Photo Log.pdf

   D. 34 images of Ford Explorer.

   E. Interview of Officer Mitchell Murkerson

   F. Officer Darren Moody statements and audio interview.

2

G. Officer Ronald Hall Statement.

H. Eight /8/ additional photos of Ford Explorer.

I. Photos in .pdf format selected from photo log sheet.

J. Autopsy Report.

K. Crime Scene Entry Log.

L. Dothan PD Investigation Report. (20 pages)

M. Alabama Dept of Public Safety Crime Scene Drawing.

N. Measurements of Ford Explorer Driver Window.

O. 1999 Ford Explorer Specifications

P. Dashboard video cam recording from Officer Moody's cruiser.

Q. Dashboard video cam recording from unknown responding officer's cruiser.

R. Deposition of Mr. Derrick Edwards.

S. Plaintiff Exhibits 19 & 20 from Deposition of Officer Moody.

## 5.   **Overview of Incident.**

Officer Darren Moody mistakenly identified the operator of a 1999 White Ford Explorer which passed his location as being a suspect for whom warrants were purportedly outstanding.

Officer Moody was accompanied in the cruiser by Officer Mitchell Murkerson, a probationary police officer. Officer Moody pursued the Ford Explorer into a parking lot and Officer Moody pulled up parallel along the driver side of the stopped Ford Explorer. The proximity was so close that Officer Murkerson reports that he could not exit the cruiser passenger door.

According to Officer Moody, he exited the driver door of the cruiser and first went to the front left of his police cruiser, but then went to the rear of his own cruiser while Officer Moody states that Moody went directly to the rear of the cruiser. Moody allegedly then approached the Ford Explorer driven by the victim which had backed up and struck a vehicle and come to a stop while Murkerson opened his door and exited the moment after the Ford Explorer moved to provide clearance.

While shouting commands at the victim, Christopher Thomas, Moody claims to have been in front of the Ford Explorer when it suddenly accelerated at him and he decided to use lethal force to stop it by shooting. As Moody stepped out of the way of the Ford, he fired two series of gunshots with a pause in between each series, into the open driver window which incapacitated and killed the driver causing the vehicle to go out of control, exit the parking lot, cross a highway with traffic, then strike and penetrate a building which resulted in injury to a person inside.

3

Officer Murkerson reports that after exiting the passenger door of the cruiser he observed Officer Moody on the driver side of the Ford Explorer and heard gunshots almost immediately.

All five /5/ gunshots enter the open driver window of the Ford Explorer striking the victim in various locations creating wound pathways of left to right with three /3/ wounds having a front to back (and left to right) direction.

There are discharged cartridge cases located in the parking lot where the shooting occurred and displayed on the crime scene mapping and in photographs.

The wound path of each gunshot, the location of the discharged cartridge cases, and the shooting dynamics elements of time and motion which occurred during this incident will be analyzed to reach valid and reliable scientific conclusions which can be compared to the version of events as seen and/or heard by each witness including the police officers involved.

## 6.    **Autopsy Report.**

The post-mortem report on Christopher Thomas states that he suffered a total of five /5/ gunshot wounds with a common wound path of left to right.   Three of the wounds, "C", "D", and "E" show an additional front to back direction which are described either by their entrance and the location where a deformed projectile was recovered, or that "C" is a superficial wound (grazing wound).

The description and locations of entrances and exits (or projectile recovery) are clear in that these left to right wound paths transverse the body of the victim at a relatively minimal angle of incidence.

> Conclusion:    *The origin of the gunshots is not from the front of the vehicle which would produce a front to back direction if it were approaching Officer Moody and he fired from a location in front of the driver side exterior rear mirror.*
>
> *The gunshot wound paths show that the muzzle of the pistol was just slightly ahead of the driver seat, and more probably than not with the driver side exterior rear mirror just to the left of Officer Moody as he fired into the open driver door window.*
>
> *This is also consistent with the scientific calculations related to elements of speed, time and motion which show that the Ford Explorer was either fully stopped or moving at a speed of .8 mph or less, including fully stopped.*

## 7.    **Officer Mitchell Murkerson.**

Narrative report dated June 29, 2012:

Officer Murkerson was riding with Officer Moody and located in the passenger seat.

After reaching the parking lot where the shooting occurred, Officer Moody pulled up so close to the driver door of the white Ford Explorer operated by Mr. Thomas that Officer was unable to open his door.

> *Note:*   *Had this occurred with a person armed with a firearm, Officer Murkerson would*
> *have been placed in a position without cover or concealment.*
>
> *In Officer Moody's version, the cruiser was at a 30 - 35 degree angle to the Ford*
> *Explorer with the front push bumper being almost in contact with the Ford driver*
> *door, however the dashboard video cam refutes Moody's statement and supports the*
> *statement by Murkerson.*

Officer Murkerson reports that the Ford Explorer then moved in reverse and that he saw Officer Moody "attempting" to move to the side of the Ford and heard gunshots as the vehicle was allegedly accelerating. The Ford then exited the parking lot crossing over a roadway and struck a building.

> *Note:*   *Officer Murkerson's statement is void of any corroborating information that Officer*
> *Moody was in front of the Ford Explorer at any point.*
>
> *It is unknown how Officer Moody could have been "attempting" to move to the side*
> *of the Ford Explorer from behind the cruiser as there are no obstacles and the path*
> *to the driver side open window is direct and unobstructed.*

## ABI Investigation Report  (page 24 ):

Murkerson stated that Moody exited his patrol vehicle and approached Thomas' vehicle. but that he could not exit the patrol car because his door would not open. Murkerson stated that his door would not open because Thomas' vehicle was against it. Murkerson stated that Thomas' reversed his vehicle and struck a parked vehicle. Murkerson stated that he could not see what was going on behind the patrol vehicle because of the K9 and K9 cage.

"MURKERSON stated that once THOMAS' vehicle reversed, he (MURKERSON) exited the patrol vehicle and **observed MOODY standing beside THOMAS' vehicle.**  MURKERSON stated that he heard what he thought was four (4) gunshots."

Audio Video Interview of Officer Murkerson:

06:45   As soon as he backed up and got past me, I got out.

06:51   First thing Murkerson saw was Moody standing beside the vehicle.

06:54   He heard what he thought were 4 gunshots.

07:05   AFTER the gunshots, the vehicle took off across the parking lot.

10:25   Murkerson could not get his door open, Moody got out of cruiser and went around to the
       back but Murkerson's view was blocked by the dog and dog cage in rear of cruiser.

10:34   As soon as vehicle had reversed enough so that he could get his door open, Murkerson
       jumped out of cruiser.

11:13   He saw Officer Moody standing BESIDE the vehicle and then shots fired.

11:20   When he opened the door and looked up, Moody was at vehicle and shots fired.

*Conclusion:*   *The dash cam video from Moody's cruiser supports Murkerson's statements that Moody pulled his cruiser very close along the driver side of the Ford Explorer*

*The brief time which it took Murkerson to exit the cruiser after the Ford backed up would have been sufficient for Murkerson to either see the Explorer at the end of its arc before striking the parked vehicle, or would have seen the Ford strike the vehicle.*

*The facts claimed by Officer Moody that he went to the front of Thomas' vehicle, had time to give numerous commands, that the Ford accelerated, and that he stepped aside and fired the shots is incompatible with the logical amount of time it took Murkerson to open the door - as the trucking is backing up - and the only location he sees Moody in is beside the driver door.*

## 8.   Officer Ronald W. Hall.

Officer Hall describes the movements of the Ford Explorer in detail and observes Officer Moody exit the patrol cruiser.

Officer Hall observes the Ford Explorer move in reverse, strike a motor vehicle and stop; he believed that this was where the Ford would finally stop and assumed that he and Officer Moody would have a physical confrontation with the operator of the Ford.

As Officer Hall approached the area where Officer Moody was standing, which is conspicuously noted to have no reference to Moody being in front of the Ford, Officer Hall heard some "pops" believing it to be the Ford Explorer as a result of it striking the parked motor vehicle but he then realized that it was Officer Moody firing his weapon as the driver of the vehicle.

*Note:*   *Like Murkerson, Officer Hall does not report seeing Officer Moody in front of the Ford Explorer despite the fact that he was looking directly at the vehicle as it struck the parked motor vehicle.*

*The observation that Officer Hall made is that he came to realize that the "pops" were actually gunshots being fired by Officer Moody. All the gunshots fired by Officer Moody were fired from the driver side of the vehicle into the driver window.*

*The interview of Officer Hall failed to investigate what Hall's path was after he exited his unmarked cruiser but he "approached the area where Moody was standing".*

### ABI Investigation Report (Page 27):

Officer Hall stated that the driver accelerated at a high rate of speed in reverse and struck a parked car. Officer Hall stated that again he thought the pursuit was over and began to take his Taser out of the holster for a confrontation with the driver. Officer Hall stated that he heard the engine of the

vehicle accelerate at a high rate of speed. Officer Hall stated that he then heard a "pop" sound several times. Officer Hall stated that he realized that Officer Moody was firing his weapon.

