UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF GEORGIA

KATHERINE THOMAS                                    )
Individually and as administrator of the            )          CAFN: 1:13-cv-920-WHA-SRW
Estate of CHRISTOPHER JEROME THOMAS      )
                                                                )
      Plaintiffs                                       )
                                                                )
v.                                                              )
                                                                )
DARREN MOODY                                        )
in his individual capacity:                             )
and CITY OF DOTHAN ALABAMA,              )
a municipality                                            )
                                                                )
      Defendants.                                    )
_____ )

## EXPERT DISCLOSURE OF PLAINTIFF

## I.    INTRODUCTION

My name is Roy R. Bedard; I reside in Tallahassee, Florida, where I am a full-time Professional Law Enforcement and Corrections Trainer and consultant. I am the owner and president of RRB Systems International, a police and public safety product and training corporation headquartered in Tallahassee, Florida that conducts law enforcement, corrections and public safety training throughout the world.  I am a listed subject matter expert in Police Use of Force by the Florida Department of Law Enforcement. I have been retained by Plaintiff's attorney, Mario Williams, Esq. to consult in Katherine Thomas, individually and as administrator of the estate of Christopher Jerome Thomas v. Darren Moody & City of Dothan, a Municipal corporation; I have been asked me to review the relevant issues as outlined in the Plaintiff's Complaint as they relate to recognized law enforcement policies, procedures and practices, as they existed on or about January 13, 2013.

1

## II.      QUALIFICATIONS AND BACKGROUND

I have taught a variety of police courses including classes in police and corrections procedures, police management and civil liability throughout the US and abroad since 1987.  I have taught advanced defensive tactics to academies, corrections and law enforcement agencies throughout Florida and many other parts of the nation. I have provided training and policy development to the Federal Law Enforcement Training Center and Federal Bureau of Prisons. I have developed police tactics training courses and hold patents, trademarks and copyrights on a variety of police equipment and law enforcement training. I have produced films and television shows which are used in colleges and law enforcement academies across the state and nation.  These films address the areas of use of force; police procedure, non-lethal uses of force; and issues involving Civil and Criminal liability. I regularly lecture to diverse audiences throughout the nation with respect to police use of force and self-defense.

I received a Bachelors degree from the Florida State University in Criminology and Criminal Justice in 1999 and a Master's Degree in Educational Psychology in 2014.  I am currently a Doctoral student at the Florida State University pursuing a PhD in Educational Psychology. For the past twenty-six years, I have served as a full time police officer, police trainer and reserve officer. I began at the Florida State University as a patrol officer and participated in most of my police career as a field-training officer. I have been active with the Tallahassee Police Department since 1990.

I am an adjunct trainer at the Florida Public Safety Institute since 1987, in Havana Florida providing training services for basic, advanced and specialized law enforcement and corrections officials.

2

I am certified as a police instructor by Florida's Criminal Justice Standards and Training Commission. I serve as a task force member to the Use of Force and Defensive Tactics Development Committee for police and corrections at the Florida Department of Law Enforcement in Tallahassee, Florida.

I have previously consulted as an expert witness in over 70 civil and criminal cases, most of which involve police use of force, defensive tactics and self defense. I have been qualified in both state and federal courts as an expert in use of force, police procedures and combat stress. My experience and publications are described more fully in the curriculum vitae, prepared by me and attached to this report.

III.     **Materials Provided for Review:**

- Agent Investigative Summary
- Autopsy Report
- Crime Scene Entry Log
- Dothan PD IO
- Drawing f Scene
- Evidence Property Receipt
- Video Interview of Officer Murkerson
- Int. Kendrick Deshawn Whatley
- Int. Officer Mitchell Mukerson
- Photo Log
- Stat. Alicia Crawford
- Stat. Alexandria Brown

3

- Stat. Brianna Bonds

- Stat. Charles Boyd

- Stat. Charles Allen

- Stat. Connie Johnson

- Stat. Dallas Bouier

- Stat. Daniel Kogutz

- Stat. Deanna Jones

- Stat. Derrick Edwards

- Stat. Drew Gibbons

- Stat. Fatima Frisby

- Stat. Jeremy Wade

- Stat. Jessica Crenshaw

- Stat. Joe Gibbons

- Stat. Kayla Pittman

- Stat. Liza Marie Ostrum Golden

- Stat. Melissa Ash

- Stat. Officer Darren Moody

- Stat. Phillip Foster

- Stat. Quaneshia Beacham

- Stat. Sean Kogutz

- Stat. Sharonda Foster

- Stat. Timothy Golden

- Stat. Travis Kenon

- Criminal history of Christopher Jerome Thomas

4

- ▪ Forensic firearms and ballistics report by Ronald R. Scott

- ▪ Report to Chief of Police (Pensacola PD) by Sgt. Mike Porter entitled, complaint on Officer Darren Moody.

## III.    SPECIFIC DETAILS OF THE CASE

1.  On Thursday, June 28th, 2012 at approximately 3:55pm, Officer Darren Moody and Probationary Officer Mitchell Murkerson of the Dothan Alabama Police department were on patrol in the City of Dothan, Alabama.

2.  Both officers were working as on-duty police officers for the City of Dothan Police Department at the time of this event.

3.  The officers were in full uniform and drove a marked Dothan Police Department patrol vehicle.

4.  While sitting on the side of the road doing paperwork, Officer Moody looked up and observed a white Ford Explorer traveling west on Powell Street near the intersection of Blackshear Street.

5.  Officer Moody believed that the operator of the Explorer was Johnny Jerome Hill, a.k.a. "Booty Bop".

6.  Officer Moody believed that Hill had a misdemeanor warrant for third degree domestic battery. Officer Moody made no attempt to validate his hunch by running a computer  check in order to confirm an active felony warrant on Hill.

7.  Officer Moody fell in behind the vehicle and attempted to conduct a traffic stop with his patrol vehicle.

8.  At that time, Officer Moody had not witnessed the driver of the motor vehicle violate any traffic laws or provide any objective lawful reason for a forced police stop.

9.  When Officer Moody activated his overhead lights, the driver of the vehicle refused to stop.

6

10. Officer Moody gave chase and initiated a pursuit on the public roadways of Dothan, Alabama.

11. Officer Moody alleged that the driver accelerated away at a high rate of speed (up to 60mph) and ran though several stop signs. Officer Moody continued to pursue.

12. According to Moody, the driver then drove through a shopping center parking lot.

13. Rather than terminating the pursuit based on tenuous and dangerous environmental conditions, Officer Moody stayed close behind the driver.

14. Neither Officer Moody nor Officer Murkerson apprised the on duty supervisor of the purpose of the pursuit[1] or any of the restrictive environmental conditions as described in policy.

15. The radio log recorded Officer Jamie Henderson #743 indicating that the pursuit might be for a "fox trot" 10-99, a felony warrant.

16. Though Officer Moody knew the warrant was for a misdemeanor, he made no effort to correct this information.

17. Officer Ronald Hall heard the pursuit being broadcast over the radio.

18. Officer Hall entered the parking lot, observed the fleeing vehicle and maneuvered his car to block the fleeing driver.

19. The pursuit terminated when the driver of the Explorer, Christopher Thomas stopped the car and briefly sat motionless in the parking lot.

20. Officer Moody pulled his patrol vehicle parallel alongside the driver's door of the Explorer; so close that Officer Murkerson couldn't open his passenger side door.

---

1 Moody told the supervisor  why he was pursuing the vehicle for only after he was asked by the supervisor and within moments of the fatal

21. Officer Hall, who was positioned at the front of the Explorer, exited this patrol vehicle with his TASER in his hand.

22. Officer Moody exited his patrol vehicle with his firearm in his hand.

23. Officer Moody moved towards the back of his patrol car and remained positioned on the driver's side of the Explorer. According to witnesses he never crossed into the path of the Explorer.

24. The vehicle accelerated in reverse and struck a parked car.

25. Moody moved alongside the drivers window, raised his weapon at close range and fired five times[2] into the driver Christopher Thomas while the vehicle was at a complete stop[3].

26. All of Moody's shots entered through the open driver's side window and hit the driver.

27. The wound pattern shows that the bullets struck Christopher Thomas to the neck and chest to include 1) a perforating indeterminate range gunshot wound to the top of the left side of the neck with a pathway of left to right, slightly downward, 2) a penetrating indeterminate range gunshot wound to the base of the left side of neck, with a pathway left to right, slightly upward, 3) Superficial perforating indeterminate range gunshot wound to the right medial quadrant of anterior chest, with a pathway left to right, slightly downward, front to back, 4) Penetrating  indeterminate range gunshot wound to the left medial quadrant of anterior chest with a pathway of left to right, front to back. 5) Penetrating indeterminate range gunshot wound to the left upper medial quadrant of anterior chest with a pathway of left to right, front to back[4].

