**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| KATHERINE THOMAS, individually, and as the administrator of the estate of Christopher Jerome Thomas, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. 1:13cv920-WHA ) |
| DARREN MOODY, in his individual capacity, and CITY OF DOTHAN, ALABAMA, | )      (wo) ) ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

**I.   INTRODUCTION**

This case is before the court on a Motion for Summary Judgment (Doc. #88), filed by the

Defendants on May 26, 2015.

The Plaintiff filed a Complaint in December 2013.   The Plaintiff is the administrator of the

Estate of Christopher Thomas ("Thomas").   With leave of court, the Plaintiff filed an Amended

Complaint (Doc. #31) adding new claims.   The Plaintiff brings a Fourth Amendment claim

against Defendant Moody (Count One), a state law claim for wrongful death against Defendant

Moody (Count Two), a state law claim for neglectfulness, unskillfulness, or carelessness against

Defendant City of Dothan (Count Three), and a state law negligent hiring claim against Defendant

City of Dothan (Count Four).

The court has federal question subject matter jurisdiction over the claim in Count I and can

exercise supplemental jurisdiction over the state law claims.   28 U.S.C. §1367.

The Defendants have moved for summary judgment as to all claims.

For the reasons to be discussed, the Motion for Summary Judgment is due to be GRANTED as to Count I, and the court will decline to exercise supplemental jurisdiction over the state law claims.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and    . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, relying on submissions which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.   Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and show that there is a genuine issue for trial. *Id.* at 324.

Both the party asserting that a fact cannot be, and a party asserting that a fact is genuinely disputed, must support their assertions by citing to particular parts of materials in the record, or by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56 (c)(1)(A),(B).   Acceptable materials under Rule 56(c)(1)(A) include depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials.

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   On the other hand, the evidence of the nonmovant must be

believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*,

477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court

shall grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).

III. FACTS

The submissions of the parties establish the following facts, construed in a light most

favorable to the nonmovant:

The case arises from the death of Christopher Thomas ("Thomas").   Darren Moody

("Moody") is a City of Dothan, Alabama police officer who shot Thomas after a police pursuit of a

vehicle driven by Thomas. Thomas died as a result of the shooting.   Thomas's claims are asserted

through his administrator Katherine Thomas ("Plaintiff").

In June of 2012, Thomas was driving a 1999 white Ford Explorer which belonged to

another person.   Dothan police officer Moody and a probationary police officer Mitchell

Murkerson ("Murkerson") were parked on a residential street in a marked police vehicle when the

white Ford Explorer driven by Christopher Moody turned in front of them.   Moody mistakenly

thought that the driver was Jerry Jerome Hill for whom there was an outstanding misdemeanor

warrant for domestic violence.   Moody attempted to conduct an investigatory stop to determine

the identity of the driver, but Thomas did not stop.   A police pursuit of the vehicle ensued, which

is recorded by the dashboard mounted camera.   (Doc. #89-2).

While pursuing Thomas's vehicle, Moody activated the emergency light bar and then his

emergency siren.   (Doc. #89-2 at 30 and 38 sec).   During the pursuit, Thomas's vehicle and the pursuing police vehicle drove through residential streets with intersections marked with stop signs without stopping at those stop signs.   At times the dashboard recording indicates that Moody was driving in excess of 50 miles per hour on a residential street without overtaking Thomas. (Doc. #89-2 at 1:04, 1:26, 1:41).   During this pursuit, Thomas swerved to avoid a vehicle entering an intersection.   (Doc. #103 at p.5).   That vehicle stopped quickly after it had already entered the intersection.   (Doc. #103 at 1:15).   Thomas passed a truck on the left side of a residential street, and that truck stopped.   (Doc. #89-2 at 1:33).   Ultimately, Thomas pulled into and drove through a parking lot.   He drove in a circular motion through vacant parking spaces within the parking lot and at one point drove so quickly that smoke is visible around his rear tire.   Thomas also swerved to avoid a vehicle with its driver clearly visible, and it is uncontested that this vehicle was the unmarked police vehicle of Dothan Police Investigator Donald Hall ("Hall") (Doc. #103 at p.7).