> *Conclusion:   Officer Hall does not corroborate or support the version of events claimed by Moody.*

## 9.   **Officer Darren Moody.**

### **ABI Investigation Report (page 16)**

Officer Moody stated that he ordered the driver out of a vehicle after the vehicle crashed into a parked car during a pursuit. Officer Moody stated that the driver accelerated toward Officer Moody. Officer Moody stated that he fired four shots from his duty weapon into the vehicle.

### **Audio Interview**

08:15   States that Hall pulled up in his unmarked cruiser and that the Ford drove straight at Hall but swerved at the last minute. (not corroborated by any other witness and Hall states vehicle came towards his cruiser but only after he had turned in the direction of where the Ford was traveling).

08:24   States that he told Murkerson to radio in that Thomas had just tried to ram Hall's car because from his (Moody's) perception that is what it looked like.

09:18   States that he drove toward the Ford and "stopped with my push bumper just short of the driver side door." His cruiser was at an angle of approximately 30 - 35 degree angle.

> *Conclusion:   Inconsistent with Officer Murkerson who stated that his (Murkerson's) passenger front door would not open from being so close to the driver door of the Ford Explorer. At a 30-35 degree angle, Murkerson's passenger door would not be blocked in by the Ford Explorer nor would it be up against the driver door of the Ford.*
>
> *The dashboard video camera in Officer Moody's cruiser is scientific evidence which refutes the statement that he moved to the left front of his cruiser. Moody's claim of the front push bumper being against the driver door and the cruiser at a $30^0$ - $35^0$ is inaccurate and fallacious; Moody's cruiser was parallel to the Ford Explorer.*

09:22   He got out of his cruiser, drew his weapon, and ordered him (Thomas) out of the car and to turn the vehicle off.

09:32   Thomas threw the Ford Explorer into reverse and accelerated.

09:57   As the Explorer accelerated backwards, Moody states he went from the left front of his cruiser to the rear and stopped.

> *Note   Video cam refutes movement to the left front by Moody.*

10:19  Moody is at the rear of the cruiser and starts approaching the Ford ordering the suspect at gunpoint to get out and was thinking that he (Moody) would get in a foot pursuit, or that the suspect would surrender.

10:40  As he was giving commands he approached the vehicle from the driver side (of Ford) but he was in front of the Explorer at the driver side front bumper.

> Note:  *There is no corroborating evidence or testimony from other officers placing Moody in front of the Ford Explorer.*
>
> *Both officers observed Moody on the driver side of the Ford only.*
>
> *The forensic evidence shows that the claimed path taken by Officer Moody to get in front of the Ford Explorer would require him to move at an angle from the rear of the cruiser, in a direction away from the open driver window, and have to cross a distance of approximately 21' to deliberately place himself in front of the vehicle.*
>
> *The forensic evidence also shows that the shooting took place when the Ford Explorer was in near contact with the parked motor vehicle which it had backed into and struck.*

11:17  Moody is comfortable with his shooting skills, been on a SWAT Team, and can move and shoot.  He stepped away from the vehicle as it was moving toward him, he fired two /2/ double taps for a total of four /4/ shots.

> Note:  *According to this description, there would have been a slight pause in between the first series of shots and second series of shots. The evidence shows that five /5/ shots were fired.*
>
> *This slight pause will be considered in the shooting dynamics analysis which evaluates elements of time and motion in shooting incidents.*
>
> *In one of the two series of shots, Officer Moody would have fired three /3/ shots, not two /2/)*

13:54  Moody gave a statement to Sgt Long about what had happened.

> Note:  *Sgt. Long's report has not been disclosed.*

14:13  "His engine was revved to the point that when he put it in drive and accelerated towards me, I felt I had no other choice".

> Note:  *In order for Thomas to put the vehicle in gear while having the engine at a high rpm would require that he have one foot on the brake pedal and the other on the accelerator pedal since vehicles will not shift unless the brake is depressed.*
>
> *There are no tire marks recorded or documented by the accident reconstruction officers related to this event.*

8

15:25  Feels that if he had not stepped out of the way as he was firing his weapon that he would have been struck.

> *Note:*   *Even if considered from a hypothetical perspective, Officer Moody hears the engine revving to a very high degree of rpms yet he illogically stands his ground in front of a vehicle and waits for the driver to put it in gear before realizing that his location is hazardous and decides it is best to step aside.*

16:04  States he fired four /4/ rounds. The way they are taught in firearms training is to double tap. He fired two sets of double taps.

> *Note:*   *Double tap training requires a pause in between the sequence of two shots to reassess the threat and determine if additional deadly force is required. This pause increases the elapsed time it would have required to fire all five /5/ gunshots that the evidence shows were actually fired.*

16:56  After he fired the two double taps, his Glock 22 jammed. He noticed that the slide was locked back and that the pistol had not loaded another round so he released the slide and let it go at which time it fed a fresh round into the chamber.

> *Note:*   *Despite this malfunction, there has been no examination of his pistol to determine, if possible, what the cause was of this jam.*
>
> *Glock pistols should not lock back in the rear position when there is additional ammunition in the magazine; this pistol should be considered prone to jams until it is shown otherwise.*

17:27  States that if he had not fired he would have gone under the tire because it was an SUV.

> *Note:*   *Officer Moody's conclusion is logically and scientifically flawed.*
>
> *Firing at a moving vehicle weighing thousands of pounds with a bullet weighing less than 1/2 an ounce will not stop it.*
>
> *Officer Moody's shots all went into the driver through the driver window; the tire was now several feet past him with no danger of going under the tire.*
>
> *Officer Moody's shots resulted in the exact opposite of his claimed intention to stop the vehicle because it went out of control causing property damage and personal injury.*

## 10.   Deposition of Mr. Derrick Edwards.

After Thomas backed up and struck the parked vehicle, Edwards saw the police officer approach the victim's vehicle from the rear of the driver door side, the officer was commanding Thomas to stop several times; then the shots occurred while the Ford Explorer was stopped. After the shots, the vehicle moved forward and went across the street. (pp 17-18, 29, 67-68, 96)

When the officer approached he had his gun out and could see Thomas leaning away toward the passenger seat, his left hand on the steering wheel, from the gun in a defensive manner. (pp 20-21)

He did not see Thomas put the car in gear, after "four shots" were fired he heard the engine rev up. (pp 22-23)

When the shots were fired, Officer Moody was within reaching distance of Thomas. (p 97-98)

> *Note: Deposition testimony of Mr. Edwards is not used as any basis for conclusions; it is presented for comparison to the forensic evidence.*
>
> *There is no testimony concerning Officer Moody being in front of the Ford Explorer at any time; the testimony is focused on Officer Moody moving to the driver side of the Ford Explorer and this is supported by the forensic evidence.*

## 11. Sergeant William N. Glover.

In the Dothan PD Narrative Report, Officer Glover reports on July 2, 2012 that "After speaking with Officer Moody, Investigator Hall, and HCSO Investigators following all of the witness interviews, and observing the crime scene I determined that Christopher Thomas was trying to run over Officer Moody with his vehicle when the shots were fired. The report was written up as an attempted murder on Officer Moody's life. Due to the fact that in the defense of his life, Officer Moody killed Christopher Thomas this case will be closed".

> *Note: This is a homicide investigation; the forensic evidence was not yet analyzed, nor was the version of events stated by Officer Moody compared to that evidence.*
>
> *This indicates blind acceptance of the version given by Officer Moody without any scientific or detailed investigation.*

## 12. Alabama Bureau of Investigation Report.

The summary section of this report states (emphasis added by R Scott):

Officer RONALD HALL entered the parking lot as Officer MOODY was chasing the Explorer through the parking lot.

Officer MOODY and Officer HALL were able to block the Explorer and the chase came to a stop. Officer HALL's vehicle was in front of the Explorer and Officer MOODY's vehicle was on the driver's side of the Explorer. Officer HALL exited his vehicle with his Taser and began to approach the Explorer. **Officer MOODY exited his vehicle with his duty weapon and ran to the rear of his vehicle.** The driver of the Explorer accelerated in reverse and struck a vehicle parked in the parking lot. Witnesses indicated that the vehicle was struck hard enough that the tires came up off of the ground.

**Officer MOODY approached the driver from the front driver's side of the Explorer.** Officer MOODY ordered the driver to stop and get out of the vehicle. The driver put the vehicle in drive and began to accelerate forward. Officer MOODY fired his duty weapon five times at the driver of

10

the Explorer. The Explorer then traveled through the parking lot striking a sign, crossing Montgomery Highway, and crashing into a building that housed Dothan Sign Designs.