---

2 Moody recalled firing four shots, See Alabama Bureau of Investigation Statement of Officer Darren Tildon Moody, pp. 1
3 See Forensic Firearms & Ballistics Report by Ronald R. Scott, M.A., M.S.
4 See Autopsy Report by Alabama Department of Forensic Sciences, Alfredo A. Paredes, M.D., 10/10/12

28. After Thomas was shot, the vehicle accelerated forward and struck a fixed sign in the parking lot.[5]

29. The vehicle continued forward, crossing Montgomery Highway and crashed into a building across the street.

30. An employee inside of the building that the vehicle crashed into was injured.

31. When officers approached the vehicle, they identified the driver, Christopher Jerome Thomas for the first time. Johnnie Jerome Hill was never inside the vehicle and was unrelated to this incident.

32. As a result of being struck by the bullets, Thomas died on the scene.

## IV.    **PRELIMINARY REPORT**

After a preliminary review of all of the documents provided by plaintiff's counsel I, being a recognized expert in self defense, combat stress and police use of force proffer that the following opinions are accurate within a reasonable degree of certainty based upon my education, training and experience. Before discussing the specific facts and circumstances involved in this case I have framed the discussion by explaining common, generalized police procedures and methodologies with respect to police pursuits and firing at motor vehicles. This foundation will assist triers-of-the –fact with understanding what should reasonably be expected when officer's voluntarily engage in police pursuits or attempt to stop them by using small caliber arms.

---

5 See audio interview of Officer Murkerson

9

## A.    VEHICLE PURSUITS

It was not until the 1960s that police pursuits were considered a problem for police and the public (Alpert & Fridell pp. 99). Throughout the following decades a significant number of studies have attempted to shed light on the dangers of police pursuits. The early studies include, The Fennessy Report (US Dept. of Transportation, 1970), The California Highway Patrol Study (early 1980's), The Solicitor General's Report (Ontario, Canada, 1985), the Beckman Study (1986-87) and The Alpert and Dunham studies (1985-1990). All of these studies represented the dangers presented by police pursuits by tabulating the number of accidents, injuries and deaths directly associated with them. The findings shocked the public conscious and led to the changes in public perception of police pursuits. Many agency policies and state laws nationwide have been written to curb and restrict the otherwise unbridled and all too reckless practice.

Police pursuits have been legally defined as "an action, thrust upon the police by lawbreakers or other external forces that require choices between different risks posed to the public".[6] The courts have recognized that regardless of what decision an officer takes with regard to giving chase, someone or some group is usually placed at risk, leaving the officer to choose between the lesser of two evils. For this reason, police pursuits are not generally forbidden in law and policy but they are highly restricted by responsible agencies to specific circumstances evermore requiring life-threatening emergencies.

Emergency doctrine is a principle that allows someone to take some action in the face of a sudden or urgent circumstance. It helps in this discussion to operationalize the term, "emergency" to be understood as a sudden or unexpected event or a combination of circumstances that call for immediate action without giving time for deliberate exercise of judgment.[7]

---

6 Pinellas Park v. Brown, 67 So. 3d 1213 (Fla. 1992)
7 This definition is commonly used by a variety of courts and has been accepted as a uniform standard in police procedure analysis.

10

Law Enforcement officers are generally trained to appraise situations as emergency or non-emergency matters by considering the *totality of circumstances* that surround a particular event. The facts and circumstances surrounding an event create an objective understanding of the nature of a stimulus and how an officer might have reasonably perceived it. This requirement also aligns police pursuit theory with all other uses of force by police officers thereby requiring the same cautious regard for Constitutional deprivations that may be caused by their use.

A law enforcement officer's mere assertion that he was involved in an emergency is not sufficient to satisfy the test of whether an emergency situation in fact existed. He must articulate reasons why he believed at that moment that an emergency was present and why he was forced to take subsequent action. Law enforcement officer are often handicapped by not knowing all of the facts related to what they are observing. Often times they are forced to make decisions under stress with rapidly unfolding circumstances. Law enforcement officials are specifically trained to consider the objectivity of a threat and to analyze it and react within the confines of law. Triers-of-the-fact must be guided to the local policy and training standards that given police officers would be expected to operate under during police pursuits in order to understand if the officer's appraisal of an emergency situation was accurate based upon the available information at that time. This analysis should be coupled with State and national standards regarding vehicle pursuits to assure that a full measure of objectivity is compared to the officer's actual actions. A discussion of objective reasonableness as taught and prescribed to law enforcement officers is found in section E.

The Dothan Police Department has policy on police pursuits that generally reflects national standards and Constitutional concerns. It cautions officers, "deciding to pursue is always a process of weighing the hazards presented by pursuit against the hazards being created by the violator. Good judgment in weighing the risk involved is essential, as it will help avoid unwarranted hazards. The seriousness of the offense does not lesson liability and/or duty to all persons, including fellow

11

officers and themselves, to drive with due regard for the safety of all persons. Officers involved in pursuits should terminate any vehicle pursuit, regardless of the seriousness of the crime when weather, traffic, road conditions or locale make further pursuit unreasonably hazardous to the safety of the public, and the officers involved…"[8]

The Dothan policy goes on to provide specific circumstances when pursuits are authorized. It includes; a) a felony, or the officer has reason to believe that a felony is occurring, b) driving while impaired and, c) an assault on or witnessed by an officer. Though these are only a few examples, they appear to be intended to reflect the severity of crime and the inherent danger posed to the public if the driver were allowed to continue operating a motor vehicle. Recalling that in this case, Officer Moody initiated a pursuit for the purpose of "confirming the identity of a driver" it is unlikely that this reason would qualify within the spirit it the written policy.

### B. THE PURPOSE OF THE PURSUIT

Officer Moody was sitting in his patrol vehicle doing paperwork on the side of the road (Blackshear St.) while Probationary Officer Mitchell Murkerson sat in the passenger seat watching traffic pass by.

Officer Moody looked up as a white Explorer drove by and he told Murkerson that *he thought he recognized the driver* as a subject by the name of Johnny Jerome Hill a.k.a "Booty Bop" who he believed had an outstanding arrest warrant for domestic violence. In fact, Hill had an alias warrant issued May 3, 2012 for failure to appear on a domestic violence 3rd degree, a simple misdemeanor in Alabama. Perhaps more important, Johnnie Jerome Hill was not driving the vehicle nor was he a passenger in it. Instead, the Explorer was driven by Christopher Jerome Thomas who Moody allegedly mistook for being Hill. Without verifying his original hunch Officer Moody decided to stop the white Explorer to ascertain firsthand who the driver actually was.

---

8 See General Order 100-4, section c; Pursuit of a motor vehicle.

Moody told Murkerson that he was going to stop the vehicle to verify the driver's identity. Moody fell in behind the Explorer as it traveled on West Powell St. Moody referred to this stop in his interview as an "investigative traffic stop" and wrote in his report that he was going to stop the vehicle to determine if the driver was in fact Hill. Absent this, Moody had not observed Thomas commit any criminal violations or traffic violations.

There are several points that must be made to understand the legality of investigatory stops. Police officers who stop motor vehicles for investigatory purposes must at the very least have reasonable suspicion of a violation[9]. Temporary detention of individuals during a stop of an automobile by police, even if only for a brief period of time and for a limited purpose constitutes a seizure under the Fourth Amendment[10]. Automobile stops by police are therefore under the Constitutional imperative that they not be "unreasonable".

Considering the facts of this case, it is doubtful that triers-of-the-fact would consider a passing, uncertain glimpse of a driver sufficient without other supporting evidence to constitute a reasonable suspicion stop. There are of course other ways besides stopping vehicles to gather information to justify reasons for a lawful stop that are permitted within the the confines of Constitutionally protected rights. Dothan Police vehicles are equipped with communication devices and access to a central dispatch so that officers can enquire about information that they are uncertain of. They have full access to State and national records regarding vehicle license plates, who the owner is, what address the vehicle is licensed to. This, and a variety of other information are usually helpful in pushing an officer's mere hunch to a respectable position of reasonable suspicion[11]. Police officers can also run active warrant checks on individuals in order to assure that yesterday's warrant, for example, is still valid today. Whereas warrants are regularly entered into and taken out of the

---

9 Whren, et al v US 517 U.S. 806 (1996)

10 See Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Martinez Fuerte, 428 U.S. 543, 556 (1976); United States v. Brignoni Ponce, 422 U.S. 873, 878 (1975)

11 Reasonable suspicion that a crime has, is or is about to be committed is the first legal basis for an investigatory stop. This is a well established

system as they are issued and served, it is always prudent to guarantee that a warrant remains current before acting on it. Moody stated in deposition that he saw the misdemeanor warrant on his computer screen was active nearly a week earlier. Dothan's policy addresses proper procedure for stopping vehicles and instructs officers of the agency's requirements for police pursuits to wit:

"Pursuing officers should make every effort to obtain the license number of the vehicle being pursued and transmit same to the Communications Center. Even a partial number can be a valuable aid in identification. Other descriptions concerning vehicle make, color and occupants should be furnished to Communications if possible. Normally the *best time to record such information is prior to any attempt to stop the pursued vehicle* and the alert officer should record the tag number as a matter of routine".[12]

With respect to this case, there is no evidence that Officer Moody attempted to verify that their was an active arrest warrant for Hill, nor did he attempt to use conventional methods readily available to law enforcement officers to verify the ownership of the vehicle before he attempted to stop it. Though he did record the vehicle license number to the dispatcher, he did not request registration information and it was not provided during the course of the pursuit. There is no dispute that Officer Moody was at all times uncertain about who the driver actually was, yet he made no effort to gather any further information beyond the quick glance, that later proved in such a tragic way, to be an inaccurate misidentification. In this respect, Officer Moody did not make a simple "rookie" mistake as patrol officers are often prone to make in uncertain rapidly changing environments. The evidence shows that Officer Moody, a field-training officer who taught department policy and procedures to newer police officers, intentionally neglected useful and recommended police procedures commonly used to verify a subject's identity and cause for a stop.