Thomas then abruptly stopped his vehicle facing a parked car. (Doc. #89-2 at 2:09).   Not visible in the recording, but uncontested, Hall stopped his vehicle near the passenger side of Thomas's vehicle. (Doc. #103 at ¶27).   Moody stopped his vehicle near the driver's side and exited his vehicle. (Doc. #89-2 at 2:10).   Moody stated in an affidavit that he exited his vehicle because he thought the pursuit had stopped. (Doc. #89-1).   Not visible in the recording, but uncontested, Thomas then "spun his tires and rapidly accelerated in reverse in a semicircular direction before crashing into the side of a parked vehicle."   (Doc. #89 at ¶32, Doc. #103 at ¶32).

Moody approached Thomas's vehicle on foot.   Hall reached into his vehicle for his taser and was behind Moody as he moved closer to Thomas's vehicle.   (Doc. #89-5 at p.3).

The Defendants contend that the evidence from witnesses at the scene demonstrates that at

this point, Thomas put his vehicle in drive and accelerated toward Moody, whereupon Moody

stepped to the side of the vehicle and fired shots at Christopher Thomas. Moody's statement of the

events is a follows:

> I had taken up a position of cover to the side of my vehicle but moved to the rear of
> my vehicle as the Explorer reversed.   In less than five seconds Thomas had crashed
> into another parked vehicle, across the aisle from where I was parked, a distance of
> 15-25 feet.   I began moving to the front of Thomas' vehicle while pointing my gun
> at him and I ordered Thomas repeatedly to stop the car and to get out. After he
> crashed into the car I again believed the chase to be over.   I thought the Explorer was
> disabled because of the force of the collision and because the engine was revving
> but the vehicle did not move.   I continued to approach his vehicle from the front driver's
> side with my weapon aimed at him, expecting him to either surrender or get out
> and run.
> Thomas ignored my commands by putting his vehicle into a forward gear and driving
> directly at me.   I suddenly feared for the safety of myself and that other officers I
> believed were behind me because of Thomas' actions.   I managed to get out of the way
> of the vehicle by stepping slight to my right. Thomas was accelerated and I started
> firing at him.

(Doc. #89-1).

Hall states in an affidavit that he looked at his taser while he unholstered it and while he

was looking at the taser he heard gunshots.   (Doc. #89-5 at p.3).   Murkerson states in an affidavit

that he saw Thomas's vehicle accelerate past Moody and then heard gunshots. (Doc. #89-6).

The Defendants have also presented evidence from non-police witnesses at the scene.

Drew Gibbons stated in an affidavit that the police officer "shouted various commands to stop as

the suspect put the vehicle back in motion toward him.   The officer fired his weapon several times

in an attempt to stop the suspect."   (Doc. #89-9).   Connie Johnson also stated that the Explorer

started forward toward the policeman and then she heard several shots.   (Doc. #89-11).

The Defendants state that many of the Plaintiff's witnesses stated during interviews with

Houston County Sheriff's Department and the Alabama Bureau of Investigation ("ABI") that

shots were fired at Thomas after the vehicle was put in motion by Thomas.

The Defendant provides the transcript of an interview of Phillip Foster and his son[1] by two interviewers with the Houston County Sheriff's Office.   Phillip Foster's son said, "I guess he was trying put it in forward. That is when the cop pulled out the gun."   (Doc. #106-3 at p.5.).   Phillip Foster's son also said he guessed that Thomas had reached down to change gears and he guessed that is "probably where the cop pulled out the gun."   (Doc. #106-3 at page 8-9).   In the transcript of an interview with witness Melissa Ash, she states that Thomas was "steadily trying to put the car in gear," and that is when the officer shot three times. (Doc. #106-5).   She also said that the car was going in reverse, but she did not really see it move.   (Doc. #106-5 at p.9).   Melissa Ash also stated that Moody was standing close to the driver's side door of the vehicle.   (Doc. #106-5 at p.6).   In the transcript of his interview with the ABI, witness Kendrick Whatley states that Thomas went in reverse, then put the vehicle in drive and "maybe the motor revved just a little for to tr-let-let (sic) you know I'm fittin to try to go forward," and "that's when it pow, pow, pow the car just shoom right on across the street."   (Doc. #106-2 at p.7).

The Plaintiff, however, has offered Declarations from these, and other witnesses, which state that the vehicle was not moving at the time that shots were fired and that Moody was not in front of the vehicle.   For example, the Plaintiff offers the Declaration of Kendrick Whatley in which he states that after hearing gun shots, he saw Thomas's truck go from stopped to moving forward in a direction away from officers.   (Doc. #103-10 at p.3).   Philip Foster states that he can say for certain that the white truck was stopped at the time he saw the officer shoot into the driver side window and that at no time did the truck accelerate toward the officer.   (Doc. #103-8).