> *Note:* *This summary completely ignores the interview statements of Officer Moody that he moved to the left front of his cruiser first; then moved to the rear of the cruiser, and allegedly placed himself in front of the Ford Explorer.*
>
> *Analysis of the position and location of Officer Moody's cruiser, as depicted in photographs and in the crime scene mapping diagram, shows that the path from the cruiser driver door to the rear of the cruiser does not take Officer Moody in front of the Ford Explorer unless he travels another approximate 21' and angles off away from the driver window.*
>
> *Further analysis and source materials show that the vehicle's movement forward after the shooting does not take the vehicle toward Moody's cruiser, and this is exhibited in the Alabama DPS Traffic Homicide Mapping Diagram.*
>
> *The analysis shows that Officer Moody would have been on the driver side of the Ford Explorer at all times and the location of the discharged cartridge cases shows that he fired these shots from the side of the Ford Explorer and that the shooting dynamics associated with these gunshots provide a reasonable degree of scientific certainty to conclude that the vehicle was either totally stopped, or moving at a speed of no more than .8 mph, when Officer Moody fired all five shots.*
>
> *The Ford Explorer was still in very close proximity to the parked vehicle it had struck.*
>
> *The gunshot wound paths described in the autopsy show that all the gunshots came from the driver side of the Ford Explorer, into the open driver door window*

**13.    Alabama DPS Traffic Homicide Investigator Report.**

The shooting incident occurred on June 28, 2012.

The Alabama DPS Traffic Homicide Report indicates that the crime scene mapping did not take place until July 1, 2012, 3 days after the shooting.

There has been no disclosure of any police crime scene diagrams produced on the date of the shooting and if this was not accomplished then it is a major and significant violation of standard accepted homicide investigation procedure.

> *Conclusion:* *Failure to generate a crime scene diagram on the date of the shooting before the evidence was recovered and scene released.*
>
> *Failure to conduct an accident reconstruction and reach opinions of speed, braking, tire marks, or info obtained from the Event Data Recorder.*
>
> *The distance from the rear of Officer Moody's cruiser to a point that would place Officer Moody in front of the Ford Explorer is approximately 21' using*

11

*the diagram scale.*

## 14.   Analysis & Shooting Reconstruction.

*Shooting Dynamics* is an area within shooting reconstruction that analyzes the elements of time and movement in a shooting incident.

Time, distance, and speed can be scientifically determined if any two of the factors are known.

When shootings like this incident are encountered, and the witnesses have differing versions based on their personal perception and other factors, then it is critical to find the truth derived from the objective scientific evidence using generally accepted scientific methodology and principles.

One officer, Officer Murkerson, despite exiting the same cruiser that he was in with Officer Moody immediately after the Ford Explorer backed up allowing him to open his passenger door, fails to state in any interview or report that he saw Officer Moody in front of the Ford Explorer.

> *Note:  The photographs and crime scene mapping clearly show that the safe, reasonable, unobstructed and direct pathway to the driver side window of the Ford Explorer does not require that Moody purposely and dangerously place himself in front of the Ford.*

The second officer, Officer Hall, actually witnesses the Ford Explorer back up, strike the parked vehicle, and come to a stop. Officer Hall then approaches the area where Officer Moody is standing (at the rear of the cruiser) and for reasons unknown, he is unable to withdraw his Taser (apparently from its holster) without having to look down at it. The Taser is in a holster but it is not attached to his hip, he is holding the Taser holster.

For an unknown reason he has to look down at the Taser and holster to withdraw it instead of bring both up to eye level in order to keep his vision on this alleged ongoing incident. As he removes the Taser out of its holster, he hears "pops" and as he looks up he realizes it is Officer Moody shooting at the driver.

> *Note:  This second eyewitness officer also fails to state that Officer Moody was in front of the Ford Explorer at any time even when he was looking at it after it struck the parked vehicle and came to a stop. According to Officer Hall, all he heard was the engine accelerating.*
>
> *There is a complete absence of any statement that he observed the vehicle move before Moody fired.*
>
> *The only location he sees Officer Moody at is on the driver side of the vehicle and realizing that he is hearing gunshots being fired.*
>
> *Drawing a taser is very similar to drawing a conventional firearm from a holster.*
>
> *Studies by the Force Science Institute, Alexander Jason, and those originally initiated by Sergeant Dennis Tueller for the 21 Foot Rule show that the average trained police officer can withdraw his firearm and bring it to the position of ready-*

12

*to-fire in approximately 2-3 seconds. This is with the firearm in a holster on the hip.*

*With the holster being held in one hand and the ability to withdraw the Taser with the other hand, it is reasonable to determine that the elapsed time to withdraw the Taser would have approximately 1 but not more than 2 seconds.*

*It is not logical, nor is it reasonable, to assume that during this 1 - 2 second time frame that Officer Moody had sufficient time to move approximately 21' and be in front of the Ford Explorer, then jump out of the way and be seen only on the driver side. The elapsed time is illogical and unreasonable.*

*An issue of training and exists as to the reasons why an officer cannot withdraw a Taser from its holster which is not attached to the belt or hip, without having to look down at it, instead of raising it up so that simultaneous visibility can be kept on the activity occurring.*

Officer Moody's version is that the vehicle drove at him causing him to have to move out of its path and that out of concern for his own safety and that of the other officers, it was necessary for him to use deadly force to stop this threat; however, Moody knew, or should have known, that his actions of shooting at a moving vehicle to stop it is a scientific impossibility and actually magnified the danger by killing the driver causing the vehicle to go out of control and injure a person.

When Officer Moody exited his cruiser he relinquished the area of safety (cover and concealment) which afforded him protection and claims to have moved to a position in front of the Ford Explorer which is voluntarily placing himself in a position of serious injury or death, commonly referred to as "fatal error".

Officer Moody knew, or should have known, that it is scientifically and physically impossible for a human being to stop a moving motor vehicle weighing 4,200 pounds. This is basic physics.

**Analysis of Time, Speed, and Distance (Shooting Dynamics):**

A critical element in shooting incidents involving alleged movement of a motor vehicle is to evaluate the elements of time and motion to reach scientific conclusions.

Although many witnesses state that the engine was accelerating this does not equate exclusively to movement since a vehicle which is in Park or Neutral can produce a high number of revolutions per minute (rpm) while remaining stationary. Several witnesses report that Mr. Thomas was moving the gear shift after striking the parked motor vehicle and just prior to being shot.

In order for Mr. Thomas to move the shift lever into a forward gear, the Ford requires that the brake pedal be depressed or the shifter cannot engage a gear. There is no evidence that any witness saw the brake lights on and this indicates that the vehicle was not being shifted into forward gear while the engine was at accelerated rpm's. It is also expected that a vehicle shifted into a forward gear at high rpm would leave tire marks as torque is suddenly transferred to the rear wheels, i.e. "burning out" or "lighting 'em up" - spinning the tires.

Officer Moody has stated that the basis for his use of deadly force was:

- To protect himself against injury caused by the forward movement of the Ford Explorer at him; and

- That if he didn't shoot he would have gone under the tire of the SUV, and

- His concern for the safety of Officers Hall and Murkerson by the forward movement of the Ford Explorer; and

- That he fired at Christopher Thomas in an attempt to stop Mr. Thomas.

*Note:*    *The analysis of the forensic evidence related to these statements and the actual shooting itself will show that the alleged unsafe and threatening forward movement of the Ford Explorer was non-existent prior to the actual shooting and that the threat of imminent bodily injury to Officer Moody and/or Officers Hall and Murkerson was fictional.*

*The forensic evidence will show that Officer Moody's attempt to stop Christopher Thomas by shooting him while operating a motor vehicle actually created the opposite result; instead of stopping Mr. Thomas, the injuries which the victim suffered caused the 4,200 pound 1999 Ford Explorer to become an uncontrolled driverless wheeled missile that crossed a highway with motor vehicle traffic, struck a building causing significant property damage, and resulted in injury to a person inside the building when the vehicle penetrated the wall.*

*The shooting of Mr. Thomas provided no reasonable or practical ability to stop the vehicle with Mr. Thomas incapacitated and dying with his body depressing the accelerator pedal.*

*There are no tire marks shown in any of the photos, nor on the crime scene mapping diagram which originate from the parked motor vehicle which was struck by the rear of the Ford Explorer that coincide with a high revving engine, engagement of a forward gear and acceleration under torque which lifts the front end and drives the rear wheels downward.*

The objective in this shooting reconstruction is to determine speed using the elements of time and distance. The benchmark starts at the time the Ford Explorer strikes the parked motor vehicle since that is a known point in which the vehicle is not engaged in a forward gear.

In Officer Moody's version, the vehicle accelerated toward him; the crime scene mapping shows that if Officer Moody proceeded parallel along the driver side of his cruiser to the rear and then continued on a straight line toward the Ford Explorer he would have arrived at the left front side of the Ford near the driver side left front wheel - not in front of the vehicle.

In other words, the length of the Ford Explorer as it sat after striking the parked vehicle places its front end beyond an imaginary line running down the driver side of the cruiser; the front end is actually in line with an area toward the left 1/3 of the trunk of the cruiser. Diagrams depicting this have been generated.

14

With Moody moving down alongside the driver side of his vehicle to the rear, he would have to turn diagonally off that line in a northeasterly direction and purposely move to get in front of the tire instead of maintaining direct visibility and verbal contact with the driver (Thomas) through the open driver window.