It appears that Officer Moody has a long history of similar conduct. I have reviewed a report

---

principle of law since 1968. See Terry v. Ohio, 392 U.S. 1 (1968)

to the Chief of the Pensacola Police Department, Moody's former employment, from August of 1996 written by Sgt. Mike Porter, Moody's supervisor, that detailed several similar complaints against Officer Moody when he was an officer with that agency. Sgt. Porter referred to a "rash of complaints" against Moody, all involving traffic stops without the requisite reasonable suspicion. Porter concluded, "*Moody has demonstrated the inability or desirability [sic] to adjust to the situation as it actually is. He continues to dig before any violation, no matter how minor in an apparent effort to justify the initial stop and to confirm that his first perceptions were right all along*".

In 2003, Officer Moody, while still working at the Pensacola Police Department, was counseled for wrongfully arresting a person who Moody accused of having an active warrant. Moody went to the subject's house, Kirk Phillips, B/M 08/06/60 and placed him in handcuffs. He then took him to jail. It was at the jail that Moody discovered that no active warrant actually existed for this subject. Moody later wrote in his Report to the Chief of Police, *"I understand that this incident could have been avoided if I had physically verified that the warrant was in the DSO before going out and serving it"*.

In August of 1997, Moody got in a pursuit of vehicle for a minor traffic infraction (no taillight) in the City of Pensacola at E. Street and Gregory St. When the fleeing vehicle began to pull over the driver quickly opened the driver's side door. Moody pulled his patrol vehicle parallel to the side of the fleeing vehicle and drove into the open front door space of the vehicle effectively blocking the driver's escape. Had the driver attempted to flee on foot it is likely that this police tactic would have resulted in his significant injury or death. Moody's disregard for the safety of the driver and violation of training and policy protocols was not addressed by the agency. It is clear from the facts of this case and the accompanying diagram that Moody violated accepted standards for

---

12 See Dothan Policce policy 100-4, ©)2(d)

stopping motor vehicles in an attempt to apprehend the driver at any cost.

The circumstances I have been asked to opine on in the Thomas case are a reflection of the many problems that Moody had been historically cited for by his former employer. His disregard for policy, proper procedures, and the Constitutional rights of others is well documented. His propensity for violence and rash decision-making is also a part of his professional record, so significant that it cost him his job with the Pensacola Police Department in 2003.[13] He admittedly attempted to find employment as a police officer twice after leaving Pensacola Police Department. He was rejected on both occasions. He later took a position at a strip club where he worked for 5 years before returning to police work for the Dothan Police Department.

Law enforcement officers are limited in their enforcement powers to detain or arrest individuals and they rely on certain facts and circumstances coming together in such a way as to create a reasonable suspicion that a crime has, is or is about to be committed. They do not possess carte blanch authority to interfere with a motorist's free passage along public or private roadways. Forcing vehicles to come to a stop without articulable facts to support the reasonable suspicion stop is a patent violation of the motorist's Constitutional rights. In my review of the information and evidence, Officer Moody's purpose for stopping the vehicle was pure unsubstantiated guesswork, insufficient criteria to constitute a lawful traffic stop.

When Officer Moody expressed his authority by activating his overhead lights, the driver refused to stop. It is alleged that the driver then committed several traffic violations including speeding and running through stop signs in midday and in a residential neighborhood. This immediately raised the danger to the community and innocent persons in the area. Moody also chased the vehicle at high speeds. He also ran through stop signs without stopping and equally created a dangerous situation to the public. Still, Moody maintained the pursuit.

---

13 Moody was allowed to resign after the Chief of Police sought to terminate him for battering his girlfriend.

16

Dothan Police policy required a supervisor to determine the circumstances of the pursuit as soon as possible to determine whether it should be allowed to continue. A review of the radio log shows that both Officer Moody and Officer Murkerson called information as the pursuit was on-going, but they failed to notify the Supervisor that they were reaching speeds in the neighborhood of up to 60 mph while running roughshod through stop signs without apparent concern for community residents. It is these factors among others roadway violations that make pursuits dangerous. The radio log shows that Scott Long #360 enquired about the reason for the pursuit only after it left the residential neighborhood and entered the commercial area of Dothan. When the pursuit was reported to be in the parking lot of Suit City, Long asked, "*advise the reason for 10-99*" (what's the warrant for)? To which another uninvolved officer answered, "*I believe it's a three fox-trot. Signal 15* (felony warrant)". Officer Moody made no effort to correct him although he was fully aware that if this driver was Christopher Thomas, he only had a misdemeanor warrant. Sgt. Long did not instruct Officer Moody to discontinue the pursuit.

It is not clear if Officer Moody's reason for pursuing Christopher Jerome Thomas was because he was suspected of having an outstanding warrant or if Officer Moody continued the pursuit based upon the new traffic violations that he was steadily observing. It should be noted that Moody's pursuit greatly contributed to the increasing criminality of Thomas as he overtly avoided capture by violating traffic control devices and endangering the public. In either case, nothing that Officer Moody observed before, during or after the pursuit could support a reasonable argument that Thomas needed to be captured there and then at the cost of steadily increasing the already enormous risk to the public. In my view, the pursuit was in clear violation of recognized standards and policies regarding vehicle pursuits and was never approved by a supervisor[14]. Whether the pursuit should have begun or have been allowed to continue in light of the expressed danger it presented to the

---

14 See Dothan Police Policy, General Order 100-4, 4(a)

17

public remains a question for the jury. To help answer the question more reliably I have framed a professional perspective of police pursuits in general in the following section.

### C.    ROUTINE AND EMERGENCY OPERATIONS

The operation of motor vehicles by law enforcement officers are generally divided into two categories; routine and emergency operations. It is generally understood that in the latter case, law enforcement officers are legally authorized by statute and policy to reasonably disregard certain traffic laws that would otherwise hinder an effective emergency response. However, the decision to violate traffic laws raises the risk to the police officer, the offender and the public who may be caught in the immediate area of an active police chase.

Statistics of police pursuits on a national scale are difficult to gather, as there are no central reporting requirements in place for the thousands of law enforcement agencies in the United States. The FBI has gathered available statistics and made estimates of the effect of police pursuits. They noted the following; the majority of police pursuits involve a stop for a minor traffic violation. As a result, one person dies every day proximate to the police pursuit. On average, from 1994 through 1998, one law enforcement officer was killed every 11 weeks in a pursuit (more recent statistics show this number has climbed to approximately one every 6 weeks). 1 percent of all U.S. law enforcement officers who died in the line of duty lost their lives in vehicle pursuits. *Innocent third parties* who just happened to be in the wrong place at the wrong time constitute 42 percent of persons killed or injured in police pursuits. 1 out of every 100 high-speed pursuits results in a fatality.

Theoretically police pursuits won't often end well. Given the spectrum of possibilities that are inevitable to the police pursuit, a fully positive outcome can be reasonably estimated to have a probability of approximately 20%. Looking at the schema below (Figure 1) that I have presented to police management classes, of the five inevitable outcomes naturally generated by the police pursuit,

18

only one possibility ends with a fully positive outcome. Police procedure experts and agency policy makers who have looked at similar schemas of police pursuits have strongly recommended that police agencies develop restrictive policies for officers tasked with such a dangerous discretionary law enforcement function.

| EVALUATING OUTCOME POTENTIAL OUTCOMES OF POLICE PURSUITS | | |
|---|---|---|
| | Positive | Negative |
| Fleeing Offender Pulls over. No injuries to the officer, the offender or innocent other and no property damage. | √ | |
| Fleeing Offender crashes into object causing injuries to himself, death or property damage. | | √ |
| Pursuing Officer crashes into object causing injuries to himself, death or property damage. | | √ |
| Fleeing Offender crashes into innocent other causing injuries or death to himself or others, or causing property damage. | | √ |
| Pursuing Officer crashes into innocent other causing injuries or death to himself or others, or causing property damage. | | √ |

**FIGURE 1**

Real world experiences teach us of the dangers associated with police pursuits. As such, State and Federal courts frequently weigh in on police pursuits providing a large body of case law regarding an officer's legal permission to pursue, further emphasizing the need for law enforcement agencies to assure prudence, cautiousness and reasonableness among their officers.