---

[1] The son is referred to as J.T. in the transcript and Phillip Foster is referred to as P.F.

Melissa Ash states that the officer was standing right next to the driver side window when she heard shots.   (Doc. #103-9).

While these witnesses' Declarations state that Thomas's vehicle was not moving toward Moody at the time shots were fired, they do not refute the evidence that, or even address whether, the engine was still running at the time shots were fired.[2]   After Moody shot into Thomas's vehicle, the vehicle drove away, struck a sign, and ultimately crashed through the wall of a nearby building.

The Plaintiff has offered an expert report[3] which noted Hall's statement that he retrieved and unholstered his taser between the time that Thomas's vehicle crashed into the parked car and Hall heard gunshots.   The report stated that an officer can unholster a taser in not more than 2 seconds, so the Plaintiff's expert offered the opinion that only a few seconds elapsed during that period. (Doc. #103-2 at p.13).   The Plaintiff also offers the Declaration of Phillip Foster in which he states that he heard the officer tell the driver of the white truck to stop but "within a second or two" he saw the officer shoot into the driver's window.   (Doc. #103-8 at p.1-2).

### IV.   DISCUSSION

#### A.   Federal Claim

---

[2]   The Plaintiff states that Hall initially did not mention that the engine was revving and only made that statement later (Doc. #103 at ¶83), but does not cite to evidence from any witnesses to call into question the testimony that the engine was running. The Declarations and deposition offered by Plaintiff state that the vehicle was stopped, and provide statements which address the timing of when the car was put into drive, but the Plaintiff does not cite to any portion of that evidence which refutes that the engine was running.   (Doc. #103-6, 7, 8, 9, 10, 17).

[3]   The Plaintiff has offered expert reports Doc. #103-2, #103-11.   The Defendants have included within their Reply "Objections to Exhibits 2, 6, 8, 9, 10, 11, 17, 27 and 28."   Objections to other exhibits will be addressed below. With respect to expert evidence, however, the court notes that the objections are essentially *Daubert* motions, which the court has denied as untimely.   (Doc. #102).   The court will consider those reports only to the extent that the opinions are admissible testimony.

The Defendants have moved for summary judgment on the basis of qualified immunity as to the Fourth Amendment claim brought against Moody.   Before the court can address the applicability of the qualified immunity defense in this case, however, the court must first address the evidence which will be considered.

## Evidentiary Objections

The Defendants have argued that the declarations of Deanna Ruth Jones, Kendrick Whatley, Phillip Foster, Sharonda Foster, Melissa Ash, and the deposition of Derrick Edwards, are inconsistent with the statements they gave during interviews with law enforcement.   The Defendants object to the evidence on that basis, but have not cited the court to any authority for the proposition that declarations or depositions which are inconsistent with previous unsworn police statements cannot be considered in deciding motions for summary judgment.   It may be that the Defendants intend to apply the "sham affidavit rule" whereby a district court may disregard an affidavit which contradicts, without explanation, prior deposition testimony on a material fact. *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir.1984).

In *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003), the court rejected an argument that an affidavit which contradicted a sworn statement to the police could not be considered, reasoning that because the affiant offered some explanation for why his statements contradicted one another, and that explanation was not itself a complete sham, the affidavit could be considered on summary judgment.

In this case, it does not appear that the statements given to law enforcement were sworn statements.   Even assuming that a sham affidavit rule can apply to evidence which contradicts unsworn statements to police, however, there is at least one declaration which provides an

8

explanation for factual discrepancies. In Kendrick Whatley's Declaration Under Perjury, he explains that his Declaration contains statements of what he can say for sure that he witnessed, while his ABI interview included assumptions about what occurred.   (Doc. #103-10).   This explanation does not appear itself be a sham.   *McCormick*, 333 F.3d at 1240 n.7.