> *Conclusion:* *With his firearm out, this approach is illogical, unsafe, and inconsistent with the forensic time analysis.*

Discharged Cartridge Case Pattern:

Officer Moody's five /5/ gunshots all entered the open driver window.   The five /5/ discharged cartridge cases are all located within a general area consistent with a Glock 22 pistol ejection pattern.

There is a number of variables which can affect the final resting place of discharged cartridge cases which include the vertical and horizontal orientation of the pistol for each shot, the grip of the shooter, height from the ground, surface of the ground, whether each cartridge has a vertical or horizontal spin imparted to it and this is further delineated into whether it is clockwise or counterclockwise.  In some instances there is minimal spin.

If the person shooting is moving in any X-Y type axis motion then this is also a variable.

All of those factors have a direct bearing on what the discharged cartridge case will do upon impact with the surface of the parking lot and defects in the surface are an additional consideration.

Discharged cartridge cases impacting surfaces like the paved parking lot are subject to deflection both away and back toward the shooter.   Additional dislocation can take place inadvertently by being kicked or moved by the influx of personnel or vehicles.

As a result, the pattern of discharged cartridge cases must always be interpreted considering all the factors;  it is only when the surface consists of some minimal deflective consistency like grass, soft sand or soft dirt that impact point is most likely very close to the final resting location.  Dislocation by external forces must always be considered even in this circumstance.

However, there is no unusual or significant anomaly about the overall pattern which would suggest that the shooting did not occur in the area where the driver door would have been located when the Ford Explorer rear end was in very close proximity to the vehicle which it struck.

> *Conclusion:* *The overall pattern of the five /5/ discharged cartridge cases, and the left to right and front to back wound paths of the gunshots indicate that Officer Moody was shooting into the driver window from a position which was just slightly ahead of the driver seat but beside the driver open window; the driver exterior rear mirror would have been to the left of Officer Moody as he faced into the window shooting at Mr. Thomas.*
>
> *Once the pistol is not collected, preserved as evidence, and tested contemporaneous to the shooting incident using the same ammunition, then it becomes subject to spoliation which precludes valid and reliable forensic testing; there is no evidence that testing or examination of the firearm was*

15

*conducted nor that it was taken into evidence and preserved.*

Time analysis of gunshots:

> *Note:*    *Officer Moody stated during his audio interview that he fired two /2/ series of double taps which is defined as two /2/ shots. The procedure is to pause and reassess the threat, then if needed fire another series of double tap if justified.*
>
>         *Officer Moody would have actually fired three /3/ shots in one of the series since a total of five /5/ discharged cartridge cases were recovered and Mr. Thomas suffered five separate wounds.*
>
>         *The following facts have been represented to me as being testified to by Officer Moody at his deposition:*
>
> - *That his pause between the two series (double taps) of shots was approximately .5 (1/2) second or less.*
> - *That the Ford Explorer was going at least 5 MPH as it came at him and continued to accelerate.*
> - *That he is not aware of any other evidence which would indicate that bullets entered the Ford from anywhere other than the driver's side window.*

Research and study has been conducted to determine perception-reaction time and gunshot elapsed time. The results provide guidelines that are generally accepted in the field of shooting reconstruction to utilize in the analysis of time and motion in shooting incidents.

These studies show that the average trained police officer can fire 2 - 5 shots per second once the first shot has been fired, with the slower officers being in the lower range, and faster officers being in the upper range. The average is just over 4 shots per second. These studies originated back in the 1980's when the Tueller Research became the foundation for officer safety. It is still a training factor and commonly referred to as the Tueller Drill or the 21 Foot Rule.

A reaction time study called the "Tempe Study" was able to determine how long it would take for the officer to transfer the decision to shoot to the actual mechanical action of pulling the trigger. The Tempe study found that it takes approximately 25/100ths of a second to begin the pull of the trigger and 6/100ths of a second for the trigger to reach its maximum rearward movement. This amounts to a reaction time of .31 of a second for the first shot to be fired in a series of gunshots.

For Officer Moody the .31 of a second is applicable to both the first shot of the first series of gunshots, and it is applicable to the first shot of the second series of gunshots because there was an intentional pause between the series and this required that Officer Moody transfer the decision to fire the second series of shots into the mechanical action of actually pulling the trigger.

Said differently, the total five /5/ shots were not intentionally consecutively fired; Officer Moody paused in between the series and this means he decided to fire additional shots which require the reaction time to decide to pull the trigger and then actually do so.

Additional studies undertaken have been published by the Force Science Institute; and by Mr.

16

Alexander Jason in the Investigative Sciences Journal.  Holster manufacturers and police departments have conducted studies with varying levels of holster retention level designs and I have conducted draw and fire evaluations with the Massachusetts State Police in the mid 1980's when the department began testing to transition from revolvers to semi-automatic pistols;  I have also been involved and trained in numerous timed shooting events, the results of which are consistent with the published studies mentioned.

This shooting does not require analysis of Officer Moody's withdrawal time of the firearm from the holster since it was already being held by him in a ready-to-shoot orientation.

The analysis will be based on:

- Officer Moody's perception of the need to shoot.
- The reaction time to transfer the decision to shoot into the actual mechanical action of pulling the trigger for the first shot of the first series.
- The subsequent gunshots of the first series of gunshots.
- Officer Moody's testimony of an approximate pause of .5 (1/2) second between the two series of shots.
- The reaction time to transfer the decision to shoot into the actual mechanical action of firing the first shot of the second series of gunshots.
- The subsequent gunshots in the second series of gunshots.

*Note:*    *There is insufficient data available to incorporate the time element involved in moving the trigger finger from being outside the trigger guard and along the frame of the Glock Pistol which is an essential element of police training and complies with the basic firearms rule of keeping the finger off the trigger until ready to shoot.*

*When Officer Moody had his firearm out and was approaching the Ford, he would have been required to have his finger off the trigger and along the side of the frame of the Glock.  Only when the decision is made to actually pull the trigger does the finger move from this position and go inside the trigger guard and onto the trigger itself.*

*The elapsed time for this movement would be added to the .31 second involved in the trigger pull.*

The analysis is based on the total time, not the individual series since it is not known whether the total of five shots were a series of 3 shots followed by 2 shots, or 2 shots followed by 3 shots.  Even if it were known how many shots were fired in each series the analysis still must be based on the total of 5 shots with a pause factor of approximately .5 second.

The reaction time analysis will be accomplished in a manner which is most favorable to Officer Moody and provide results which are most beneficial to him and least beneficial to the plaintiff  by benchmarking Officer Moody with the ability to fire 5 shots per second, with a .5 (1/2) pause and the time to mechanically pull the trigger for the first shot of each series.

The open window of the Ford Explorer driver window is approximately 28.5" in width.  Two analyses will be provided, one which provides the entire 28.5" available area that could be fired into

17

and a second analysis which eliminates gunshots that would have the potential for striking the dash and/or steering wheel since all 5 gunshots struck the victim only who was sitting in the driver seat.

The total time to fire five /5/ shots by Officer Moody from a double action Glock Pistol is determined as follows:

| | |
|---|---|
| Reaction time for the first series of shots: | .31 |
| Fire a total of 5 shots in two series of shots in 1 second | 1.0 |
| Pause between the series of shots | .50 |
| Reaction time for the second series of shots | .31 |
| Total time for the entire shooting: | 2.12 seconds |

This correlates to 2 & 3/25ths of a second which is the elapsed for firing all five of the shots with the pause between the two series.

This report does not analyze the basis or how his perceptual task evolved; the analysis starts from the point where Officer Moody has made the decision to shoot and to be transferred into actually firing the Glock pistol; this would be uniformly applied across the spectrum of shooting dynamics for all shooting reconstruction incidents.

The speed of the Ford Explorer can be determined by applying the 2.12 seconds to any measured distance area of the window. Once the speed of the vehicle is shown to have traveled further in that 2.12 seconds, then it is scientifically impossible for the gunshots to have occurred and create the left to right trajectory.

Calculations for time, speed, and distance show that for a vehicle traveling at 5 mph will cover a distance of 15.5 feet in 2.12 seconds. This means that the entire length of the Ford Explorer from the front bumper to the rear bumper passes Officer Moody in the time it takes for him to fire the five shots.