Good public policy begins with the understanding that police pursuits are never static. They are extremely dynamic and do not occur within a vacuum. The potential for harm, the immediate danger to others, the seriousness of the offense, the risk to intervening police officers, other motorists, pedestrians and property must all be constantly considered to shape the officers' decision to continue to pursue a fleeing vehicle or to or terminate.

Many police research groups, insurance companies and public policy analysts encourage policy makers to think of police pursuits as a public safety issue rather than an apprehension issue.

19

This attempt to balance the risks associated with pursuits against the need to capture a fleeing vehicle compels every officer and supervisor involved in the pursuit to be mindful of changing conditions and to base decisions to continue a pursuit or to terminate it by weighing the need to capture a fleeing driver against the obvious danger presented to the public.

The first inquiry concerning pursuit investigations is whether there was a bona fide emergency afoot when the officer(s) initially engaged the pursuing vehicle. Many law enforcement agencies require that officers have probable cause to believe that those in the fleeing vehicle have committed a forcible felony or have committed some act that presented an immediate danger of death or great bodily harm to another. In other words, the pursuing officer must only create pursuit conditions when the need to capture the vehicle outweighs all of the dangerous conditions previously mentioned. Minor traffic violations would most certainly not qualify. Nor would investigatory stops based on mere hunch. Some agencies however, continue to allow their officers to pursue for the most minor traffic violations by leaving their policies broad and implicitly vague. Still, it is exceedingly rare to find a police agency that does not require officers to take changing conditions into consideration for continuing a police pursuit.

There is no argument that fleeing and evading law enforcement officers is wrong. However, it is generally reasoned that fleeing vehicles might simply be fleeing because they don't want to get caught by the police and not because they are rushing to get somewhere faster. The community cannot reasonably expect that a fleeing suspect will stop because the conditions become too dangerous. Desperate individuals generally have a lack of insight and show little concern about consequences. They may not fully consider the risk to themselves or others that they present by their desperate actions. Understanding this element of human nature, it can reasonably be concluded that the only one the community can rely on for having the intellect, emotional control, and objective maturity for controlling a police pursuit is the police officer who has been trained in deciding to

20

begin a chase, continue a chase or break off a chase and has the insight to consider when the risk of injury to innocent people exceeds the need to immediately capture the offender.

Thousands of police pursuits involving desperate drivers have been captured on police dash cams throughout the nation and are regularly shown to the public on the Internet and television.[15] They all too often end in fiery carnage. Restrictive police pursuit polices are not intended to encourage drivers to defy law enforcement authority or to deter law enforcement officers from making arrests. Rather, they are objective measures put in place to prevent potential tragedy and loss of life.

For some police officers, allowing a defiant driver to escape is a hard pill to swallow, but when the danger to innocent people outweighs the need for an immediate apprehension it must be done. It requires not only intellect, but also the kind of emotional control and maturity that only comes from experience and specific pursuit training. These are characteristics communities expect their police officers to exhibit before they are entrusted with the tools and weapons of the trade. Today, police agencies are driven by a multitude of court decisions that reflect this sentiment. The onus of responsibility for injury to innocent citizens caused by unjustified police pursuits is now most commonly placed upon the pursuing officer(s) who we should expect to be properly trained and restricted by policy in their decisions to pursue.

### D. AGENCY POLICY, POLICE PURSUITS AND USE OF FORCE

In my experience reviewing cases, I have noted that police agencies commonly maintain policies on police pursuits, the discharge of firearms, and in particular, situations that specifically involves firing at motor vehicles. Sixteen states in America currently have statutory requirements that agencies create and maintain policies regulating police pursuits. In a study conducted in 1997 by Geoffrey Alpert, Ninety-one percent of agencies surveyed (n=800, 436 respondents) had written

---

15 I have been directly involved in the collection of captured dashcam videos for the television series World's Wildest Police Videos for over a

policies governing pursuits, with most of them written in the 1970's and most of those (87%) modified them within the last two years to make them more restrictive[16].

The subject of the use of deadly force against the drivers and occupants of moving motor vehicles has also become an increasingly troublesome and controversial topic. Some departments have adopted policies that greatly restrict or altogether prohibit shooting at or from a motor vehicle in particular when the instrument of threat is the motor vehicle. As an example, consider the policy used by the Los Angeles Police Department addressing firing at moving motor vehicles:

*"Firearms shall not be discharged at a moving vehicle unless a person in the vehicle is immediately threatening the officer or another person with deadly force by means other than the vehicle. For the purposes of this Section, the moving vehicle itself shall not presumptively constitute a threat that justifies an officer's use of deadly force. An officer threatened by an oncoming vehicle shall move out of its path instead of discharging a firearm at it or any of its occupants. "*

Contrast this with an east coast Sheriff's Department and the similarities reflect a National sentiment. The Palm Bach County Sheriff's Office policy states, "*Firing at a motor vehicle is prohibited, except when the employee reasonably believes that: an occupant of the vehicle is using or threatening to use deadly force by means other than the vehicle or a vehicle is operated in a manner intended to strike an employee or citizen and all other reasonable and available means of defense have ben exhausted, including moving out of the path of the vehicle…*"

This statutory and policy consideration has also been called into question in this case. To recap the previous section, the City of Dothan had a formal written policy that sets forth the factors to be considered in initiating and maintaining a police pursuit. The factors listed in Dothan's written policy include road conditions, traffic conditions, weather conditions, and locale. Officers are also

---

fifteen year period.
16 Alpert, Geoffrey, Police Pursuit: Policies and Training . Series: NIJ Research in Brief Published: May 1997 13 pages, NIJ

instructed to not pursue if the fleeing vehicle is too far ahead of the pursuing officer. Policy requires that as soon as practical that officers start and maintain steady communication with the radio dispatcher, notifying him of the unit, location, direction of travel, license number and description of the vehicle being pursued, reason for the pursuit, traffic conditions, speed and weather conditions.

There are three relevant areas of Dothan's police policy that Officer Moody testified that he was trained in before engaging in the pursuit with Christopher Thomas: that a pursuit will be terminated regardless of the seriousness of the crime when weather, traffic, road conditions, or locale make further pursuit unreasonably hazardous to the safety of the public, that a pursuit must be terminated when a motor vehicle pursuit exposes an officer, member of the general public, or suspect to an unnecessary or unreasonable risk of harm or injury, and that safety is the prime consideration when an officer is engaged in the pursuit of another vehicle. The policy is clear that officers involved in a pursuit can also terminate without fear of professional consequences if they believe the danger to the suspect(s) or others outweighs the need for immediate apprehension. Finally, I note that Dothan's written pursuit policy required that post pursuit reports (PD-12) be filed by officers involved in vehicular pursuits. These reports should be signed by all officers involved, reviewed by a supervisor and forwarded through the Chain of command to the Chief of Police and the Internal Affairs Commander. This report is required to be submitted before the pursuing officers end of shift.

The City of Dothan also had a specific policy regarding firing a weapon at or from a moving vehicle[17]. It explicitly stated, "*officers' shall not discharge their firearms at or from a moving vehicle except as the ultimate measure of self-defense or in defense of another*".

It is not clear from the policy if a Dothan police officer's assessment of a deadly threat requires more than the mere aggressive operation of a motor vehicle. But under Federal and State law, if a Dothan Police officer were to evaluate the mere operation of a motor vehicle as a deadly

---

17 See Dothan Police Department General Order 100-2, E; Moving Vehicles.

threat to himself or others he would also be compelled to describe how the use of a small caliber bullet would serve to end that imminent threat. Law enforcement officers nationwide are instructed and have a priori knowledge that police officers do not shoot to kill. Rather they shoot to stop active threats. Modern law enforcement policy commonly instructs officers to get out of the path of a motor vehicle if possible rather than to try and stop the vehicle's motion and the imminent threat it might present with a small caliber bullet. Bullets do not stop moving cars.

The purpose of this and other similar policies that restrict a law enforcement officer's permission to shoot at motor vehicles is that bullets from handguns in particular, are considered ineffective for immobilizing motor vehicles. While a bullet can penetrate certain limited parts of the motor vehicle and incapacitate the driver, this is not necessarily a good thing. Fleeing drivers, even under high anxiety, fortunately retain some cognitive ability to control the motor vehicle and to intentionally avoid collisions with people and property. However, if a police officer's bullet does find the driver and does have a debilitating effect, the moving vehicle is now completely out of control and uninhibited. In this condition it reasonably becomes an even larger danger to the community than it previously was. It is expected that a moving motor vehicle without the benefit of a viable driver will proceed out of control, striking other cars, fixed objects, crashing into buildings, or striking pedestrians who are not fortunate enough or alert enough to get out of the way. A speeding vehicle without a reactive driver piloting it creates an entirely new emergency and a greater responsibility for the police agency. It is considered imprudent for police officers to create special situations that present new dangers to the community beyond whatever danger is already posed by a resisting offender. The principle of State Created Danger is patently obvious when a police officer forcefully debilitates a capable driver who is fleeing in a motor vehicle. Most circuit courts analyze the issue of whether the state-created danger theory is applicable by examining if officers left the individual or community in a situation that was more dangerous than the one in which they found it,

by creating a previously nonexistent danger or increasing a present danger.