In addition, again assuming without deciding that the sham affidavit rule can apply when a declaration is compared to an unsworn interview transcript, the court cannot agree that Phillip Foster's Declaration is contradicted by his previous statement to the police.   The portions of the interview with Phillip Foster and his son which are said to be contradicted by Phillip Foster's Declaration were speculation, engaged in by Phillip Foster's son, not Phillip Foster, when he said that he "guessed" certain things occurred.   To be disregarded as a sham, Phillip Foster's declaration would have to contradict, without explanation, prior testimony which consisted of clear answers by Phillip Foster to unambiguous questions. *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 n.6 (11th Cir. 2012).   Instead, at most, Phillip Foster's Declaration contradicts statements by his son.   Finally, Melissa Ash stated in both her Declaration and her interview that Moody was standing close to the driver's side door of Thomas's vehicle at the time shots were fired. (Doc. #106-5 at p.6 and #103-9 at p.1).   The court will, therefore, consider the Declarations of Kendrick Whatley and Phillip Foster and the indicated portion of the Declaration of Melissa Ash, which are sufficient to create questions of fact as to whether Thomas's vehicle was moving at the time that shots were first fired, and whether Moody moved to the side or was already standing at the side of Thomas's vehicle when he first fired shots.

### Fourth Amendment Claim and Qualified Immunity Defense

#### 1. Qualified Immunity Standard

Qualified immunity is a protection designed to allow government officials to avoid the expense and disruption of trial. *Ansley v. Heinrich*, 925 F.2d 1339, 1345 (11th Cir.1991).   As a preliminary matter, the court must determine whether the public official was acting within the scope of his discretionary authority at the time the allegedly wrongful acts occurred.   *See Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988).   Once it is established that a defendant was acting within his discretionary authority, the court must determine whether "[t]aken in a light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"   *Saucier v. Katz*, 533 U.S. 194, 201 (2001).   "[I]f a constitutional right would have been violated under the plaintiff's version of the facts," the court must then determine "whether the right was clearly established." *Wood v. Kesler,* 323 F.3d 872, 878 (11th Cir. 2003).

Requiring that a constitutional right be clearly established means that liability only attaches if "[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."   *United States v. Lanier*, 520 U.S. 259, 270 (1997).   In other words, a defendant is entitled to "fair warning" that his conduct deprived his victim of a constitutional right. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

In this case, it is apparently undisputed that Moody was engaged in his job duties and performing a discretionary function.   The court, therefore, may address first whether a constitutional violation exists, or may instead move to the issue of whether the law was clearly established.   *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2020 (2014).   In this case, the court turns to the issue of whether there was a violation of clearly-established law.

In *Vinyard v. Wilson*, 311 F.3d 1340, 1350–53 (11th Cir. 2002), the Eleventh Circuit articulated three ways in which individual state defendants can receive "fair notice" that their

conduct violates clearly established law.   First, the words of a federal statute or constitutional provision may be specific enough "to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, *even in the total absence of case law*."   Id. at 1350 (emphasis in original).   The Eleventh Circuit considers a case falling into this category an "obvious clarity case."   *Id.* at 1350.

Second, if the conduct at issue is not so egregious as to violate the Constitution or a federal statue on its face, the court must turn its attention to case law that espouses "broad statements of principle . . . that are not tied to particularized facts."   *Id.*   at 1351.   In these types of cases, courts will declare "X Conduct" unconstitutional regardless of the specific factual situation.   *Id.*   "[P]ut differently, the precise facts surrounding 'X Conduct' are immaterial to the violation," thus these decisions can "clearly establish law applicable in the future to different sets of detailed facts."   *Id.*

Third, courts must look to cases that tie a particular type of conduct to the specific facts of the case.   *Id.*   With these cases, courts must examine case law stating that "Y Conduct" is unconstitutional in "Z circumstances."   *Id.*   If the circumstances facing the official are "materially similar" to those of the fact-specific case, this precedent can clearly establish the applicable law and qualified immunity will not be warranted.   *Id.* at 1352.

"Clearly established law" is determined on the basis of the law existing at the time of the conduct in question. *See Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988).

## 2.   Analysis

The law governing Fourth Amendment excessive force claims where deadly force is used, broadly stated, is that deadly force is "reasonable" when an officer "(1)   has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or

that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible." *Vaughan v. Cox*, 343 F.3d 1323, 1329–30 (11th Cir. 2003) (quotation omitted).

Reasonableness requires analysis of the totality of the circumstances. *Plumhoff*, 134 S.Ct. at 2020. Reasonableness must be analyzed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* Therefore, courts allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* A police officer's attempt to terminate a high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment. *Id.* at 2021.