> **Conclusion:** *It is scientifically impossible for Officer Moody to have fired 5 shots into a 28.5" window unless the vehicle was completely stopped or traveling at a speed of .8 mph or less; .8 mph equates to 4/5 of 1 mph.*

Using the total elapsed time required to fired the five shots of 2.12 seconds the following chart shows distances traveled by a motor vehicle at various speeds.

| MPH | Distance traveled in 2.12 seconds | MPH | Distance traveled in 2.12 seconds |
|---|---|---|---|
| 0.0 | 0 | 5.5 | 17' 1" |
| 0.2 | 7" | 6.0 | 18' 8" |
| 0.4 | 15" | 6.5 | 20' 2" |
| 0.6 | 22" | 7.0 | 21" 9" |

| 0.8* | 30"* | 7.5 | 23' 4" |
|------|------|-----|--------|
| 1.0 | 3' 1" | 8.0 | 24' 10" |
| 1.5 | 4' 6" | 8.5 | 26' 5" |
| 2.0 | 6' 1" | 9.0 | 28' |
| 2.5 | 7' 7" | 9.5 | 29' 6" |
| 3.0 | 9' 4" | 10.0 | 31' |
| 3.5 | 10' 10" | 10.5 | 32' 7" |
| 4.0 | 12' 4" | 11.0 | 34' 2" |
| 4.5 | 14' | 11.5 | 35' 9" |
| 5.0 | 15' 6" | 12.0 | 37' 4" |

\* Denotes the distance traveled which exceeds the width of the window; this is the maximum speed which the Ford could be moving for the shots.

The constant conversion factor for determining feet per second traveled by a motor vehicle is 1.467 feet per mile per hour; this equates to a constant of 3.11 per mph for an elapsed time of 2.12 seconds.

Although Officer Moody is given the benefit of the entire length of the open driver window of 28.5", it is clear that the exterior mirror obstructs several inches of the opening and the gunshot wound paths described in the autopsy show that shots did not occur as the vehicle approached; all the gunshots occurred within a much narrower portion of this window opening.

Conclusion: *Using the 2.12 seconds required to fire the gunshots and utilizing a more scientific available area which coincides with the gunshot wounds to the body and removes gunshots which would have struck the steering wheel when fired from outside the window in a left to right direction, a distance of 22" is approximated as the maximum area into which Officer Moody would have been capable of producing the gunshot wounds to Mr. Thomas.*

*Calculations of speed, time, and distance show that the maximum speed of the Ford Explorer over a distance of 22" in 2.12 seconds produces a result showing that the speed of the Ford Explorer is either completely stopped, or traveling at .6 mph (3/5 of 1 mph) or less.*

## 15.    Summary Conclusions:

As a result of the scientific and forensic evidence, the shooting reconstruction and the analysis of shooting dynamics (elements of speed, motion and time) in Officer Moody's shooting of Christopher Thomas I have reached the following opinions to a reasonable degree of scientific certainty:

A.    Officer Moody's version that he moved to the front of the Ford Explorer from his location at the rear of his cruiser is not scientifically plausible due to the distance he would have to travel, and the elapsed time which would have occurred to cover that distance; Officer Murkerson exited his cruiser immediately after the Ford unblocked his door by backing up and when he looked toward the Ford he observed Officer Moody on the driver side and heard 4 gunshots; Officer Hall saw Moody at the rear of the cruiser and looked down only momentarily to withdraw his Taser from his

19

holster when he heard "pops" and determined it was Officer Moody shooting the driver. Neither officer ever observed Officer Moody at any location other than going behind the cruiser, being behind the cruiser, then at the driver side window shooting. The distance that Moody would have had to cover from the rear of his cruiser to get to the front of the Ford Explorer is approximately 21' and would require that he deviate off a straight path to purposely place himself in front of the vehicle. These facts disprove the version claimed by Moody.

B.   Officer Moody's interview statement that his cruiser pulled up almost to the driver door of the Ford Explorer with his front push bumper and the cruiser positioned at a $30^0$ to $35^0$ and then exited his cruiser and proceeded to the left front of his cruiser is fictitious; the dash cam video clearly shows that Moody pulled parallel to the Ford Explorer with Murkerson's door close to the driver door; there is no video of Moody ever moving to the front left of his cruiser.

C.   In the elapsed time in which Officer Moody exited his vehicle and eventually ended up at the rear of his cruiser as the Ford Explorer backed up and struck the parked motor vehicle, the only scientific time frame available for his route of travel was for Moody to proceed directly toward the open driver door window which are the observations of Murkerson and Hall when they looked up to see him on the driver side of the Ford. The application of the Tueller 21 Foot Rule shows that it would have taken Officer Moody at approximately 3 seconds to run the 21 feet to move in front of the Ford Explorer and this would have been sufficient time for Murkerson to have exited and seen him located there as well as Hall who looked down momentarily to allegedly pull his Taser out of the holster he was holding.

D.   Officer Moody was located near orthogonal $(90^0)$ to the open driver window for five /5/ shots which struck Mr. Thomas; the driver side exterior rear mirror was most likely just to the left of Officer Moody as he fired at Mr. Thomas sitting in the driver seat which resulted in all gunshots traveling from left to right with three of the gunshots transversing the body and going from front to back during their wound path.

E.   Based upon the studies performed by Force Science Institute, Lewinksy, Tueller, Jason, the statement of Officer Moody that he paused between the series of shots, the testimony of Officer Moody that this pause was approximately .5 of a second, and in considering the known and accepted protocols involving perception of a threat, reaction time to that threat, mechanical action of pulling the trigger for the first shot of each series, and with Officer Moody being benchmarked at the highest rate of shots per second for police officers in the studies, I conclude that it required a total of 2.12 seconds for Officer Moody to have fired all 5 shots.

F.   Interpreting the forensic evidence in a light most favorable to the defendant(s), the Ford Explorer would have been fully stopped or moving at a speed of no more than .8 mph using the entire 28.5" window area in order to fire all 5 shots in 2.12 seconds creating the wound paths to Mr. Thomas.

G.   When using a more scientific and factual window area available for the gunshots to have been fired into, that being 22", the maximum speed of the Ford Explorer is

20

either completely stopped or no more than .6 mph in order to fire all 5 shots creating the wound paths to Mr. Thomas.

H.   The Alabama Bureau of Investigation report is substandard and replete with omissions, fails to address the numerous conflicts amongst Officers Hall, Murkerson, and Moody themselves; it lacks forensic analysis of the shooting, failed to collect and test evidence (firearm & ballistics evidence) and ignores the elements of time, motion, speed, and distance directly related to the wounds and wound paths which refute the version of events stated by Officer Moody. ABI investigators knew, or should have known, that these material issues of fact existed which required an in-depth and detailed investigation commensurate with a homicide and that it was scientifically impossible to fire 5 shots into the window of a vehicle moving at speed when considering the required elapsed time to conduct that shooting with a pause in between the series of shots.

I.   Based upon the forensic evidence, the scientific shooting reconstruction analysis, calculations of time and motion, dash cam data, and all the opinions, conclusions, and notes contained in this report, the version of events described by Officer Moody regarding the need to shoot Mr. Thomas or risk going under the tire of the Ford Explorer, and that the Ford Explorer accelerated toward him while he was standing in front of it is fallacious and refuted by the totality of the scientific and forensic evidence.

## 16.   **Right to Amend.**

I reserve the right to amend or add to this report if additional evidence or medical data is received.

Respectfully submitted,

Ronald R. Scott, M.A., M.S.

State of Arizona )

)

County of _Maricopa_ )


Subscribed and sworn (or affirmed) before me this _27th_ day of

_August_ , 20_14_ .


(seal)

JANE GOURDY
NOTARY PUBLIC - ARIZONA
Maricopa County
My Commission Expires
February 3, 2016

Notary Public



RONALD R. SCOTT

FORENSIC BALLISTICS

**RONALD R. SCOTT, M.S.**
Shooting Reconstruction,
Forensic Firearms & Ballistics
37881 N. 10th Street
Phoenix, Arizona  85086

Tel:   **623-764-6371**
Email: *ronaldscott@azballistics.com*

*www.azballistics.com*
*www.forensic-ballistics.com*

> *Firearms ▪ Ballistics ▪ Police Shootings ▪ Shooting Reconstruction & Investigations*
> *Toolmarks & Comparison Microscopy ▪ Dynamics of Shooting Incidents ▪ Crime Scenes ▪ Gunshot*
> *Distance ▪ Daubert Consultation ▪ Gunshot Wounds ▪ Hunting & Firearms Safety ▪ Trajectory*

Majority of investigations consist of:

- The investigator lacks forensic expertise,  the crime scene technicians lacks investigative skills; typically much later a crime lab examiner picks up the evidence from a property room with minimal knowledge, if any, of the details or alleged version of events.
- Tangible and intangible evidence which should have been present at the scene goes unconsidered;  critical evidence gets overlooked.
- Result: the investigator, crime scene, and forensics fail to work in unison resulting in a final report abundant with critical flaws and omissions.
- Attorneys/prosecutors do not realize the discrepancies which exist.

I offer expertise in all three areas for criminal or civil cases based on 25+ years with the Massachusetts State Police conducting and supervising criminal investigations, crime scenes, and forensics with 10 additional years as an independent forensic consultant.

Subspecialize in police shootings, have investigated approximately 125 fatal officer involved and over 200 non-fatal police involved incidents.  I was a member of the MSP Firearms Review Board, have conducted internal investigations, and will determine the missing answers since they are commonly not properly investigated.

All types of shooting incidents can be reconstructed; I can address issues which are not commonly considered such as reaction time,  free-fall, elapsed time, force, motion, and momentum; distance, gunshot wounds, and analysis of the alleged versions of events to all factors and evidence.