The firing of a firearm at or in the direction of a person is a prima facie use of deadly force. Therefore when an officer discharges his or her weapon at a person he or she must justify that the person presented an imminent threat of death or great bodily harm to the officer or others. The facts and circumstances surrounding the use of deadly force, according to Dothan Police policy must be articulated in a Use of Defensive Actions Report (DPD #12) and filed with the officer's supervisor before the end of shift. The officer's supervisor shall be notified as soon as possible and shall conduct an investigation to determine the facts. An administrative review of the report is also required. The report must be signed by the officer's chain of command and then forwarded to the Chief of Police. Finally, the Office of Internal Affairs, who will prepare a written detailed analysis of the event, will review all Defensive Actions Reports.

I have not been provided a Post Pursuit report (PD-12) or a Defensive Actions Report (DPD #12) nor have I seen any report regarding these two policy issues generated by the department's Internal Affairs. It is not known if the agency complied with its own policies and have simply left these documents out of the discovery materials or that significant policies were violated and none of the required documents were ever written. At present there is a glaring lack of written documentation surrounding two of the most serious areas of police conduct, pursuits and use of deadly force.

### E.   OBJECTIVE REASONABLENESS

All use of force is held to an **objective reasonable** standard. Where law enforcement use of force decisions are always subject to an after-the-fact determination of reasonableness it became imperative that certain rules and guidelines be put in place in policy and training to help structure the reasoning that formally comprises lawful officer decision-making. To this end, the profession has operationalized certain terminology that is widely accepted among law enforcement professionals. There are also models of force and well refined schemas describing proportional categories of force

that have become widely accepted within the profession for over the last fifty years. These decision-making tools are prescribed to officers both at the academy level and in-service.

Operationalizing terms, understanding force modeling and familiarity with force schemas are also important to those of those who are tasked with objectively reviewing an officer's actions and behaviors in hindsight. Triers-of-the-fact must be instructed in the standards that are in place in the police profession for the use of force at the time that force was used. Absent this knowledge, their analysis would be based solely on subjective factors rather than the objective models and schemas accepted within the profession and used by police officers.

For those who do not share the police experience or are otherwise unfamiliar with police training, objectively deciding reasonableness in light of police discretionary functions is a nearly impossible endeavor[18]. The Federal and State courts are the basis for providing structure and guidance to the concept of "objective reasonableness."[19] The science of use of force decision-making has evolved in the law enforcement profession since the 1960's and represents one of the most well studied and often applied models of appropriate behavior for law enforcement officers.

Force applications are measured for proportionality with the use of measuring instruments called force continuums. The concept of a civilian law enforcement force continuum was borrowed from an earlier military model that suggested rules of engagement as appropriate responses to perceived threats. After the Court's landmark rulings established the need for objective reasonableness[20], experts familiar with the military model reshaped and redefined the rubric to reflect threats reasonably foreseeable to officers of the law with pre-determined use of force response patterns. This was an applied method of scaling force that turned conflict resolution into a

---

18 As an example, newspaper reports of deadly force incidents regularly feature members of the public wondering why officers didn't shoot aggressive subjects in a limb. They are unfamiliar with police firearms training which always teaches that shots are placed center mass. They also question why officers don't fire warning shots or chase cars that run from them. To them, these possibilities seem more reasonable than an officer's trained course of action.
19 Tennessee v Garner, Graham v Connor
20 **Graham v Connor,** 490 U.S. 386 (1989) & **Tennessee v. Garner**, 471 U.S. 1 (1985)

measurable science by presenting a visual model of escalating categories of resistance and response that showed accepted levels of proportionality.

Underlying the categorical model is the concept of objective reasonableness that allows after-the-fact observers to see with clarity the agreed upon standards of self-protection afforded to law enforcement officers in the performance of their duties. The chart does not require that officers select best choice, less intrusive means or lower alternatives to be considered objectively reasonable. Instead it allows officer to use a variety of force options that consider the *totality of the circumstances* to measure a proportional response to the corresponding level of threat. If an officer were to use a response level above the agreed upon corresponding resistance level, a line on a chart would be nearly sufficient to show that the officer used excessive or objectively *unreasonable* force.

I co-authored the Florida Department of Law Enforcement's Criminal Justice Standards and Training Commission chart to instruct officers in basic recruit training. This chart is merely a model of escalation/descalation theory and a rubric for demonstrating proportionality of force. Similar charts are routinely found in agency policy throughout the nation for both State and Federal law enforcement.



**Taken from the Criminal Justice Standards and Training Commission Defensive Tactics Curriculum Legal and Medical Risk Summary (2002)**

## F.     THE USE OF DEADLY FORCE

A quick glance at the provided chart shows that Deadly Force can only be used when a subject presents Aggravated Physical Resistance.  Aggravated Physical Resistance is considered a threat level that a trained law enforcement officer reasonable anticipates will cause death or great bodily harm to the officer or another.  Assuming that Officer Moody believed that he was exercising a legitimate law enforcement function at the time he fired shots at Mr. Thomas, we can analyze his use of deadly force by reviewing the training that he was known to have received along with the rules and guidelines considered acceptable within the profession. For the use of deadly force to be reliable, the officer who used the force must describe specific facts and circumstances based upon the totality of the circumstances that gave rise to his reasonable belief that his life or that of another

were in imminent danger of death or great bodily harm. These facts and circumstances are not simple guesswork. The description of specific threats must be supported by well-founded beliefs. It is not sufficient that an officer merely declares himself or others in danger of death or great bodily harm; he must show convincing evidence to support his analysis. This type of information is expected to be found in the Defensive Action Report that is required by policy. In this case no such reporting seems to exist.

To be sure, the use of deadly force is always a final solution to resistance. It is a weighty decision that requires a careful analysis of the facts and circumstances presently known to the officer. Officers may not attempt to flavor their reporting with facts that they discovered after the use of force was applied. Law enforcement officers should be trained in certain specific elements that are necessary to justify the use of deadly force[21] and records of Officer Moody's training show that he was.

Under Dothan Police Policy, Alabama State and Federal law, for deadly force to be justified, regardless of whether the intended recipient of the force lives or dies as a result of the force, the officer must be able to articulate and establish a reasonable belief that his/her life or some other person's life was in imminent danger of suffering death or serious bodily harm from the actions of another. There is no deviation or inconsistency from nationally accepted standards of using deadly force among these three authoritative entities.

In the State of Alabama Code, section 13A-3-27 entitled, Use of Force in Making an Arrest or Preventing Escape requires that peace officers use only the degree of force which he reasonably believes to be necessary, upon a person in order to make an arrest, prevent an escape or to defend themselves or others from imminent harm.

The use of deadly force is justified upon another person when and to the extent that he

---

21 Olson, Dean T, **Improving Deadly Force Decision Making,** FBI Law Enforcement Bulletin, Feb 1, 1998

reasonably believes it necessary to make an arrest for a felony or to prevent the escape of a person arrested for a felony or to defend himself or another from what he reasonably believes to be an imminent use of deadly physical force. Where Alabama Criminal law allows for the use of deadly force to apparently make any Felony arrest, it is Constitutionally unreasonable to stop all fleeing felons by killing them.[22] For the use of deadly force to be valid law enforcement officers must be able to articulate facts and circumstances, probable cause aside, that the escape presented an imminent danger of death or great bodily harm to the officer or another.

Though all law enforcement use of force is based upon a reasonable standard as prescribed by the 4th Amendment of the US Constitution[23], deadly force requires a deeper and more complete analysis in order to justify its use[24]. For this reason, most training standards require that officers be able to articulate three distinct elements when recounting the facts and circumstances that they were challenged with at the time that deadly force was used.

It must be understood that Constitutionally, deadly force is never used as a compliance technique or an arrest technique unless there is a fear that a person's escape needlessly endangers the life of others. It is used only in defense of an officer's life or the life of another when the facts and circumstances indicate that a subject is imminently likely to cause death or great bodily harm. Officer Moody seems to have understood this. His use of force examinations going all the way back to 2008 has asked this question. Moody has answered the question, "An officer may use deadly force when: (answer b) there is imminent danger of loss of life or serious bodily injury to the officer or another person. He has rejected responses a, c &d; respectively, "the suspect is considered armed and dangerous", all other means of arrest have failed" and "the suspect has committed a crime in the presence of the officer". On question 14 of the exam, Moody has answered the question, "What are

---

22 Tennessee v. Garner, 471 U.S. 1 (1985): "The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. Pp. 7-12."
23 **GRAHAM V. CONNOR**, 490 US 386 (1989)

the two factors that must be present to justify deadly force? Circle two: to be (a) imminent danger and (d) absence of a safe alternative. Though I might be critical of the examination's construction, it's ability to assess applicable knowledge, and the fact that the same examination is given every year (going back to at least 2008) without change, the two items described show some evidence that Officer Moody knew the rules for making Constitutionally valid deadly force decisions.