The Defendants cite the court to *Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002). In *Pace*, the suspect driver had engaged in a dangerous evasion of police and had come to stop in a cul-de-sac where his vehicle was surrounded by police vehicles on three sides. The Eleventh Circuit explained that it accepted the evidence that the driver did not try to run over the deputies who stopped him, and that the driver did not aim the car at the deputies, but the court also noted that the car had been stopped for only a few seconds and no cooling time had passed for the officers pursuing him. The court further noted that the police told the driver to get out of the car before they shot, but he did not. *Id.* at 1282. The court also found it significant that once the chase began, the driver never left the vehicle or even turned the engine off. *Id.* at 1281-82. The court held that there was no constitutional violation when the officers fired on the driver. *Id.*

With respect to the qualified immunity defense, the court held that if there were a

constitutional violation, it was not a violation of clearly-established law because there was no case giving the officers fair warning that their conduct was unconstitutional. *Id.* at 1283. The court stated that the plaintiff had identified "no case demonstrating a clearly established rule prohibiting officers from using deadly force in circumstances like those in this case: a case, among other things, where the fleeing suspect appeared to be dangerous by virtue of his hazardous driving during the long, nighttime car chase and where the suspect remained in his automobile with the engine running, even when almost surrounded by officers and where—*IF* the chase had ended at all—it had ended (at most) a very few seconds before the officers fired and, even then, the suspect's car started driving away again, causing more shots to be fired." *Id.*

The Defendants point to the evidence of the pursuit in this case as being analogous to that in *Pace*. The facts, more fully set out above, are that Thomas led Moody in a pursuit during which at time Moody drove in excess of 50 miles per hour in a residential area without overtaking Thomas. Thomas went through several stop signs without stopping, swerved around one car coming through an intersection and caused that car to stop, passed another vehicle on a residential street, swerved around an occupied car in a parking lot, and eventually came to an abrupt halt in the parking lot. Hall and Moody got out of their vehicles. Thomas put his vehicle in reverse, drove in a circular motion backwards, and rammed into a parked vehicle. For purposes of summary judgment, the court accepts that the car did not move again until after shots were fired and that Moody was standing beside the car when he fired at Thomas. The evidence also demonstrates that Thomas remained in his vehicle, that the engine was still running, that Thomas did not surrender although he was told to stop, and that only a few seconds passed between the time that Thomas rammed his vehicle into the parked car and Moody shot into Thomas's vehicle.

The Plaintiff points out that the facts regarding the driving which preceded the shooting in *Pace* are more egregious than Thomas's driving.   Thomas's driving, while not as egregious as that in *Pace*, is within that viewed as reckless by courts.   *See, e.g., Plumhoff*, 134 S.Ct. at 2021 (citing as examples of reckless driving that the driver passed other vehicles, several of which were forced to alter course).   The court, therefore, does not find *Pace* distinguishable on that basis.

The Plaintiff has also pointed out that Moody stated in his affidavit that he thought the chase was at an end when he approached Thomas's car.   This fact does not distinguish the case from *Pace*, however, because in its qualified immunity analysis, the *Pace* court incorporated the fact that under a scenario that the chase had ended, it had ended only a few seconds before the time that shots were fired.   *Id.* at 1283. [4]   The court finds, therefore, that *Pace* applies in this case.

Applying the *Pace* court's qualified immunity holding in this case, therefore, this court concludes that the law was not clearly established that Moody was prohibited from using deadly force "where the fleeing suspect appeared to be dangerous by virtue of his hazardous driving   . . . and where the suspect remained in his automobile with the engine running, even when almost surrounded by officers and where   . . . the chase had ended   . . . a very few seconds before the officers fired and, even then, the suspect's car started driving away again . . . ."   *Pace,* 283 F.3d at 1283.

The Plaintiff relies on *Morton v. Kirkwood*, 70 F.3d 1276 (11th Cir. 2013), in arguing that Moody violated clearly-established law.   *Morton* cannot clearly-establish the law for purposes of the qualified immunity defense in this case, however, because it had not been decided at the time

---

[4]  The Plaintiff contends that Moody's warning was ineffectual, but the very short time lapse in this case and in *Pace*, 283 F.3d at 1282*,* between the warning and the shots fired indicate that the effectiveness of the warning is not dispositive for purposes of the qualified immunity defense under these facts.

of the events in question. *See Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988) (stating that on "motion for summary judgment the court is to determine not only currently applicable law, but whether that law was clearly established at the time an action occurred.")(quotation omitted).