I have been the Commanding Officer of the MSP Ballistics Section, the Troop Shift Commander of 6 barracks, a Staff Inspector,  Commander of an urban Boston area State Police Barracks, and Shift Commander of the state-wide Operations Section, and commanded the shift operations of multiple barracks at the troop level.

Military service in the Army Ordnance Corps testing and researching; total experience is almost 50 years in firearms & ballistics; and over 30 years in forensic areas outlined at the top of this page and have testified as an expert approximately 270 times nationally and internationally.

i



**RONALD R. SCOTT, M.A., M.S.**
Forensic Firearms & Ballistics
37881 N. 10th Street
Phoenix, Arizona 85086

**Tel:  623.764.6371**
**Email: *ronaldscott@azballistics.com***

***www.azballistics.com***
***www.forensic-ballistics.com***

---

*Firearms ▪ Ballistics ▪ Police Shootings ▪ Shooting Reconstruction & Investigations*
*Toolmarks & Comparison Microscopy ▪ Dynamics of Shooting Incidents ▪ Crime Scenes ▪ Gunshot*
*Distance ▪ Daubert Consultation ▪ Gunshot Wounds ▪ Hunting & Firearms Safety ▪ Trajectory*

---

## *Curriculum Vitae*

### Formal Education:

- 1991 - Master of Science in Management, Lesley College, Cambridge, MA.
- 1982 - Master of Business Administration, 1 year of study in Macroeconomics, Analysis and Policy, Salem State College, Salem, MA.
- 1981 - Master of Arts in Criminal Justice, Anna Maria College, Paxton, MA.
- 1980 – Bachelor of Science Cum Laude, Law Enforcement, Northeastern University, Boston, MA.
- 1979 - Graduate Study Criminal Justice, American International College, Springfield, MA.
- 1978 – Associate in Science, North Shore Community College, Beverly, MA.
- 1967 - 1969  Accounting & Finance, Bentley College, Waltham, MA.

### Informal, Technical, Forensic Education/Training:

- 2013 – Class 2 and Class 3 Vendors Exhibition, Phoenix, AZ.
- 2012 – U.S. Department of Justice, NIJ "Forensic Photography".
- 2012 – U.S. Department of Justice, NIJ "Principles & Thought Processes of Crime Scene Investigation".
- 2012 – U.S. Department of Justice, NIJ "Answering the NAS: The Ethics of Leadership and the Leadership of Ethics".
- 2010 – SAR NFA Class 3 Manufacturer's Exhibition, Phoenix, AZ.
- 1993 – Total Quality Management Program – MSP Academy, New Braintree, MA.
- 1991 – Contemporary Liability Issues for Modern Police Agencies, Springfield, MA.
- 1991 – Smith & Wesson Academy, Contemporary Firearms Issues, Springfield, MA.
- 1981 – MIT Leadership Program, Massachusetts Institute of Technology, Sloan School of Business,  Cambridge, MA.
- 1981 – Forensic Examination (Medico-Legal) of Violent Death, Babson College, Wellesley, MA.
- 1980 – Bureau of Alcohol, Tobacco, & Firearms, National Firearms Academy, Firearms Examiner Course, Boston,  MA.

- 1973 – Massachusetts State Police School of Handguns, Achievement Grade "Master".
- 1973 – Graduate of the Massachusetts State Police Academy (17 weeks curriculum)
- 1969 – 1970 Mechanical Engineering in HVAC, Raisler Corp., Boston, MA.
- 1966 – 1969 Mechanical Engineering Apprentice Program and machinist , GE, Lynn, MA.
- Continuing study in Newtonian Mechanics.
- 1963 - 1966  Ordnance specialist in research, testing, repair, and maintenance U.S. Army including Explosive Ordnance Reconnaissance certification.

## **Expert Testimony or Significant Casework Venues:**

International:

- Afghanistan
- Iraq
- Nigeria

- Canada
- Israel
- Philippines

- United Kingdom
- Virgin Islands
- Pakistan

National:   Approximately 33 states within the U.S. including multi-cases in several individual states.

Innocence Projects:   Medill (Northwestern University), Northern Arizona, Downstate Illinois, Wisconsin (Wisconsin University).

## **Expertise:**

- Police shootings
- Crime scenes
- Tool mark microscopy
- Reaction time
- Gunshot wounds
- Distance determination testing
- Chamber pressure
- Defective design
- Catastrophic failures
- Gyroscopic stability
- Photomicrographs
- Bullet Drop – Path – Lead
- Wind deflection and diagramming
- Discharged cartridge case patterns
- Departmental review evaluation
- Prison made firearms

- Shooting reconstruction
- Daubert/Frye
- Shooting dynamics
- Firearms safety
- Theory of Identification
- Drag model analysis
- Hunting protocol
- Time – Speed – Distance
- Kinetic energy calculations
- Macro measuring digital/mechanical instrumentation
- Training
- SmartDraw and/or PowerPoint
- Modified, improvised, full-auto conversions
- Gunshot distance determination testing
- Angle of incidence
- Velocity testing

## **Police Shootings:**

Since 1979 I have been involved in the forensic, criminal, or internal investigation of approximately 325 police shootings where the officer either discharged his firearm or was fired upon.

**Gunshot Wound Ballistics:**

Trained extensively with Drs. George Katsas (Chief Medical Examiner of Suffolk County and Forensic Pathologist at the Southern Mortuary) and Albert Shub (Medical Examiner of Essex County), attended numerous presentations by Drs. Vincent DiMaio, Martin Fackler, and George Katsas.

Made forensic presentations at medical symposiums in MA and NH.

Conducted, supervised, reviewed, or assisted at hundreds of fatal/non-fatal gunshot incidents including wound ballistics interpretation prior to the institution of the modern Medical Examiner system.

Have attended approximately 400 post mortems involving gunshot wounds and trauma.

**Specialized Firearms/Ballistics Training:**

Armorer courses and/or actual familiarization with manufacturing, design, function at factories for:

| | | |
|---|---|---|
| • Beretta | • Marlin | • Sturm Ruger |
| • Browning | • Mossberg | • Smith & Wesson* |
| • Colt | • Remington | • Thompson Center Arms |
| • Dan Wesson | • Sig-Sauer* | • Winchester |
| • Glock* | • Saco-Maremont** | • Iver Johnson |
| • Ithaca | • Savage Arms | • Gunsmithing |

\*    Indicates the extended law enforcement armorer course.
\*\* Military M60 GPMG and hammer forging of tank and artillery barrels.

**Military - U.S. Army (1963-1966):**

- Fort Gordon, GA
- Fort Benning, GA
- Fort Dix, NJ
- US Army Ordnance School, Ft. Dix, NJ
- US Army Small Arms Repair School, Aberdeen Proving Ground, MD
- Aberdeen Proving Ground: ammunition, trajectory, chamber pressure testing; prototypes.
- 2 ½ years with 40th Ordnance Co. researching development of Eastern Bloc weapons.
- Company armorer .50 Cal MG, .45 ACP, M14 and M14A1 Rifles, Thompson .45 ACP.
- Crew chief .50 caliber M2 Browning HB Machine Gun.
- 1965 - Operation "Power Pack"  Dominican Republic

**Ballistics & Weapons Training/Experience 1963 –present:**

- Massachusetts State Police Ballistics Section – Commanding Officer.
- Massachusetts State Police – STOP Team weapons training and evaluation including full automatic, grenade launchers, tear gas, incendiaries,
- Massachusetts State Police – Transitional evaluation & testing of semi-automatic pistols.
- MSP Academy & Department Firearms Training (over 400 hours).

- US Army Natick Research Lab – Ballistic Materials Research and Testing.
- US Army Watertown Arsenal, United States Army Materials and Mechanics Research Center.
- Ft. Devens Special Warfare Weapons Center – 10th Special Forces Group.
- Association of Firearms and Toolmark Examiners.
- IHMSA – Professional Shooting Competition and Firearms Development.
- Ammunition reloading and propellant burn rates.
- Camp Curtis Guild – National Guard Training Facility (Military weapons).
- Camp Edwards – National Guard Training Facility (Military ordnance & firearms).
- Bureau of Alcohol, Tobacco & Firearms National Academy Firearms Examiner Training Course.
- MA Criminal Justice Training Council.
- Continuing research through readings, casework, attendance at scientific meetings.
- National Institute of Justice (NIJ) of the U.S. Department of Justice.
- Triangle Tool and Die, Lynn, MA.

**Lectures and Presentations**:

| | |
|---|---|
| Harvard University | Massachusetts State Police Academy |
| Northeastern University | Municipal Police Academy |
| Boston University | MDC Police Academy |
| District Attorney Seminars/Conferences | Metro Boston Emergency Medical System |
| American Academy of Forensic Sciences | Sportsman's Clubs (Firearms & Hunter Safety) |

**Other Experience:**

- Extensive reloading knowledge
- Professional shooting awards
- Barrel performance
- Ammunition penetration tests
- Collector & Federal Firearms Dealer
- Mil-Spec Testing
- Less than lethal ammunition

- Built/customized numerous firearms
- Chamber pressure trace testing
- Long-range trajectory testing
- Improvised firearms
- Destructive testing
- Silencers and improvised devices

**Publications:**
I choose not to engage in written publications.

**MASSACHUSETTS STATE POLICE  1973 -1998:**

**1973:  Massachusetts State Police Academy Graduate:**  17 Weeks in residence police training course.

**1973 – 1979 Field Operations:** Criminal/Traffic Investigations, Logan Airport Delta Airlines crash, Boston Busing enforcement, State Prison riots, state forest and game preserves, Salisbury Beach Detail.    Senior Trooper on 6-Officer Selective Enforcement "55 Team"; commercial vehicle enforcement, Presidential security, Seabrook Nuclear Power Plant, sporting events, crisis response, major traffic incidents, local police assistance, Executive Security, criminal investigations, crime scenes, and special assignments.

**1979 – 1992: Ballistics Section:** Commanding Officer of two labs, trained 5 additional firearms experts. Conducted forensic investigations statewide and out-of-state. Combined labs averaged 1500-1700 cases annually for fatal, non-fatal, accidental, defective design, malfunctions, voluntary/involuntary, toolmark macroscopy, gunshot distance determination, trajectory, crime scenes, autopsies, wound interpretation, shooting reconstruction, firearms safety, ballistics, improvised and prison made firearms, modified and altered full auto, catastrophic failures, pen guns, police procedures. Conducted agency transitional firearms evaluation testing 1987-88.  Member of Firearms Review Board.  Shooting investigations and reconstruction of incidents involving organized crime, bank and armored vehicle robberies, officer involved shooting incidents, hunting incidents.

**1992:  Shift Commander "GHQ":** General Headquarters Operations Section. Supervised statewide troop operations, 911 system, communications system, special investigations, consolidation of police forces, authorized and coordinated the use and response of department services to State Police entities, local cities and towns.

**1992 – 1995:  Shift Commander Troop "H":** Supervised 4 barracks covering metropolitan Boston Special advisor on the Consolidation of Police Forces.  Training Coordinator for new Officers; department internal investigations, commanded special details (sports events,etc.)

**1995:  Shift Commander Troop "A".** Supervised 6 barracks responsible for northeast quadrant of Massachusetts.   Training Coordinator for new Officers; department internal investigations, commanded special details (sports events, etc.)

**1995 – 1997:   Commanding Officer-Revere Barracks:** Responsible for 65-officer municipal oriented policing operation covering cities of Lynn, Nahant, Chelsea,  E. Boston, Winthrop, and Revere.  Gang activities.  Specialized units included motorcycles, off-road and beach patrols, K-9, Mounted Unit.  Primary jurisdiction on state and MDC beaches, parks, roads and waterways.

**1997:  Shift Commander Troop "A".** Supervised 6 barracks responsible for northeast quadrant of Massachusetts.   Training Coordinator for new Officers, department internal investigations, commanded special details (sporting events, etc.).

**1997-1998: Staff Inspector:**  Conducted investigations involving ethics, misconduct, use of force, shooting investigations, audits of drugs, cash, evidence, contraband, security and special investigations. Unannounced inspections of personnel and equipment. Reported directly to Superintendent/Colonel of State Police.

**1973-1998:   Annual In-Service:**  Various annual certifications and non-certification areas; CPR recertification, law updates, firearms training and qualification, pursuit and high speed driving, skid pan, physical agility, policy and procedure, rules and regulations, ethics, etc.

**1967-1973**

- Mechanical Engineering Apprentice Program, General Electric, Lynn, MA.   Jet engine fabrication, assembly, and inspection.

- Mechanical Engineering (on-site) apprenticeship for Raisler-Lappin Corp., A Joint Venture,  at the NEMNB 37-story office building, Boston, MA.

- Senior accountant and auditor, O.C. Moyer & Co, Certified Public Accountants, Boston, MA. Medium sized local public accounting firm providing financial services to professional athletes, corporations, and non-profit entities.

- Senior auditor and accountant at B&L Management Co., Somerville, MA. Firm specialized in capital venture, investment, development, and management of land, nursing homes, management companies in New England.

**Professional Organizations and Societies:**

- American Academy of Forensic Sciences (AAFS).
- International Association for Identification (IAI).
- International Association of Chiefs of Police (IACP).
- American Association for the Advancement of Science (AAAS).
- On-Call Scientists of the American Association for the Advancement of Science.
- Association of Firearms and Toolmark Examiners (AFTE) – (Former member.)
- American Society of Criminology (ASC). (Former member.)
- NRA – Life Member.
- Sigma Epsilon Rho Honor Society.

Ancillary Education:

- Massachusetts Institute of Technology, OpenCourseware, "For the Love of Physics", Professor Walter Lewin.
- Massachusetts Institute of Technology, OpenCourseware, "Introduction to Kinematics", Professor Walter Lewin.
- Yale University Lecture Series, Fundamentals of Physics, "Vectors in Multiple Dimensions", Professor Ramamurti Shankar.



**RONALD R. SCOTT, M.A., M.S.**
Forensic Firearms & Ballistics
37881 N. 10th Street
Phoenix, Arizona 85086

Tel:   **623.764.6371**
Email: _ronaldscott@azballistics.com_

_www.azballistics.com_
_www.forensic-ballistics.com_

---

*Firearms ▪ Ballistics ▪ Police Shootings ▪ Shooting Reconstruction & Investigations
Toolmarks & Comparison Microscopy ▪ Dynamics of Shooting Incidents ▪ Crime Scenes Gunshot
Distance ▪ Daubert Consultation ▪ Gunshot Wounds ▪ Hunting & Firearms Safety ▪ Trajectory Analysis*

Cases testified last 4 years:

August 2014.   N.G. AND L.G., Minors by and through their Guardian ad Litem Lilliana Magallon; Sara Perez,  Plaintiffs v County of Los Angeles; Leroy Baca, David Chevez, Lawrence Swanson. U.S. District Court, Central District of California NO. CV13-0083127  SVW (FFMx). Atty Gary Casselman, 3415 S. Sepulveda Boulevard, Los Angeles, California 90034.  Police fatal shooting of Jilberto Guiterrez while handcuffed to a hospital bed, issues of trajectory and wound path, distance, location of shooter. Deposition.

June 2014.    Rendon v City of Indio, CA.  U.S. District Court, Central District, CA.  Case # ED CV 13-0067 VAP (OPx).  Attys David Kenner and Brett Greenfield, Kenner & Greenfield, 16663 Ventura Blvd, Encino, CA 91436.  Police fatal shooting of Alejandro Rendon; trajectory, gunshot wounds, location of evidence, crime scene review, omissions of investigative procedures, subjective investigative techniques.  Trial.

May 2014.    Lucia Fancia/Estate of Nick Dominguez v Deputy Sheriff Johnny Barrientos, et al. U.S. District Court, New Mexico. Case # CIV 11-118 LH/LAM. Attys Mark Fine and David Fine, The Fine Law Firm, 220 Ninth St NW, Albuquerque, NM 87102.  Police fatal shooting of Nick Dominguez; trajectory, sequence of shots, distance determination, discharged cartridge case ejection pattern variables,  location of shooter. Deposition.

May 2014.    Rendon v City of Indio, CA.  U.S. District Court, Central District, CA.  Case # ED CV 13-0067 VAP (OPx).  Attys David Kenner and Brett Greenfield, Kenner & Greenfield, 16663 Ventura Blvd, Encino, CA 91436.  Police fatal shooting of Alejandro Rendon; trajectory, gunshot wounds, location of evidence, crime scene review, omissions of investigative procedures, subjective investigative techniques.  Deposition.

April 2014.    Arizona v Rosendo Sahagun.  Maricopa County Superior # CR2011-157058-001. Atty Bruce Blumberg, Blumberg & Associates, 3600 N. 19th Ave, Phoenix, AZ.  Sentencing hearing.  Homicide, pled to reduced charge.  Testimony at sentencing on gunshot distance, wound path trajectory, shooting reconstruction, firearms safety and lack of training.

March 2014.   Victor Velasquez v City of Santa Clara, et al.   Atty. M. Jeffery Kallis for Plaintiff, Law Firm of Kallis & Associates, 333 W San Carlos St., San Jose, CA 95110.  U.S. District Court, Northern District, San Jose Division, San Jose, CA, # 11-CV-03588-PSG. Trial.

1

March 2014.   Torres v Albuquerque Police Dept.   2nd Judicial Court, County of Bernalillo, NM. Atty. Cathy Love;  McGinn, Carpenter, Montoya & Love, P.A., 201 Broadway Blvd, Albuquerque, NM 87102.  Daubert Hearing and bench trial. Multiple Daubert motions denied, one allowed as being cumulative testimony already in evidence.   Fatal police shooting, gunshot wounds, crime scene investigation, forensic methodology, holster retention level design, absence of evidence, which should be present.

January 2014. Pennsylvania v Lloyd Thomas. Office of the District Attorney of Susquehanna County, Montrose, PA.;  District Attorney Jason Legg.  Gunshot wounds, shooting reconstruction, trajectory. Double homicide. Trial.

January 2014.     Kentucky v Pharo Wilson. *Trial.*  Kenton Circuit Court, 4th Division,  Case # 12-CR-0765; Atty. Daniel Schubert, Department of Public Advocacy, 333 Scott Street, Covington, Kentucky.  Trajectory, gunshot wound, ricochet of projectiles determined to be a police friendly fire shooting.

January 2014.     Kentucky v Pharo Wilson. *Daubert Hearing.* Kenton Circuit Court, 4th Division,  Case # 12-CR-0765; Atty. Daniel Schubert, Department of Public Advocacy, 333 Scott Street, Covington, Kentucky.  Trajectory, ricochet of projectiles, generally accepted methodology.

October 2013.       Torres v City of Albuquerque, NM, U.S. District Court, District of New Mexico, # CIV 12-1048 RB/KBM.   Atty. Tyler Atkins for Plaintiff; McGinn, Montoya and Love, P.A., 201 Broadway Blvd SE, Albuquerque, NM 87102. Police fatal shooting of Christopher Torres, wrongful death. Deposition.

September 2013.      Victor Velasquez v Santa Clara Police and City of Santa Clara, et al.  U.S. District Court, Northern District, Oakland Division, Case # 11-CV-03588-PSG. Atty Jeffery Kallis, Kallis & Associates, San Jose, CA 95110.  Police non-fatal shooting, crime scene, trajectory, gunshot wounds, shooting reconstruction. Deposition.

June 2013.     Arizona v. Mario Enriquez, Pima County Superior Court, Case # CR-2011-1438. Attorney Stanton Bloom, 145 S 6th Ave, Tucson, AZ 85701.  Microscopic comparisons, Theory of Identification, crime scene evidence.  Trial

April 2013.     Carol Champommier and Eric Avery Feldman, individually and as Successors-in Interest to Zachary Champommier, deceased, PLAINTIFFS,   v.  United States of America, U.S. Drug Enforcement Administration DEA Agent Peter LoPresti; DEFENDANTS.   United States District Court, Central District of California, Western Division.     Case No. CV11-3913 JHN (PJWx). Attorney Cara L. Eisenberg, The Eisenberg Law Firm, 509 S. Beverly Drive, Beverly Hills, CA 90212.  Fatal shooting by members of a Federal, County, and City Task Force;  issues of distance, vehicle speed, reaction time to draw and fire, crime scene evidence, forensic examination, crime lab issues, trajectory, firearms safety, shooting at moving motor vehicle, location of evidence, shooting reconstruction, calculations of the free-fall of glass in relation to time, speed, and distance of motor vehicle, etc. Deposition.

March 2013.   Arizona v. Kerry J. Putnam. Maricopa County Criminal Superior Court, Case # CR2012-007390-001.  Attorney Ronald Debrigida, DeBrigida Law Offices, PLLC., 20325 N. 51st Avenue, Suite 134, Glendale, AZ 85308. Impairment, firearms safety negligence, trajectory, gunshot wound, location of evidence. Homicide. Trial.

2

August 2012. Ruth Mitchell and Christopher Mitchell, Plaintiffs v. City of Flagstaff, Arizona, and Roy Taylor, Defendants. U.S. District Court, District of Arizona, No. 3:11-cv-08140-FJM. Attorneys Michael W. Pearson; Curry, Pearson and Wooten, PLC., 814 W. Roosevelt, Phoenix, AZ. Shooting reconstruction, gunshot wounds, reaction time, momentum and kinetic energy, wrongful death, review of reenactment by defendant, on-site reenactment, line of sight, laser trajectory, investigation by police and results of Firearms Review Board, location of victim, and correlation of evidence to the alleged version of events. Fatal shooting by police. Deposition.

May 2012. People of the Virgin Islands v. Jesus Browne *(Jury Trial)*, Superior Court of the Virgin Islands, Division of St. Croix, Case # SX-10-CR-059. Criminal trial (May 9); issues of Theory of Identification for Tool Marks, generally accepted methodology, opinions and conclusions, Virgin Islands Lab Policy & Procedure deviation and violations, calibration procedures, etc.. PowerPoint and exemplars. Attorney W. Bruce Cole; Hunter, Cole & Bennett, 1138 King Street, Christiansted, St. Croix, U.S. Virgin Islands. Homicide.

May 2012. People of the Virgin Islands v. Jesus Browne *(Daubert Hearing)*, Superior Court of the Virgin Islands, Division of St. Croix, Case # SX-10-CR-059. Defense challenge at Daubert Hearing (May 8) against the Prosecution; cross motion by Prosecution challenging Ronald Scott for qualifications. Issues of Theory of Identification for Tool Marks, generally accepted methodology, opinions and conclusions, Virgin Islands Lab Policy & Procedure deviation and violations, calibration procedures, etc. Attorney W. Bruce Cole; Hunter, Cole & Bennett, 1138 King Street, Christiansted, St. Croix, U.S. Virgin Islands. Homicide.

March 2012. Carol Champommier and Eric Avery Feldman, individually and as Successors-in Interest to Zachary Champommier, deceased, PLAINTIFFS, v. United States of America, U.S. Drug Enforcement Administration, Michelle Leonhart, in her official capacity as Administrator of the U.S. Drug Enforcement Administration, DEA Agent Peter LoPresti; County of Los Angeles, Sheriff Lee Baca, Deputy Sheriff Mark Brewster; City of Los Angeles, Los Angeles Police Department, Chief of Police Charlie Beck; and Unknown State and Federal Agents or Employees (DOES 1-10, DEFENDANTS. United States District Court, Central District of California, Western Division. Case No. CV11-3913 JHN (PJWx), consolidated with Case No. CV11-05486-Closed. Attorney Cara L. Eisenberg, The Eisenberg Law Firm, 509 S. Beverly Drive, Beverly Hills, CA 90212, 310-201-0211. Deposition by Defendants Attorneys in Los Angeles. Police fatal shooting wrongful death claim.

February 2012: Nevada v Lovell Randolph, 8th Judicial District Court, Clark County, Las Vegas, NV, Case # C274502. Attorneys Lance Maningo and Jennifer W. Amelburu, Bellon & Maningo, Ltd., 732 S. 6th Street, Suite 102, Las Vegas, NV. Failure to preserve evidence, trajectory of gunshots into moving vehicle, attempted murder, Theory of Identification, standards for crime scene processing. Trial/Hearing.

July 2011: Maribel Peguero, as Personal Representative of the Estate of Jose Gabriel Ventura v David Delaurentos and Miami-Dade Police Department. U.S. District Court, Southern District of Florida, Miami Division, Case # 11-20069CIV-Jordan. Law office of Gonzalo Dorta, 334 Minorca Ave., Coral Gables, FL 33134. Deposition. Police fatal shooting wrongful death claim. Deposition.

May 2011: Diane Rose Campillo, et al, v. Ricardo Orosco, et al; Sergio O. Ramirez v. City of Phoenix, et al. Superior Court of Arizona in Maricopa County. Case No. CV2009-024376 consolidated with Case No. CV2009-024926. Robbins & Curtin, PLLC, Phoenix, AZ. Deposition. Police fatal shooting wrongful death claim. Deposition.

3

April 2011:    United States District Court, Eastern District of New York,  Leroy J. Rasanen as Administrator of the Estate of John C. Rasanen deceased v Daniel Brown et al.  CV- 04-1995. Attorney Harry Kutner, Mineola, NY.  Police fatal shooting wrongful death claim. Trial.

December 2010:    State of Washington, Pierce County, Superior Court;  Personal Restraint Petition of Carl Jives. No. 10-2-05583-1, Court of Appeals No. 38509-1 Evidentiary Hearing.  Attorney Mark Larrañaga, Walsh & Larrañaga, 705 Second Ave., Suite 405, Seattle, WA 98104.  Post conviction appeal hearing.

<u>Written Publications:</u>

Do not engage in written publications.



**RONALD R. SCOTT, M.A., M.S.**
Forensic Firearms & Ballistics
37881 N. 10th Street
Phoenix, Arizona  85086

**623.764.6371**

*www.azballistics.com*
*www.firearmsballisticsexpert.com*
*ronaldscott@azballistics.com*

---

*Firearms ▪ Ballistics ▪ Police Shootings ▪ Shooting Reconstruction & Investigations*
*Toolmarks & Comparison Microscopy ▪ Dynamics of Shooting Incidents ▪ Crime Scenes Gunshot*
*Distance ▪ Daubert Consultation ▪ Gunshot Wounds ▪ Hunting & Firearms Safety ▪ Trajectory Analysis*

August 27, 2014

### Disclosure of Fees

The following represents Professional Fees related to the case of Thomas v Moody:

Professional fees @ 395.00 per hour.

Court, deposition, or other testimony @ 395.00 per hour with a 4 hour minimum

Travel @ 350.00 per hour.