A review of the documents received in discovery shows that Officer Moody was trained and regularly retrained in the use of force. Modern course curricula in deadly force decision-making and justification present three elements that are necessary to justify a proper use of deadly force to wit: (1) Ability, (2) Opportunity and (3) Jeopardy.

First, an officer must reasonably believe that a subject had the ***ability*** to cause death or serious bodily harm to the officer or another. Determining ability requires that the officer recount a specific feature of the resistance that could have, if allowed to fully transpire, result in the officer's or another's death or serious bodily harm. As an example, a person who holds an object that can pierce, penetrate, slash, cut, cause significant bodily trauma or in other ways leave broken bones, permanent disfigurement, scarring, or extended hospital stays would be said to have the ability to cause death or serious harm. This would of course include the possession of conventional weapons like knives, guns, or explosives, but could also include any item that could be wielded to cause the type of injuries described from cement bricks to liquor bottles to ballpoint pens. Further, determining a subject's ability to cause death or great bodily harm may extend to allow for something more ambiguous like an attacker's much larger size in relationship to a defending officer. Reasonable minds may agree that very large subject's would inherently pose an elevated danger too much smaller officers if the two should engage in a violent fist to cuffs encounter.

---

**24** **Tennessee v. Garner**, 471 U.S. 1 (1985)

Second, an officer must reasonably believe that if the subject does indeed poses the ability to cause death or serious bodily harm, then the subject must also have the **opportunity** to cause such harm due to the immediacy and proximity to the endangered other. For instance a subject who possesses the **ability** to cause death with a sharpened knife, may lack the **opportunity** if the knifes inherent cutting qualities are mitigated by distance. Where a person wielding a firearm may permit the subject a deadly opportunity to cause death or serious bodily harm from hundreds of yards away, a person wielding a knife would have no such opportunity at such a great distance.

Third, an officer must reasonably believe that he is in jeopardy of death or serious bodily harm, either deliberately or incidentally to some other's unlawful action. How jeopardy is established is left to the officer's analysis of the events and an articulated explanation of the totality of circumstances that gave rise to his/her reasonable belief that the actions of another if allowed to continue, would be likely to cause death or great bodily harm to another.

These three criteria make up a standard of care by which all acts of deadly force can be reasonably measured. An officer's use of force cannot be viewed with the benefit of 20/20 hindsight, but must be considered from the perspective of the officer on the scene. The force must be judged based upon a description of what an officer reasonably believed at the moment that the force was used. We must be certain to not consider the intent of the officer as the Fourth Amendment "reasonableness" inquiry is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and its calculus must embody an allowance for the fact that police officers are often forced to make split-second decisions about the amount of force necessary in a particular situation.[25]

32

In reviewing the incident between Officer Moody and Christopher Thomas, witnesses and physical evidence show that Officer Moody fired at Thomas through the driver's side window. The majority of witness statements indicate that Officer Moody was not in imminent danger of death or great bodily harm as he was positioned at the side of the vehicle and not in its direct path when he discharged his service weapon. From where Officer Moody was standing in relation to Thomas's vehicle it is then clear to see that Thomas did not possess the requisite *ability* to cause Officer Moody deadly or great bodily harm nor did he possess the *opportunity* within the known facts and circumstances to cause Officer Moody death or great bodily harm. Though Officer Moody testified that he stepped in front of the motor vehicle, it is not in my view likely that he did so. Aside from the obvious conclusion that stepping in front of a motor vehicle with a reckless driver who has clearly demonstrated his commitment to escape would be a fundamental lack of common sense for even the most naïve untrained individual, the forensic evidence showed that a rational jury could easily conclude that Officer Moody never placed himself in front of Thomas' car, nor did Thomas' vehicle speed towards Officer Moody, prior to Moody firing five fatal shots into Thomas' body.

Where Moody concluded that his life was in jeopardy he would need to articulate factual evidence that was known to him at the time that he chose to use deadly force. His claim that he felt his life was in imminent danger of death or great bodily harm is not objectively sufficient. A rationale jury could easily conclude, based on testimony and forensic evidence, that Moody knew that neither Officers Hall nor Murkerson's lives were imminent danger at the time Moody fired five fatal shots into Thomas' body. In fact, the evidence shows that the vehicle wasn't moving when the shots were fired. However, in his official statement, Officer Moody stated that he was concerned about both of their lives and that the vehicle was coming at him. Though there appeared to be ample time, there is no evidence that Officer Moody warned Thomas before he shot him. Officer Moody did not document this important requirement for the use of deadly force in any report. Whereas the

33

11th circuit has ruled that a verbal warning to a subject should precede the use of deadly force and is required where feasible, there simply is no evidence that Officer Moody had ever given warning to Christopher Thomas that he was about to be killed. The sentiment regarding the need for such warnings echoes in the landmark US Supreme Court Graham v Connor, whose language has filled volumes of books dedicated to the development of police policies and procedures.

Officer Moody alleged that he fired two series of gunshots with a pause between each series. In police firearms training, this technique is called the "double-tap" method, a short volley of two bullets followed by a period of appraisal to determine compliance. If the delivery of force is not effective and the threat is not reasonably eliminated, a second volley of shots would reasonably follow. The formula S-C-E-C is commonly cited. This acronym stands for shoot, command, evaluate and control. Upon identification of a deadly threat the officer may fire the double-tap (providing some warning had been given where feasible). Immediately after the series of shots, the officer would command the subject to cease the threat (i.e., drop the weapon, stop the car, get on the ground, etc.). This is followed by an evaluation method whereby the officer analyzes what he/she is seeing to determine if compliance has been reached. If it is not reached, the officer cycles through these first three steps again. Once reached, the officer is safe to control the situation by handcuffing the arrestee, calling for medical personnel if necessary, setting up crime scene, etc. Though Officer Moody claimed to be trained to this standard, it can be reasonably certain that he did not deploy this technique. The command and evaluation period takes time and according to witnesses Officer Moody did not afford Christopher Thomas time to react to the initial command or the alleged subsequent commands after the shots were fired into him. Rather than four shots (two series of double tap), Officer Moody fired 5 shots in total. Some witnesses reported a steady succession of gunfire. The forensic ballistics expert, Mr. Ronald Scott has analyzed the location of the bullet casings, the wound path of each gunshot, and the shooting dynamics elements of time and motion to

provide an objective analysis of Officer Moody's use of deadly force. He provided a description of in his report of how these factors led him to his conclusions within a scientific degree of certainty. He objectively concluded that Officer Moody could not have reasonably provided Christopher Thomas the necessary time to comply with his orders before he was shot five times.

### G.    The Investigation

As previously pointed out, my review of the documents along with the missing documents that should have been delivered in discovery shows that several policies of the Dothan Police Department were violated with respect to the mandatory reporting requirements for police pursuits, use of force and discharge of a firearm.

There is no record of a Defensive Action Report (Policy #100-2, section: Procedure, A (3) ), Administrative Review of the event (policy #100-2, section: Procedure, I (1), (3) ), Follow-up Investigation (policy #100-2, section: Follow-up Investigative Responsibilities, (1), (2) or (3)), Assembly of a Deadly Force Review Board, (policy#100-2, section: Deadly Force Review Board) or a Post Pursuit report (policy 100-4, (C)(10), also policy #200-40H, (C)(8)

Whereas policy #100-4 explicitly states that, "officers who have not completed a defensive and pursuit driving course shall not engage in vehicular pursuits and policy #200-40H requires that "all police sworn personnel will complete a one hour block of training each year covering the departmental procedures on vehicle pursuits and road blocks" I could find no record of completed coursework documented in Officer Moody's in-service training file from 2009 through June 28, 2012.  I also did not find any certificates for advanced or specialized training in this topic area. It appears then that this policy was also violated[26].

What is perhaps most egregious is that there is also no internal affairs report that looked into the circumstances of the death of Christopher Thomas. Somehow, in spite of clear policy on this

issue, the administration of the Dothan Police Department appears to have chosen to completely disregard this critically important internal requirement.

The only document I found that referenced a disposition of Moody's shooting internally was a two-page report filed by William N. Glover on 06/29/12, a day after the killing of Christopher Thomas. Glover's report went on to briefly explain his involvement in the investigation on 06/28/12 when he responded to the crime scene. He stated that he notified the Alabama Bureau of investigation of the incident because it was a police involved shooting. Glover details the witness names in his report and explains that they were transported to the Dothan Police Department. He explained that the body of Christopher Thomas was identified by his mother and through fingerprints obtained at autopsy. Glover concluded that, "*Thomas has an extensive criminal history and it is preliminarily believed that Thomas have been fleeing because of several individual bags of marijuana found in the vehicle when Thomas' body was removed*". Where this statement characterizes Thomas as a villain and pins a possible motive on him for refusing to stop, it does little to explain the actions taken by Officer Moody. Glover acknowledged that there was more work to be done and, "*once ABI processes the vehicle more will be known*". He reported that the vehicle was impounded to the DPD forensics building for further processing. Glover did not mention the importance of the evidence that had not yet been collected including the ballistics report, the autopsy, witness statements, traffic crash report, etc. It is not important that he failed to mention these things so much as he apparently failed to recognize the value of this information in making an objectively reasonable, evidence based determination of whether the force used by Officer Moody was appropriate. Without waiting for this important information to come in, Glover concluded that Officer Moody, upon his word, had been in imminent danger and needed to kill Christopher Thomas to save himself.

---

26 There is one entry in Moody's in-service training file entitled "Drivers Training" on 09/07/10. This is generally a different topic than

In the final paragraph consisting of three sentences Glover concluded that Christopher Thomas was trying to run over Moody with his vehicle when the shots were fired. He abruptly announced that the case would be closed. He stated this even though all of the evidence would soon point to the contrary.

Providing that I have been given all of the relevant documents requested for discovery, it is difficult to comment on the ineptness and paucity of the Dothan Police Department's internal investigation involving the death of Christopher Thomas. To internally close this case, that involved the death of a citizen of Dothan at the hands of a police officer, less than 24 hours after it occurred is in my view a callous disregard for the life of Christopher Thomas. Considering that the evidence described throughout this report points to an objective determination of the wrongful death and unjustified homicide of Christopher Thomas, one can only wonder where the City of Dothan and Glover in particular had gathered the courage to so publicly close the case without drawing a conclusion based on all of the evidence that still needed to be collected.

## H.    FINDINGS

After an exhaustive review of the documents referenced in this report and based on the evaluation of the policies of the Dothan Police Department that govern police pursuits and the policies that govern the use of deadly force against moving vehicles, coupled with the testimony of witnesses given thus far in this case, I am of the opinion that those policies, procedures and professionally accepted law enforcement norms and standards were knowingly and intentionally violated in this case by Officer Moody and other members of the Dothan Police Department. Further, I am also of the opinion that Officer Moody and other members of the Dothan Police Department concerted to misinterpret, misstate and disguise critical evidence in this case.

---

defensive and pursuit driving.

**The traffic stop and subsequent pursuit were a violation of law and policy.**

When Officer Moody decided to stop Christopher Thomas to ascertain his identity upon the mere hunch that he might be someone else and he might have an active warrant, he violated Thomas' Constitutionally protected rights. If Officer Moody *wasn't* reasonably certain that "Booty Bop" was driving the vehicle then he lacked reasonable suspicion to stop the vehicle. If he *were* reasonably certain that the driver was "Booty Bop" then Dothan pursuit policy would have required that he not pursue the vehicle based upon this reasonably certain identification[27]. In either case, the decision to pursue cannot be justifiably defended.

Christopher Thomas made it clear that he did not intend to stop for the Dothan Police car that pursued him. He overtly fled through a residential area and a commercial parking lot. It is clear from the witness statements that the dangerous driving exhibited by Thomas was proximate to the fact that he was being pursued. It is reasonable that if Moody would have terminated the pursuit, Thomas would have stopped driving erratically and the danger posed to the community would have subsided. Though it is true that Thomas would have escaped custody on that day an investigation would have likely revealed his identity and a warrant could have been later obtained as recommended by Dothan's policy. In the alternative, if Christopher Thomas would have escaped and had never been identified no greater harm would have come to the community and Thomas would likely be alive today. It is my opinion that Moody's decision to pursue and to continue pursuing the vehicle not only violated policy but also was careless and negligent and resulted in a dangerous situation for innocent persons in the area. Moody's decision to pursue was a state created danger imposed on the public where no danger had previously existed.

Officer Moody should have reasonably anticipated that during the time of this pursuit, innocent

---

27 See Dothan Police policy 100-4, 4(b) Abandoning pursuit.

people would be placed in jeopardy as they conducted commerce, shopped or otherwise became vulnerable to the well-known dangers presented by a police pursuit. Not knowing whom the driver was and not observing any crime or infraction created by the driver, it is clear that Officer Moody had no identifiable law enforcement reason to stop the vehicle. But Officer Moody's rationalized his deliberate actions against policy and training when Plaintiff's attorney asked him in deposition:

Q. Why didn't you call off the chase?

A. Part of my job is to chase and apprehend bad guys, apprehend criminals.

Q. For misdemeanors?

A. Yes, sir, for misdemeanors.[28]

Reminiscent of the words of his former Sergeant Porter, "*Moody had the inability...to adjust to the situation as it actually is. He continues to dig before any violation, no matter how minor, in an apparent effort to justify the initial stop and to confirm that his first perceptions were right all along*". These words resonate and this characterization suggests a more likely reason that Moody chased Christopher Thomas and ultimately shot him. The pursuit exceeded any valid law enforcement goal that could be imagined, including the need to capture the driver for allegedly driving erratically or attempting to elude capture. Officer Moody later admitted that this pursuit was unreasonably hazardous to the public.[29] In this regard, I note that the objective facts demonstrate that Officer Moody had knowledge that his conduct and decision to continue the pursuit would almost certainly result in physical harm to innocent others.

It is my opinion that Moody should not have pursued the vehicle based upon the policies of the Dothan Police Department. Knowing the danger presented to the innocent public far outweighed the need to identify the driver based upon Moody's mere hunch. The officers of the Dothan Police Department had the license plate number of the fleeing motor vehicle. The objective facts show that

---

28 See Deposition of Darren Moody,pp.96, lines 14-18.

a follow-up on the vehicle registration would have allowed officers to locate the vehicle at a later time and to appropriately charge the driver as recommended in Dothan's policy.

For Officer Moody, the danger associated with this event was not rapidly unfolding. In fact nothing had happened out of the ordinary until Moody activated his lights. Officer Moody had ample time to run the license plate and to determine who actually owned the vehicle. If the name was different than the one he was looking for, then Officer Moody might have leaned more towards the possibility that he was mistaken in his belief. Officer Moody knew that the stop and the subsequent pursuit was initiated for the obscure reason of identifying the driver. He did not know if an active warrant existed. The fact that he admittedly was trying to identify the driver is evidence that he did not know, with any degree of certainty who he was chasing. Moody knew or should have known that the reckless driving behaviors exhibited by Thomas resulted from the pursuit itself and not because Thomas intended to be a menace to the roadways or the surrounding community.

After the vehicle stopped in the parking lot, Officer Moody took the precaution to place himself in a position that he was not in jeopardy of being struck by the vehicle if it accelerated away. Officer Moody moved to the driver's side of the vehicle and approached from that location. Moody demonstrated that he had the ability and the time to position himself and to protect himself from the possibility that Thomas *might* try to drive him over.

After Moody fired his five fatal shots at Thomas in continued sequence, he stated that he had no other choice but to fire at the car for his own safety since his escape was cut-off. This statement is not consistent with any of the evidence or witness statements. Had Moody truly been trapped as he described he would have certainly been run over. The result of firing at Christopher Thomas was a greater actual and potential harm to the community than had previously existed. Officer Moody's shots appear to have caused the desperate or reactionary acceleration across the roadway and into the

---

29 See Deposition of Darren Moody, pp. 101, lines 13-18.

building on the other side of the street. The time of day, volume of traffic and presence of pedestrians and shoppers in the area was grounds enough to not begin firing in the mall parking lot. Disabling the driver of a moving vehicle is nearly always a bad idea. Within this highly dynamic and fast moving event unintended victims of gunshot wounds or a vehicle careening out of control should have been reasonably anticipated. The risk of accidental injuries was actualized when Brad Glover, an innocent store employee was injured as the car crashed through the building.

Contrary to Officer Moody's testimony. The forensic evidence shows that when Officer Moody fired his weapon, he stood alongside the driver's side door and fired directly into the driver's open window. He did this while the vehicle was stopped. This has been corroborated by testimony of several witnesses including Officer Murkerson in his initial interview with ABI agents. Considering the reliability of the forensic evidence and the corroborating witness testimony, it is concluded that the vehicle was not coming at him and did not pose an imminent threat of death or great bodily harm to him. It is my opinion, based upon a reasonable degree of law enforcement certainty, that Officer Moody's decision to shoot was objectively unreasonable, excessive and unjustifiable under the given set of circumstances.

**The City of Dothan -** The State of Alabama had all but publically admitted that Moody used deadly force for the strict purpose of apprehending Thomas when "District Attorney Doug Valeska said he believed the shooting was justified. According to Valeska, the shooting occurred at the end of the chase when Thomas had initially stopped his vehicle in the shopping center parking lot, then put the car in reverse and struck another car. Valeska said the officer repeatedly ordered Thomas to stop, *and fired after Thomas failed to comply*".[30] The evidence shows that this is a misstatement of the facts. Officer Moody shot Mr. Thomas while the vehicle was stopped, eliminating the possibility that Mr. Thomas was not complying when he was shot.

---

30 Family of Man Shot By Police Files Civil Suit, Dothan Eagle, Dec 18, 2013

Considering the alternative scenario alleged by Mr. Valeska, that if Mr. Thomas was absolutely not complying with Officer Moody's orders to stop, it must be restated: failing to comply with an officer's order to submit is not a sufficient reason to shoot a person under Federal law. If there is not a reasonable belief that the officer's life or another's life is in imminent danger, the use of deadly force is patently and constitutionally unreasonable.

The offense report taken by the Dothan Police Department, suggests that Mr. Thomas attempted to murder Officer Moody by driving over him. In this report, Christopher Thomas is indicated as the suspect while Officer Moody is listed as the victim. There is no credible evidence to support this assertion. This report was reviewed by the Dothan Police chain of command and not a single supervisor applied the facts of the case to their findings of exceptionally clearing the case and exonerating Officer Moody of any wrongdoing.  This is not time that the City of Dothan Alabama ignored certain meaningful facts regarding Officer Moody's behavior.

The first occasion of record was when Thomas Moody applied for a police officer job at the Dothan Police Department. It is reasonably assumed that the hiring process would have included a review of Officer Moody's previous law enforcement service at the Pensacola Police Department. A simple review of this documentation would have revealed that Officer Moody choose to resign from the Pensacola Police Department rather than face termination.  An investigation would have revealed that Officer Moody has a propensity for excessive violence. In 1996 he struck his girlfriend in what he inferred was a drunken fight with her. He claimed that he swung at her and that she suffered a black eye. The complaint was sustained by the internal affairs division investigation. In 2003 he was arrested for striking and falsely imprisoning still another girlfriend. Officer Moody resigned while being investigated. These episodes would reasonably lead a reasonable background investigator to conclude  that from this pattern of excessive force, Daren Moody might likely have an overt lack of emotional control and/or alcohol or other substance abuse. It is well known that in police work, some

42

people in the public make an effort to get under an officer's skin. The disposition of a police officer must therefore be exceptional for tolerating a variety of emotion evoking circumstances. Officer Moody was known to lack this quality before he was hired by the Dothan Police Department.  In his field training documentation his FTO commented on him being cocky, arrogant and mentioned that he showed too much interest in impressing females. His polygraph showed him to be deceptive. In fact, the Chief of the Pensacola Police Department wrote during the investigation of the second domestic violence incident what could be viewed as a prophetic warning to future agencies that might consider Officer Moody for employment, *"I have concluded that Officer Moody's conduct constitutes scandalous or disgraceful conduct while on or off duty, which conduct tends to embarrass the City or bring the City into public disrepute. And his conduct also constitutes an exhibition of bad moral character…"*

Officer Moody's deposition revealed that he applied to at least two other police departments in Florida who refused to hire him. It was only after he failed to get hired in Florida as a police officer that he moved to Dothan Alabama and took employment as a police officer at the Dothan Police Department under the direction of Police Chief John Powell. I noted that John Powell was a former deputy Sheriff in Escambia County and a trainer for Darren Moody at the George Stone Technical Institute Police Academy. Whether Darren Moody was given preferential treatment for hire by Chief Powell or if the facts of his professional past were intentionally ignored is unknown but it is likely that triers of the fact will speculate the question of negligent hiring.

These are my findings based on the relevant evidence submitted to me. As additional information is made available and as new facts may be uncovered during the discovery process, my professional opinions may change to reflect the newfound information; however, the opinions expressed herewith are current and are based upon the information reviewed and my experience as of this date.

43

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 29th day of August, 2014.

Roy R. Bedard
September 22, 2014

## V.  FEE STRUCTURE AND RECOLLECTED CASES:

I have testified in trials and deposition both in State and Federal Court. My rate of compensation is a flat fee of $3000.00 for the case review and the submission of a report. Depositions are compensated at a flat rate of $1200.00 for a regular deposition, $1000.00 for a Tallahassee deposition and $1000.00 for a phone deposition. Trial appearance is compensated at a rate of $1500.00 per day. Reasonable reimbursement for travel and meals is not included in these rates.

## VI.     PUBLICATIONS

• *How to Choose a Reality Fighting Instructor*, Black Belt Magazine; Nov 2009, Co-author

• Florida FDLE CJSTC Video Production for Defensive Tactics: Set Director

• The Eddie Griffin Show: Television Pilot, Consulting Producer, Police Technical Advisor, Police segment with Tampa Police Department, VH1, Pilot

• Female Forces: Television Series (13 Episodes), Consulting Producer, Police Technical Advisor, The BIOGRAPHY Channel

• Rookies – Tampa: Television Series (8 episodes), A&E

• Operation Wild Season 1: Television series, Consulting Producer, Police Technical Advisor Boutique TV, Planet Green (DISCOVERY CHANNEL), Six episodes

• Operation Wild Season 2: Television series, Consulting Producer, Boutique TV, Planet Green (DISCOVERY CHANNEL), Ten episodes

• Unleashed; Broward County K-9 (6 episodes); Television Series, Consulting Producer, Police Technical Advisor, Thinkfactory Media, TLC

• World's Wildest Police Videos (13 episodes): Television Series, Field Segment Producer, Pilgrim Productions, SPIKE TV

• Landmark Use of Force Cases: Interactive DVD, Writer and on camera host. Summer 2007

• FDLE CJSTC BRC CMSII: (Basic Recruit Curriculum, State of Florida) 2008

• FDLE CJSTC BRC CMS: (Basic Recruit Curriculum, State of Florida) 1999

• *Meeting the Demands of the Contemporary Ground Encounter*: The Law Enforcement Trainer, Volume 12 number 7; Jan/Feb 1998

• *Using the Tools of Persuasion*: The Law Enforcement Trainer; Volume 20, number 2, Apr/May 2005

• *Center Mass Shooting to Kill*: The Law Enforcement Trainer; Volume 20, number 4, Nov/Dec 2005

• Exploring Criminal Justice: contributing author, college level textbook, 2006 by McGraw-Hill.

*Manuals published by RRB Systems, International and used by law enforcement, corrections, military and security agencies and personnel in various parts of the world.*

• The Rapid Rotation Baton Basic Training Manuals; 1996

• The Rapid Rotation Baton Basic-Experienced Training Manual
• The Rapid Rotation Baton Intermediate Training Manual

• The Rapid Rotation Baton Advanced Training Manual

• The Rapid Rotation Baton Instructor Training Manual (Translations in Spanish, German and Korean)

• The Rapid Cuff: Training Manual (Instructor) 1998(Translations in Spanish and German)

• GROUNDFIGHT!: Training Manual (Instructor) 2000

• Oleo-Resin Capsicum (OCI) *Training Manual (Instructor) 2000*

• Pepper Ball: *(Instructor Course, SA-200, SA-10 Armorer's Manual) 2002*

• Defensive Tactics Instructor (DTI): *(Instructor Manual) 1996*

• PROTECTORS Occupational Fitness (Instructor Manual) 2008

• Vascular Neck Restraint Instructor Manual 2009


VI. **The following are cases in which I have testified within the past four years:**

*1.* **Derrick Dupont V County of Jasper**, *Case no. 2008-CP-27-529*

46

*The South Carolina Court of Common Pleas*
*Retained by Defendant*
*Trial 08/28/2012*

2. **Nathaniel Richardson v Sumi Restaurants, LLC, et al,** *Case no: 2012-CA-012722*
*In the Circuit Court, Fourth Judicial Circuit in and for Duval County*
*Retained by Plaintiff*
*Deposition: February 10, 2014*
*Deposition: July 24, 2014*

3. **State of Georgia in the Matter of Iziah Goar**, *GBI Case No: 09-0194-34-13*
*Grand Jury Presentation 09/24/2013*
*Retained by Prosecutor*

4. **Treneshia Dukes v Bennett, et al,** *Case No: 1:2012cv02517*
*District Court, Georgia District Atlanta Office*
*Deposition 04/23/2014*
*Retained by Plaintiff*

5. **Keys v City of Chicago et al** *1:2009cv04162*
*Illinois Northern District Court 42:1983 Civil Rights Act*
*Deposition 11/03/10*
*Retained by Plaintiff*

6. **Marina Radchuck et al v City of Citrus Heights, et al**, *Case No: 2:2011cv00486*
*US District Court Eastern District of California*
*Deposition 08/07/12*
*Retained by Plaintiff*

7. **State of Florida v Amanda Arruda**, *Case No: 12-CF-15893*
*Circuit Court, Twentieth Judicial Circuit in and for Lee County*
*Pre-Trial Immunity Hearing 03/13/13*
*Retained by Defendant*

8. **Thomas v Borough of Swissvale, et al**, *Case No.2:09-CV-996-NBF*
*Western District of Pennsylvania*
*Deposition 06/07/11*
*Retained by Plaintiff*

9. **Pita v City of North Miami, et al**, *Case No. 13-23682-CIV-MOORE*
*Southern District of Florida*
*Deposition 09/19/14*
*Retained by Plaintiff*

47

**10. State of Florida V Larry White**, *S.A. Case No. 06CF007778AD*
      *Fourth Judicial Circuit in and For Duval County, FL*
      *Deposition 09/05/14*
      *Retained by Defendant*

**11. Sherilyn Taylor v Richard Taylor**, *Case no.*
      *Southern District of Georgia, Dublin Division*
      *Deposition 09/02/14*
      *Retained by Plaintiff*