*Morton* is also factually distinguishable.   In *Morton*, the plaintiff was sitting in a running, parked car, when he noticed a police vehicle, and let his car coast at about 1 mile per hour.   The plaintiff then noticed a police officer chasing him and heard the officer shout.   The plaintiff put the car in park and raised his hands.   The officer fired at the car and seven bullets struck the plaintiff, paralyzing him.   The car shifted to reverse and traveled in reverse until it bumped into a tree.   *Morton*, 70 F.3d at 1279-80.   The court reasoned that there was no probable cause to believe that the driver had committed any offense, no reason to believe that the driver was a threat to anyone, and because the driver had shifted his car into park and put up his hands, no reasonable officer could have reasonably believed that he had to shoot the driver to prevent escape.   *Id.* at 1281-82.

The Plaintiff contends that as in *Morton* there is evidence that when Moody told Thomas to get out of the car, "Thomas put his hand up in compliance," referencing Derrick Edwards's deposition.   (Doc. #103 at p.38).[5]   In the cited pages of Derrick Edwards's deposition, he stated that when Moody pulled his gun, Thomas reacted by "moving his head out of the way," but Thomas was short, so Derrick Edwards could "kind of still see his arm on the steering wheel of the car," but he could not see his right arm.   (Doc. #103-17 at p.20:23-21:12).   Derrick Edwards characterized Thomas's reaction as "more of a leaning towards the passenger side of the car."

---

5 Derrick Edwards's deposition is also the subject of an objection by the Defendants, but this portion of the deposition is not one which the Defendants have pointed to as contradicting his statement to law enforcement.

(Doc. #103-17 at p.21:4-5).   The court cannot conclude that this is evidence of surrender by Thomas.   It is certainly not factual support for Plaintiff's counsel's statement to the court in brief that "Thomas put his hand up in compliance."   (Doc. #103 at p.38).   Furthermore, this case is also distinguishable from *Morton* because in this case Thomas had engaged in reckless driving before the officer's use of force.

The Plaintiff also cites *Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003),[6] which is a case decided after *Pace*, but before the events in question.   In *Vaughan*, the court found a constitutional violation where two suspects were driving eighty to eight-five miles per hour in a seventy-mile-per-hour zone and accidentally collided with a police cruiser, which the court found did not present an immediate threat of serious harm.   *Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003).   In that case, however, the officer shot into a moving truck from his moving police vehicle. The court reasoned that the only risk of harm posed by the driver was the risk of an accident, which the officer transformed into a "virtual certainty" by shooting into a moving vehicle.   *Vaughan*, 343 F.3d at 1333.   *Vaughan*, therefore, is not like this case.   Instead, *Pace* controls here.

In summary, as contemplated by the Supreme Court in *Plumhoff*, Moody was a police officer "forced to make [a] split-second judgment[ ]—in circumstances that are tense, uncertain, and rapidly evolving."   134 S.Ct. at 2020.   Even if there is sufficient evidence to establish a constitutional violation in this case, under the qualified immunity holding of *Pace* the court must conclude that a reasonable officer would not have had fair warning that his actions violated constitutional law.   Summary judgment is due to be GRANTED as to the Fourth Amendment

---

6  The Plaintiff also cites *Arnold v. Bunn*, 565 F. App'x 812 (11th Cir. 2014), which is also factually distinguishable and decided after the events in question.

claim against Moody.

### B. State Law Claims

Having determined that summary judgment is due to be GRANTED as to the federal claim in this case, the court will decline to exercise supplemental jurisdiction over the state law claims. 28 U.S.C. §1367(c)(1),(3); *see also Pace*, 283 F.3d at 1284 at n.15 (stating that "[b]ecause Plaintiff's state law assault and battery claims present complex issues of state law, we direct the district court to dismiss the state law claims without prejudice.").

### V. CONCLUSION

For the reasons discussed, it is hereby ORDERED that the Motion for Summary Judgment (Doc. #88) is GRANTED as to the Plaintiff's federal claim, and that the court declines to exercise supplemental jurisdiction over the state law claims.

Done this 12th day of August, 2015.

/s/ W. Harold Albritton
W.   HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE